**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| CHICAGO TRANSIT AUTHORITY,<br><br>   Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION;<br><br>FEDERAL TRANSIT ADMINISTRATION; and<br><br>UNITED STATES OF AMERICA,<br><br>   Defendants. | Case No. _____<br><br>**COMPLAINT** |

1. This case arises from the federal government's attempts to hold hostage billions of dollars in federal grants for crucial infrastructure projects in the City of Chicago, in violation of the Administrative Procedure Act ("APA"), the constitutional separation of powers, and the Spending Clause.

2. Congress has declared it to be "in the interest of the United States … to foster the development and revitalization of public transportation systems" nationwide. 49 U.S.C. § 5301. To further that interest, Congress authorized the Department of Transportation ("DOT") to issue grants to state and local governments for projects aimed at expanding or increasing the capacity of urban transit systems. *See id.* § 5309. Once made, grants under this program are "obligate[d]" to the recipient. *Id.* § 5309(k)(2)(D)(i).

3. In line with this congressional directive, the Federal Transit Administration ("FTA"), a subagency within DOT, issued two grants obligating a total of $3.1 billion to the Chicago Transit Authority ("CTA") for projects to modernize and expand the "L," Chicago's world-famous system of elevated and underground trains. These vital projects—the Red and Purple Modernization Phase One Project (the "RPM Project") and the Red Line Extension Project (the "RLE Project")—will effectuate much-needed improvements to the capacity, efficiency, accessibility, and safety of two of the L's most-used train lines.

4. As a condition of receiving those grants, CTA was required, by both statute and DOT regulation, to set goals for participation by Disadvantaged Business Enterprises, or DBEs, in a portion of the subcontracts needed to carry out the RPM and RLE Projects. DBEs are defined as businesses owned and operated by individuals found to be socially and economically disadvantaged. For decades, DOT regulations have provided, at Congress's direction, that women and racial minorities were presumed to be socially and economically disadvantaged and that

1

businesses owned by women or racial minorities were presumed to qualify as DBEs. But recently, the Executive Branch concluded that those race- and gender-based presumptions are unconstitutional and announced it would not defend them in court.

5. The implications of that position on existing grant recipients—who are and were required by statute and regulation to comply with the DBE requirements in effect at the time—were not immediately clear.

6. Several months after the government announced its position on the unconstitutionality of these DBE presumptions, on September 30, 2025, DOT promulgated an interim final rule (the "IFR"), which DOT made effective immediately upon the IFR's publication in the Federal Register on October 3, 2025. The IFR amended the definition of DBEs to remove race- and gender-based preferences. And it required all of the nation's more than 41,000 DBE-certified firms to apply for recertification under those new standards.

7. For the vast majority of grants, DOT allowed funding to continue even while this recertification process occurred. With respect to CTA, however, DOT decided to apply the IFR retroactively. DOT immediately and unilaterally froze CTA's existing funding on the RPM and RLE Projects. And it did so based on CTA's past conduct in complying with the DBE regulations that existed at the time.

8. Specifically, the same day that the IFR took effect, DOT sent CTA two letters stating that, "[i]n conjunction with the issuance of the IFR," DOT was reviewing the RPM and RLE Projects "to ensure nondiscrimination in [DOT's] financial assistance programs." The federal government would therefore make "no further disbursements for the Program[s]" until that review concluded. A DOT press release issued the same day confirmed that these funding freezes constituted an effort "[t]o continue implementation of" the IFR. DOT also began requesting

information from CTA, purportedly to ensure that the grants were consistent with federal law.

9.      Of the hundreds of grants nationwide affected by the IFR's new DBE requirements, only four had their funding frozen under the IFR's authority: the two CTA grants at issue here, and two grants supporting transit infrastructure in New York City and New Jersey.

10.     The freeze of CTA's funding has now persisted for months, without any lawful justification.

11.     CTA responded fully to DOT's initial information requests in October 2025, affirming that it had complied with the IFR and that its contracting and employment policies were consistent with federal guidance. And in December 2025, DOT informed CTA that its review of the two grants was "complete[]" and that the funding would resume as soon as CTA certified its satisfaction of several enumerated conditions. CTA promptly did exactly as it was told.

12.     To no avail. More than two months later, the government has neither restored the funding, nor requested any additional information from CTA, nor identified any deficiencies in CTA's certifications. CTA therefore has no choice but to turn to this Court for relief.

13.     Defendants' actions are unlawful many times over. At the outset, Defendants' decision to apply the IFR retroactively to freeze CTA's grants is flatly arbitrary and capricious: Defendants' actions irrationally penalize CTA for having complied with its statutory and regulatory obligations to contract with DBE-certified firms under the then-applicable definition of that term. Defendants fail to explain why grants to the hundreds of other projects nationwide that likewise complied with those same obligations were not similarly frozen. Defendants ignore CTA's significant reliance interests in continued funding. And Defendants wholly fail to justify the continued freeze even after Defendants completed their "review" and CTA provided all of the requested assurances without qualification.

3

14. Defendants' actions were arbitrary and capricious for a separate reason: the freezes' purported justification—a desire to ensure nondiscrimination in DOT's funding programs—is pretextual, and the freeze was instead based on political retaliation. Indeed, in the days before and after Defendants froze CTA's funds, the Administration made clear its desire to single out for adverse treatment those jurisdictions and programs affiliated with leaders from a different political party. But it is arbitrary and capricious for an agency to base its decisionmaking on irrelevant factors like political animus.

15. Defendants' actions violated the APA in a litany of other ways too: The IFR violated the APA's notice-and-comment and delayed-effectiveness requirements. The freezes amount to an impermissible attempt to evade the detailed set of procedures for withholding federal funds based upon a finding of discriminatory practices set out in Title VI and its implementing regulations. And DOT lacks statutory authority to summarily and indefinitely freeze disbursements of funds that Congress has appropriated for—and the agency has obligated to—crucial infrastructure projects like CTA's.

16. Defendants' unlawful actions cause CTA irreparable harm in spades. With federal funding frozen, and notwithstanding the extraordinary measures CTA has taken over the last several months to carry on the RPM and RLE Projects, work on CTA's crucial infrastructure projects is set to grind to a halt unless this Court provides relief. Immediate relief is therefore necessary to avoid these irreparable harms.

## JURISDICTION AND VENUE

17. This action arises under the Administrative Procedure Act (APA), 5 U.S.C § 551 *et seq.*; the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 529 (2021); Title VI

of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* and its implementing regulations; and the United States Constitution.

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil suit arises under the Constitution of the United States and federal statutes, including 49 U.S.C. § 5309, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and Title VI of the Civil Rights Act of 1964, as amended, *see* 42 U.S.C. § 2000d-2.

19. CTA seeks an order declaring unlawful and setting aside agency policy, and action directed at CTA in furtherance of that policy, in violation of CTA's constitutional and statutory rights. Therefore, this Court has jurisdiction over CTA's claims.

20. Because this suit seeks relief other than money damages and instead challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit. 5 U.S.C. § 702.

21. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 703, 705, and 706; 42 U.S.C. § 1988; and through the equitable powers of this Court. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

22. Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, "a substantial part of the events or omissions giving rise to the claim[s] occurred" in this District, and CTA "resides" in this District.

23. CTA has standing to bring this case. Defendants' actions—unless halted by this Court—will cause imminent, concrete, and irreparable injury to CTA and its millions of riders. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

**PARTIES**

24. Plaintiff the Chicago Transit Authority is an independent Illinois municipal corporation created by state legislation that operates one of the nation's largest public transportation systems in Chicago and the surrounding suburbs.

25. Defendant United States Department of Transportation is a cabinet-level Department of the federal government. DOT is responsible for leading the nation's transportation systems. It is composed of the Office of the Secretary; the Office of the Inspector General; and ten Operating Administrations, including the Federal Transit Administration.

26. Defendant Federal Transit Administration is a subsidiary agency within DOT. It is tasked with supporting transit systems nationwide, including buses, subways, light rail, commuter rail, trolleys, and ferries through funding and technical assistance. It also oversees safety and conducts research on transit issues.

27. Defendant the United States of America is the federal government and sued pursuant to 5 U.S.C. § 702.

**STATUTORY AND REGULATORY FRAMEWORK**

**A.     Federal Investment in Public Transportation in Urban Areas**

28. Public transit constitutes critical infrastructure for modern American cities, simultaneously supporting economic vitality, equal opportunity, and environmental sustainability. Transit systems move millions of workers daily, enabling businesses to attract employees from across broad regions while providing car-free households with essential mobility. Economically, transit spurs development and increases property values near stations. Environmentally, mass transportation dramatically reduces per-capita emissions and combats urban sprawl. Socially, accessible public transit ensures that residents across income levels can reach employment,

education, and healthcare. Cities with robust transit networks consistently outperform their car-dependent counterparts in economic productivity, livability, and long-term fiscal sustainability.

29.     On average, approximately one million rides are taken on CTA daily, making it the second-largest public transportation system in the United States.

30.     Public transit is integral to Chicago's identity and economic vitality. The iconic "L" system in Chicago connects downtown's employment centers to neighborhoods across the city, enabling Chicagoans from all income levels to commute to their jobs in the Loop and beyond. Chicago's economy depends on this mobility: the city's major industries—finance, healthcare, education, and professional services—rely on transit to draw employees from throughout the metropolitan area. Transit also shapes Chicago's urban form, with higher-density, transit-oriented neighborhoods along rail lines supporting local businesses and reducing automobile dependence. For a city that spans over 234 square miles and serves as a regional economic hub, public transportation isn't merely convenient—it is essential infrastructure that keeps Chicago functioning, competitive, and accessible.

31.     For decades, CTA has worked with the federal government to make needed improvements to Chicago's public transportation system.

32.     This case involves one facet of that working relationship: "[f]ixed guideway capital investment grants" issued by the FTA to CTA pursuant to 49 U.S.C. § 5309. Fixed guideways include subway and train lines like those operated by CTA.

33.     Section 5309 of Title 49 provides a process for state and local government to apply for grants to complete a variety of transportation projects, including, as relevant here, "core capacity improvement project[s]" ("CCIPs") and "new fixed guideway capital project[s]" ("NFGCPs"). 49 U.S.C. § 5309(d), (e). A CCIP is a project that increases the capacity of an

existing fixed guideway by at least 10%. *See id.* § 5309(a)(2). An NFGCP is a project that either creates a new operable fixed guideway or extends the reach of an existing fixed guideway system. *See id.* § 5309(a)(5)(A). Both types of projects are eligible to receive government funding via full funding grant agreements, or FFGAs. *See id.* § 5309(k)(2)(A).

34.     Under § 5309, grant applicants must undergo a robust application process to qualify for an FFGA for either a CCIP or an NFGCP. Projects are divided into three phases: (1) the project development phase, (2) the engineering phase, and (3) the construction phase.

35.     The project development phase requires the applicant to provide information to DOT to justify the new project and to demonstrate that the applicant has sufficient local financial commitment to finance the non-federally funded portion of the project's completion costs. *See* 49 U.S.C. § 5309(d)(1), (e)(1). Projects are also subject to an analysis under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq*.

36.     CCIPs and NFGCPs are allowed to advance to the engineering phase only after meeting certain requirements, including a finding by the Secretary of Transportation that the project

> is justified based on a comprehensive review of the project's mobility improvements, the project's environmental benefits, congestion relief associated with the project, economic development effects associated with the project, policies and land use patterns of the project that support public transportation, and the project's cost-effectiveness as measured by cost per rider.

49 U.S.C. § 5309(d)(2)(A)(iii) (NFGCPs); *see id.* § 5309(e)(2)(A)(iv) (similar requirement for CCIPs). The Secretary also must determine that the project is "supported by an acceptable degree of local financial commitment" to satisfy the non-federally funded costs for the project to advance. *Id.* § 5309(d)(2)(A)(iv) (NFGCPs); *id.* § 5309(e)(2)(A)(v) (same requirement for CCIPs).

37.     An NFGCP or CCIP must then undergo further evaluation before it can transition from the engineering phase to the construction phase. The construction phase commences when the Secretary determines that the project meets all requirements of § 5309 and applicable guidance and that the project is reasonably likely to remain in compliance with those requirements. *See id.* § 5309(g)(1)(A)-(B).

38.     An NFGCP or CCIP that is approved to move forward to the construction phase is required to "be carried out through a full funding grant agreement." *Id.* § 5309(k)(2)(A). The purpose of an FFGA is to "establish the terms of participation by the Government" in the approved NFGCP or CCIP, as well as to "establish the maximum amount of Federal financial assistance for the project." *Id.* § 5309(k)(2)(C)(i)-(ii). As a practical matter, an FFGA "obligates an amount of available budget authority specified in law" to the recipient project. *Id.* § 5309(k)(2)(D)(i).

39.     Once an FFGA is approved and funds are "obligate[d]" to a project, *id.*, the statute provides that any such "amount[s] made available or appropriated for a[n] [NFGCP] or [CCIP] shall remain available to that project for 4 fiscal years, including the fiscal year in which the amount is made available or appropriated." 49 U.S.C. § 5309(n).

**B.     DBE Contracting Requirements**

40.     Since 1983, Congress has required recipients of DOT funds to implement a Disadvantaged Business Enterprise (DBE) program.[1] These statutes are implemented by Title 49 C.F.R. part 26. *See* 49 C.F.R. § 26.1.

41.     Recipients of FTA funding are required to establish overall annual DBE goals in accordance with 49 C.F.R. § 26.45.

---

[1] *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100 (1983).

42.     Regulations require recipients to set their overall DBE goals using a two-step process: first, they must establish a "base figure for the relative availability" of DBEs in their market; and second, they must adjust that base figure based on evidence that includes the current capacity of DBEs to perform work, past participation levels, and barriers to participation identified in disparity studies or other sources. 49 C.F.R. § 26.45(c)-(d).

43.     Each state has a certifying entity, known as a Unified Certification Program ("UCP"), responsible for certifying applicant firms as DBEs. In Illinois, as in most states, the UCP is located within the State Department of Transportation.

44.     Under the regulations in effect at the time CTA pursued federal funding for the projects at issue in this case, a DBE was defined as a for-profit small business concern owned at least 51% by one or more socially and economically disadvantaged individuals and whose management and daily operations are controlled by such individuals. 49 C.F.R. § 26.5 (effective through October 2, 2025).

45.     These regulations included rebuttable presumptions that members of certain groups—including Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and women—were socially and economically disadvantaged. 49 C.F.R. § 26.67(a) (effective through October 2, 2025).

46.     The rebuttable presumptions were included in the DBE program at Congress's direction. Race-based presumptions have been included in the program for the entirety of its tenure,[2] and the program has included gender-based presumptions for almost as long.[3]

---

[2] *See supra* note 1 (defining "socially and economically disadvantaged individuals" as in section 8(d) of the Small Business Act, 15 U.S.C. § 637(d) (as amended by Pub. L. No. 95-507, § 211(d)(1), 92 Stat. 1757, 1767 (1978)).

[3] *See, e.g.*, *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 922 F.2d 419, 423 (7th Cir. 1991) (detailing the addition of the gender-based presumption in 1987).

47.     For projects receiving FFGAs under the FTA's Capital Investment Grants program, before an agreement is executed, the recipient must demonstrate compliance with all civil rights requirements, including maintaining an approved DBE program.[4]

**C.     Suspension and Termination of Federal Financial Assistance Under Title VI and DOT Regulations**

48.     Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI permits an agency, under detailed conditions, to enforce this substantive provision by terminating or suspending federal financial assistance.

49.     Title VI is Spending Clause legislation, *see Barnes v. Gorman*, 536 U.S. 181, 185-86 (2002), which means that it imposes obligations on funding recipients as a condition of receiving those funds, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Accordingly, Title VI funding recipients must be given "clear notice" of their legal obligations in order to be held liable for violating them. 451 U.S. at 25. And "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

50.     If an agency, including DOT, wishes to freeze federal funds to a recipient based on alleged civil rights violations under Title VI, it must follow a detailed and mandatory statutory framework. *Alexander v. Sandoval*, 532 U.S. 275, 289-90 (2001) (describing Title VI's procedural limits as "elaborate restrictions on agency enforcement").

---

[4] *See Full-Funding Grant Agreements Guidance*, FTA Circular 5200.1A, FTA, https://perma.cc/8GSB-GNU5 (last updated Feb. 27, 2020).

11

51. By statute, "the department or agency concerned" must "advise[] the appropriate person or persons of the failure to comply with the requirement" and must "ha[ve] determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1.

52. If, but only if, the agency determines that compliance cannot be secured by voluntary means, the agency may terminate or refuse to grant or to continue federal financial assistance, but only after initiating a hearing and making certain express findings on the record. *Id.* § 2000d-1. The agency head must file "a full written report of the circumstances and the grounds for such action" with the relevant committees in the House and Senate. *Id.* § 2000d-1. Further, the action does not "become effective until thirty days have elapsed after the filing of such report." *Id.*

53. DOT regulations mirror these steps and specify a detailed process for DOT to suspend or terminate grants to federally assisted programs for violations of Title VI.

54. DOT regulations first require that the Secretary seek to obtain voluntary compliance "to the fullest extent practicable" before suspending or terminating a grant. 49 C.F.R. § 21.9(a).

55. The Secretary is also required to investigate alleged noncompliance and make findings before taking action against a grant recipient. *Id.* § 21.11. Any investigation should include "a review of the pertinent practices and policies of the recipient, [and] the circumstances under which the possible noncompliance" occurred. *Id.* § 21.11(c). If the investigation determines that a violation has occurred, the Secretary must "inform the recipient" and attempt to "resolve[] [the noncompliance] by informal means whenever possible." *Id.* § 21.11(d).

56. If noncompliance cannot be resolved through informal means, the Secretary may commence a formal process to terminate the grant. Any order suspending, terminating, or refusing to continue federal financial assistance is not effective until:

(1) The Secretary has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means; (2) There has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part; (3) The action has been approved by the Secretary pursuant to § 21.17(e); and (4) The expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.

*Id.* § 21.13(c).

57. DOT regulations also provide that any hearing pursuant to § 21.13(c) be preceded by a notice to the grant recipient advising them of "the action proposed to be taken, the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for this action." *Id.* § 21.15(a). Recipients have the right to be represented by counsel at a hearing. *Id.* § 21.15(c). And parties at the hearing "shall be entitled to introduce all relevant evidence on the issues." *Id.* § 21.15(d)(1).

58. Following any hearing, DOT regulations require the hearing officer to issue a decision that "set[s] forth [a] ruling on each finding, conclusion, or exception presented." *Id.* § 21.17(d).

59. In addition, any action to suspend or terminate a grant "shall be limited to the particular political entity … as to whom" a finding of noncompliance has been made following an investigation. *Id.* § 21.13(c).

60. DOT regulations also limit the extent to which the Secretary may take other actions to achieve compliance. The Secretary may only take action to effect compliance by other means authorized by law if:

(1) The Secretary has determined that compliance cannot be secured by voluntary means; (2) The recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance; and (3) The expiration of at least 10 days from the mailing of such notice to the recipient or other person. During this period of at least 10 days, additional efforts shall be made to persuade the recipient or other

13

person to comply with the regulation and to take such corrective action as may be appropriate.

*Id.* § 21.13(d).

61. The regulatory scheme also entitles recipients of DOT funding to seek judicial review under 42 U.S.C. § 2000d-2, which governs judicial review of administrative actions taken to enforce Title VI. *See* 49 C.F.R. § 21.19.

62. Apart from Title VI, DOT also must comply with general regulations regarding Federal financial assistance. *See* 2 C.F.R. part 200; 2 C.F.R. § 1201.1. Among other requirements, those regulations limit the circumstances when funding may be withheld; provide for appeal rights of any withholding or suspension; and require prompt payment to funding recipients. *See* 2 C.F.R. §§ 200.305, 339, 342.

## FACTUAL BACKGROUND

**A.    CTA**

63. CTA operates the nation's second-largest public transportation system, a regional transit system that serves 3.4 million people across the City of Chicago and 35 surrounding suburbs. On an average weekday, a million or more rides are taken on CTA.[5]

64. CTA's system is anchored by the "L" (elevated train) rapid transit system.

65. The L system comprises eight color-coded rail lines—Red, Blue, Brown, Orange, Green, Pink, Purple, and Yellow—that collectively span over 224.1 miles of track and serve 146 stations across Chicago and nearby suburbs.[6]

---

[5] *Facts at a Glance*, CTA (updated Mar. 2026), https://www.transitchicago.com/facts/; *Monthly Ridership Report: November 2025*, CTA (Dec. 10, 2025), https://www.transitchicago.com/assets/1/6/Monthly_Ridership_2025-11.pdf.
[6] *Facts at a Glance*, *supra* note 5.

66.     The Red and Blue Lines form the backbone of the system, operating 24 hours a day and connecting the city's North, South, and West Sides through downtown's Loop, where converging elevated tracks encircle the central business district and give the area its name.



67.     The Brown, Orange, Green, Pink, and Purple Lines provide crucial connections between neighborhoods and downtown during peak hours, while the Yellow Line (Skokie Swift) serves Chicago's northern suburbs.

68. Together, these lines move around 500,000 riders on an average weekday, with the Red Line alone carrying over 100,000 passengers on an average weekday.[7]

**B. The Red and Purple Modernization Phase One Project.**

69. CTA has undertaken two major initiatives to revitalize and extend the L relevant to this litigation.

70. The first is the Red and Purple Modernization Phase One project ("RPM Project"), which aims to rebuild a portion of those lines' century-old track structure and stations north of Belmont. It is the second-largest capital project in CTA history, consisting of a new bypass structure just north of the Belmont station; a complete rebuild of the Lawrence, Argyle, Berwyn and Bryn Mawr stations; and the installation of a new signal system between Howard and Belmont.[8] Once fully realized, the RPM Project will increase passenger capacity, reduce travel times, improve access to job markets and destinations, and provide improved access to individuals with disabilities.[9]

71. The RPM Project is funded through a combination of local and federal funds. In 2017, the DOT approved an FFGA (the "RPM FFGA") for the RPM Project, obligating more than $1 billion in federal funds for the project.[10] That included approximately $956.6 million in Core Capacity funds—because the RPM Project is a CCIP—and approximately $125 million in Congestion Mitigation and Air Quality ("CMAQ") Improvement funds.

---

[7] *Id.*; *Annual Ridership Report: Calendar Year 2024*, CTA (Jan. 22, 2025), https://perma.cc/DB69-W2AQ.
[8] *About the RPM Phase One Project*, CTA, https://www.transitchicago.com/rpm/about/ (last visited Mar. 20, 2026).
[9] *Frequently Asked Questions*, CTA, https://www.transitchicago.com/rpm/faq/ (last visited Mar. 20, 2026).
[10] *See* Full Funding Grant Agreement, Chicago Transit Authority – Red and Purple Modernization Phase One Project, IL-2017-002-00 (the "RPM FFGA") (attached as **Exhibit C**).

72.     CTA broke ground on Phase One of the RPM Project in October 2019, starting with the Red-Purple Bypass. In December 2019, CTA began pre-stage preparatory trackwork for the Lawrence to Bryn Mawr corridor, ahead of new station and track construction starting in 2021.

73.     As of January 31, 2025, the RPM Project has already created approximately 3,000 construction trade labor jobs.

74.     The RPM project reached a major milestone in July 2025, opening four new, 100%-accessible Red Line stations that replaced century-old stations.

75.     Work on the RPM remains ongoing. Remaining work on the project includes decommissioning CTA's old Addison signal house and removing it; completing work list items; correcting nonconforming work items such as deficiencies in station drainage systems; installing under 'L' activation between Lawrence and Ardmore; finalizing documentation and certifications regarding various safety and security issues; completing various civil restoration projects; and making miscellaneous site improvements. Until that work is complete, some areas of work, including aspects of the signal system, have operating restrictions to maintain safety and prevent failures while the work is completed.

C.     **The Red Line Extension Project**

76.     The second major CTA project relevant to this litigation is the Red Line Extension project ("RLE Project"). The RLE Project will add 5.5 miles of new track and four stations to the Red Line on Chicago's southern border. It is the first CTA rail transit extension in Chicago in 30 years and, once complete, will serve roughly 100,000 people, most of whom are from low-income households on Chicago's South Side. Approximately 24% of residents in the RLE Project corridor live below the poverty level and 25% travel over 60 minutes to their jobs, exceeding citywide

averages.[11] The RLE Project will provide up to 30 minutes' worth of time savings to riders traveling from the future end station to the Loop and bring a substantial increase in newly accessible jobs within an hour's commute for those traveling from the RLE Project area.[12]

77.     The RLE Project is expected to generate $4.4 billion in economic activity in Cook County, Illinois, during the construction phase.[13] The RLE Project is estimated to directly create roughly 12,500 construction and construction related jobs and indirectly create 59,800 jobs in local communities.

78.     On January 10, 2025, FTA and CTA executed an FFGA contractually obligating FTA to provide $1.97 billion in funds for the RLE Project as an NFGCP.[14] *See* 49 C.F.R. § 611.105; 49 U.S.C. § 5309(c), (d). Additionally, the federal commitment includes $130 million in CMAQ and CRP funds, and $2 million in Housing and Urban Development ("HUD") and Area of Persistent Poverty ("AOPP") federal funds.

79.     FTA approved this FFGA after determining that CTA had satisfied all applicable requirements, including compliance with DBE program requirements under 49 C.F.R. Part 26.[15]

---

[11] Press Release, FTA, *Investing in America: Biden-Harris Administration Announces Close to $2 Billion Construction Grant to Advance the Chicago Transit Authority's Red Line Extension Project* (Jan. 10, 2025), https://perma.cc/MMV9-HSGD.

[12] *Red Line Extension Project: Connecting 95th/Dan Ryan to 130th Street*, CTA (updated Jan. 2025), https://www.transitchicago.com/assets/1/6/REF_20250313_RLE-benefits-flyer_Rev01_(1).pdf.

[13] *See* Press Release, Dick Durbin, *Durbin, Duckworth, Chicago Delegation Announce $1.9 Billion Funding Agreement with FTA to Support Chicago's Red Line Extension Project* (Dec. 18, 2024), https://perma.cc/MH6U-JUR4.

[14] *See* Full Funding Grant Agreement, Chicago Transit Authority – Red Line Extension Project, IL-2025-001-00 (the "RLE FFGA") (attached as **Exhibit D**); *see* Press Release, Off. of the Mayor, City of Chi., *Mayor Brandon Johnson, Federal Transit Administration and the Chicago Transit Authority Announce Finalization of the $1.9 Billion Funding for Transformational Red Line Extension Project* (Jan. 10, 2025), https://perma.cc/PEL6-E6PK.

[15] *See Red Line Extension New Starts Project - Chicago, Illinois*, FTA (Jan. 2025), https://www.transit.dot.gov/sites/fta.dot.gov/files/2025-01/IL-Chicago-Red-Line-Extension-FFGA-Profile-FY26-01-16-2025_0.pdf.

80. In late 2024, CTA began advance work for the extension, including demolition, utility relocation, and soil boring work. CTA is currently finalizing the design of the structural components of fixed guideways, and expects to begin field work on approximately April 6, 2026. Additional on-site activity will follow, as CTA completes the design of other key elements

**D. CTA's Compliance With 49 C.F.R. Part 26 Regulations Governing DBEs**

81. CTA maintains a DBE Program Plan in conformance with 49 C.F.R. Part 26.[16]

82. All contracts awarded by CTA for the RPM and RLE Projects complied with the DBE requirements in 49 C.F.R. Part 26 as those requirements existed at the time of contract award and FFGA execution.

83. In accordance with 49 C.F.R. Part 26.45, CTA established and submitted to FTA a 20% DBE goal for the RPM Project, and a 21% overall DBE goal for the capital project program (including the RLE Project) for fiscal years 2025 through 2027.[17] For the RLE project specifically, CTA set a DBE goal of 25% for design and 22% for construction. These goals applied to all CTA contracts utilizing federal funding during this period for the RPM and RLE Projects, in accordance with federal law.[18]

**E. The Interim Final Rule**

84. On September 30, 2025, DOT announced the IFR, eliminating from DBE program regulations the decades-old race- and gender- based presumptions of social and economic disadvantage. It did so "pursuant to legal determinations by DOT and DOJ that the race- and sex-based presumptions previously embedded in these programs are unconstitutional." Disadvantaged

---

[16] *See Disadvantaged Business Enterprise Program*, CTA (June 28, 2023), https://perma.cc/5RK5-VAXU.
[17] *See* Press Release, U.S. Dep't of Transp., *U.S. Department of Transportation Statement on Review of Chicago's Discriminatory, Unconstitutional Processes* (Oct. 3, 2025) (attached as **Exhibit E**), https://perma.cc/XB7G-MLQG; *Disadvantaged Business Enterprise Program*, CTA (Feb. 11, 2019), https://perma.cc/7NJJ-2ND7.
[18] *Id*.

Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications, 90 Fed. Reg. 47,969, 47,974 (Oct. 3, 2025). The IFR was rooted in DOT's view of applicable constitutional principles as well as Title VI. *Id.* at 47,979. The IFR replaced the prior definition of "socially and economically disadvantaged" with a new framework for how contracting firms will be evaluated going forward, requiring the re-examination of all existing certifications.

85. DOT's shift in position was foreshadowed by its stipulation in an ongoing case in U.S. District Court for the Eastern District of Kentucky that, in the government's view, "the DBE program's use of race- and sex-based presumptions of social and economic disadvantage…. violates" the Constitution.[19] On June 25, 2025, the U.S. Solicitor General advised the Speaker of the House that, because Department of Justice ("DOJ") had concluded the presumptions violated the Constitution, DOJ would not defend the current DBE regulations in any litigation.[20]

86. The IFR was issued without notice and comment.[21] DOT stated in the IFR that "providing advance notice and an opportunity to comment" was "impracticable and contrary to the public interest" because the continuance of race- and gender- based presumptions in DOT's regulations—notwithstanding the months' long delay after DOJ and DOT's public statements about the constitutionality of DBE presumptions in June 2025—was too "confusing and contradictory" to "continue" during the notice and comment process.[22]

87. Invoking "good cause" under 5 U.S.C. § 553(d)(3) for these same reasons, DOT also made the rule effective upon its publication date of October 3, 2025, evading the normal

---

[19] 90 Fed. Reg. at 47,971 & n.7 (quoting Joint Motion for Entry of Consent Order, *Mid-America Milling Co. v. U.S. Dep't of Transp.*, No. 3:23-cv-00072 (E.D. Ky. May 28, 2025)).

[20] *Id.* (citing Letter from Solicitor General D. John Sauer, to Hon. Mike Johnson (June 25, 2025), https://www.justice.gov/oip/media/1404871/dl?inline).

[21] 90 Fed Reg. at 47,974.

[22] *Id.*; *see also* 5 U.S.C. § 553(b), (b)(B).

requirement that rules go into effect 30 or more days following their publication in the Federal Register.[23]

88.     The changes made by the IFR are three-fold:

a.     First, the IFR amends the definition of "socially and economically disadvantaged" to state that "[a]ll applicants must demonstrate social and economic disadvantage (SED) affirmatively based on their own experiences and circumstances within American society, and without regard to race or sex." 49 C.F.R. § 26.67 (effective Oct. 3, 2025); *see also* 90 Fed. Reg. at 47,971-72, 47,981.

b.     Second, to demonstrate that they satisfy this new definition, business owner applicants must provide, and UCPs must evaluate, a "Personal Narrative" establishing "the existence of disadvantage by a preponderance of the evidence based on individualized proof regarding specific instances of economic hardship, systemic barriers, and denied opportunities" that "impeded the owner's progress or success" and "how and to what extent the impediments caused the owner economic harm"; applicants also "must establish the owner is economically disadvantaged in fact relative to similarly situated non-disadvantaged individuals." 49 C.F.R. § 26.67(a) (effective Oct. 3, 2025); *see also* 90 Fed. Reg. at 47,972, 47,976.

c.     Third, the IFR requires all UCPs to reevaluate any currently certified DBEs according to the new standards and to decertify any that fail to meet the new standards or fail to provide required additional information—*i.e.*, the personal narrative. 90 Fed. Reg at 47,972; *see also* 49 C.F.R. § 26.111 (effective Oct. 3, 2025). The IFR expressly states, however, that this recertification process "does not replace or restrict the Department's ability to conduct a review or

---

[23] 90 Fed Reg. at 47,974; *see also* 5 U.S.C. § 553(d).

take action under Title VI or other applicable law regarding compliance with equal protection principles." 90 Fed. Reg. at 47,973.

89.     The IFR's new DBE standard applies both retroactively to all previously certified DBEs, as well as prospectively to new firms applying for DBE certification.

90.     Until the reevaluation and recertification process mandated by the IFR is complete, agencies, such as CTA, may not set any contract goals, and participation by any DBE certified under the old rules may not count towards any project's goals. 90 Fed. Reg. at 47,972.

91.     DOT estimated in the IFR that, under this rule, approximately 41,000 firms—all those currently DBE certified, less 10% that DOT anticipated would not apply for recertification—will seek recertification to maintain their DBE status. 90 Fed. Reg. at 47,976-77. It further estimated that these firms will incur, together, $91.9 million in costs and that the required UCP certification reevaluations will incur an additional $3.4 million in costs. 90 Fed. Reg. at 47,975.

92.     The reevaluation and recertification process contemplated by the IFR is one that proceeds firm by firm, not project by project. Any given DOT-funded project may contract with dozens or even hundreds of DBEs.

**F.      Defendants' Unlawful Pause of CTA's Project Funding**

93.     Despite the large number of active state infrastructure projects that have received DOT funding contingent on their maintenance of DBE programs in compliance with the old DBE standards, Defendants have chosen to freeze only a small subset of these grants—namely, four grants for public transportation improvement projects in Chicago and in New York City.

94.     On October 2, 2025—the second day of a government shutdown following a lapse in appropriations—President Trump stated, "I have a meeting today with Russ Vought, he of

22

PROJECT 2025 Fame, to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut."[24]

95. The following day, on October 3, 2025, and the same day the IFR became effective, Director Vought announced the freeze on X, writing that "$2.1 billion in Chicago infrastructure projects—specifically the Red Line Extension and the Red and Purple Modernization Project—have been put on hold" and describing the hold as necessary "to ensure funding is not flowing via race-based contracting."[25] Director Vought also noted that "[m]ore info" would "come soon" from DOT.[26]

96. On the same day as Director Vought's announcement on X and the same day the IFR became effective, DOT sent two letters to CTA (the "Freeze Letters").[27] Both letters began the same way: by noting that on September 30, DOT issued the aforementioned IFR "which removes race- and sex-based presumptions of social and economic disadvantage" from its DBE program. *Id.* Both letters then stated that "[i]n conjunction with the issuance of the IFR," DOT "is reviewing the projects it funds to ensure nondiscrimination in its financial assistance programs." *Id.* The review purportedly sought to ensure compliance with several nondiscrimination laws, "including Title VI of the Civil Rights Act." *Id.*

97. The Freeze Letters informed CTA that this review applies to the RLE and RPM Projects, and that while the review is ongoing, "no further disbursements" for either program "will be made." *Id.*

---

[24] President Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 2, 2025, 7:59 AM), https://truthsocial.com/@realDonaldTrump/posts/115304455138824245.
[25] Russ Vought (@russvought), X (Oct. 3, 2025, 7:26 AM), https://perma.cc/B72H-SN28.
[26] *Id*.
[27] Letter from FTA Administrator Marcus J. Molinaro to CTA Acting President Nora Leerhsen regarding RPM Project (Oct. 3, 2025) (attached as **Exhibit A**); Letter from FTA Administrator Marcus J. Molinaro to CTA Acting President Nora Leerhsen regarding RLE Project (Oct. 3, 2025) (attached as **Exhibit B**).

98.     The federal government froze transit funding in New York on the same day it did so in Chicago. *See New Jersey v. U.S. Dep't of Transp.*, No. 26-cv-939, 2026 WL 323341 (S.D.N.Y. Feb. 6, 2026) (temporarily enjoining the government's unlawful suspension of such funding), *appeal docketed*, No. 26-282 (2d Cir. Feb. 9, 2026).

99.     As promised by Director Vought, DOT promptly issued a press release titled *U.S. Department of Transportation Statement on Review of Chicago's Discriminatory, Unconstitutional Processes*.[28] This release stated that "[t]o continue implementation" of the IFR, DOT sent the two aforementioned Freeze Letters to CTA to inform it that both projects were "under administrative review," linking the funding freezes in Chicago to reviews of projects in New York City.[29] "Illinois, like New York," the press release continued, "is well known to promote race- and sex-based contracting and other racial preferences as a public policy."[30]

100.    The press release, however, made clear that the "[d]iscriminatory, [u]nconstitutional [p]rocesses" in question were, in fact, basic steps CTA took to comply with federal DBE law as it existed at the time that the money was awarded. The press release's "source" for the apparent violations of law was a news article on the RPM Project that notes that "21% of [CTA's] spending on the Red-Purple Modernization has so far gone to DBE firms – some 119 companies in total."[31]

101.    Defendants did not follow the processes mandated by statute or their own regulations before suspending CTA's FFGAs. For example:

a.      DOT did not conduct a full investigation of any alleged noncompliance, inform CTA, or seek to obtain CTA's voluntary compliance.

---

[28] Ex. E.
[29] *Id*.
[30] *Id*.
[31] *Id*.

b.  DOT did not, after concluding that compliance could not be obtained voluntarily, give CTA notice or the opportunity for a hearing at which it had a right to counsel and to present evidence.

c.  DOT did not, after such a hearing, make an express finding on the record and file written reports with the committees of the House and the Senate with legislative jurisdiction over the relevant project.

102.  Instead, CTA's obligated funds were summarily frozen pursuant to a newly announced IFR and policy change, with no investigation, no notice, no explanation, no opportunity to remedy whatever alleged faults in compliance might exist, no hearing, and no record.

103.  Prior to the funding freezes, FTA typically provided reimbursement the next business day if the invoice was submitted before 2:00 p.m. EST, and within two business days if it was submitted after 2:00 p.m. EST.

104.  On October 6 and 13, 2025, CTA submitted two reimbursement requests under the FFGAs for the RPM—one for $9.5 million and another for just over $6,000. On October 9, 2025, CTA received an email from FTA stating that "[p]er the communication [of] 10/3/2025, those projects are under review, which is temporarily affecting disbursements."

105.  On approximately February 3, 2026, CTA became aware of a message in the ECHO system suspending funds for the RPM and RLE, meaning it no longer has the ability to submit additional reimbursement requests. CTA did not receive any notice of this change in status.

**G.      DOT's Administrative Review and Subsequent Statements.**

106.     Immediately after effectuating the funding pause, DOT initiated a purported administrative review of the RPM and RLE Projects. CTA promptly complied with every one of DOT's requests and cooperated fully. Although the "review" is now complete, the freeze remains in effect, with no further comment by the government.

107.     On October 7, 2025, DOT submitted formal information requests to CTA, purportedly "to ensure that disbursements for the Program[s] are consistent with" federal law.[32] Those requests sought responses within 14 calendar days.

108.     Pursuant to an agreed-upon extension, CTA responded in full on October 21, 2025, providing extensive information.[33] In its responses, CTA affirmed that it has "taken immediate steps to comply with the requirements of the [IFR]" and that its "contracting and employment policies and practices are based upon federal non-discrimination and [DBE] Program requirements and guidance." *Id*.

109.     On December 1, 2025, DOT notified CTA that it "has completed its initial civil rights administrative review" of both Projects.[34] In those letters, DOT pledged "to resume funding

---

[32] Letter from FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams to CTA Acting President Nora Leerhsen regarding Administrative Review of Red and Purple Modernization Program (Oct. 7, 2025) (attached as **Exhibit F**); Letter from FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams to CTA Acting President Nora Leerhsen regarding Administrative Review of Red Line Extension Project (Oct. 7, 2025) (attached as **Exhibit G**).

[33] Letter from CTA Acting President Nora Leerhsen to FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams regarding Administrative Review of Red and Purple Modernization Program (Oct. 21, 2025) (attached as **Exhibit H**); Letter from CTA Acting President Nora Leerhsen to FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams regarding Administrative Review of Red Line Extension Project (Oct. 21, 2025) (attached as **Exhibit I**). Exhibits H and I each contain sub-exhibits. Sub-exhibit 5 has been omitted from each Exhibit for file size and confidentiality reasons.

[34] Letter from FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams to CTA Acting President Nora Leerhsen regarding Administrative Review of Red and Purple Modernization Program (Dec. 1, 2025) (attached as **Exhibit J**); Letter from FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams to CTA Acting President Nora Leerhsen regarding Administrative Review of Red Line Extension Project (Dec. 1, 2025) (attached as **Exhibit K**).

disbursements for the Program[s], provided [the] CTA certifies in writing within 30 days … that it accepts and will fulfill" specific "conditions identified in th[e] letter[s]." *Id.* (confirming that "DOT will notify [the] CTA whether any other deficiencies need to be addressed before DOT resumes disbursements").

110.    For the RPM Project, those specific conditions were certifying that:

(1) there is no outstanding work on the RPM Program for which new contracts will be let;

(2) no DBE goals are currently being or will be enforced going forward in connection with the RPM Program;

(3) CTA has ceased the solicitation, collection, or use of any Diversity Outreach Plans from bidders or contractors in connection with the RPM Program; and

(4) CTA has rescinded or canceled any requirements it (or its prime contractors) placed on contractors or subcontractors mandating that dollars disbursed for the RPM Program be managed or utilized in a way that considers race, sex, ethnicity, or national origin, including any requirements to use Minority-Owned Deposit Institutions (MDIs) or Community Banks for the deposit of funds awarded under any DOT-assisted contract.

Ex. J at 2.

111.    For the RLE Project, those specific conditions were:

1. CTA shall immediately cease the solicitation, collection, or use of any Diversity Outreach Plans from bidders or contractors.

2. CTA shall work in concert with other members of the Illinois Unified Certification Program (UCP) to develop a comprehensive timeline for completing the required DBE reevaluation process described in 49 CFR 26.111 and shall provide that timeline within 30 days of receipt of this letter to the Department.

3. To the extent any previously certified DBE contractor that has performed or continues to perform work under a Project contract or subcontract fails to retain its DBE certification after the UCP completes the process described in 49 CFR 26.111, CTA shall take all necessary actions within 60 days of the completion of the reevaluation process to ensure that all such contracts and subcontracts for the Project come into compliance with 49 CFR part 26, as amended by the Department's DBE IFR.

Ex. K at 2.

112. CTA provided all certifications and necessary information on December 10, 2025.[35]

113. DOT has not contacted CTA concerning its certification since: It did not seek additional information, identify deficiencies, or assert that CTA's certification was inadequate. The administrative review is apparently complete, compliance has been confirmed, but funding has not been restored.

## H. The Immediate and Irreparable Harm to CTA and Its Customers

114. Defendants' unlawful pause on CTA's funding is already causing immediate and irreparable harm. Absent federal reimbursement, CTA cannot afford to pay its liabilities to its contractors and vendors that continue to accrue.

115. During the period when funding has been frozen, CTA has undertaken extraordinary measures to enable work to continue despite the absence of federal funding. That includes issuing new bonds, extending lines of credit, and incurring non-recoverable costs as a result. The interim flexibility afforded by these financial measures will imminently be exhausted, and CTA does not have the ability to continue funding the RPM and RLE Projects from its own funding without the assurance of federal reimbursement. CTA engaged in these interim measures in a good-faith effort to provide Defendants an opportunity to fulfill their pledge, that they would resume funding once CTA certified compliance with the relevant conditions. Despite that certification, CTA's federal funding remains frozen, and CTA's interim measures are nearly exhausted and otherwise not sufficient to completely fund the Projects.

---

[35] Letter from CTA Acting President Nora Leerhsen to FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams regarding Administrative Review of Red and Purple Modernization Program (Dec. 10, 2025) (attached as **Exhibit L**); Letter from CTA Acting President Nora Leerhsen to FTA Departmental Office of Civil Rights Acting Deputy Director Angela Williams regarding Administrative Review of Red Line Extension Project (Dec. 10, 2025) (also providing detailed outline of compliance steps) (attached as **Exhibit M**).

116. If the promised federal funds remain frozen, CTA will have no choice but to halt work on the RPM and RLE Projects and initiate a necessary demobilization process no later than March 27, 2026, in order to complete demobilization before all funding is exhausted.

117. Demobilization involves significant steps to ensure that all project work is safely wound down, including relocating heavy equipment, securing worksites, and undertaking a range of actions before work may be completely stopped.

118. Accordingly, CTA will need to issue notices to affected employees and contractors no later than March 27, 2026. Notices will inform employees that their work will be suspended or terminated and direct certain employees and contractors to undertake demobilization efforts.

119. Demobilization must be completed by April 10, 2026, to ensure that CTA has adequate funding to pay for that work. Further, if notice is provided on March 27, 2026, the heavy equipment and machinery associated with the significant drilling and boring work currently scheduled to commence on April 6, 2026, will not be procured or moved into place. That work will not commence as scheduled, causing significant overall delays to the RLE Project.

120. Demobilization and work stoppages will lead to a cascade of negative consequences affecting CTA, its ridership, and the greater Chicago area. Among others: Hundreds of people will soon be out of work, and thousands of future jobs will be jeopardized, if not eliminated. Leaving the Projects unfinished will require that speed restrictions on the Red and Purple Lines remain in effect for longer than planned, passing along costs to commuters in time and inconvenience and irreparably harming CTA's reputation and goodwill. CTA and its contractors will also incur unrecoverable costs. Specifically, in advance of the stoppages, CTA will bear the costs of demobilizing and redeploying equipment, and resuming work *after* any stoppage would involve additional restart costs that would not otherwise need to be incurred. Additionally, because both

29

of CTA's FFGA's contain dates by which work must be completed, prolonged stoppages could cause CTA to default on its grant obligations, which the government may assert authorizes it to terminate the grants entirely. Prolonged stoppages also risk cancellation of *other* grants to CTA, many of which are contingent on the existence of federal funding—possibly requiring cancellation of the RLE Project.

121. The result will be irreparable harm not only to CTA, but to the people of the City of Chicago and the surrounding suburbs. Thousands of construction jobs will be threatened. Hundreds of thousands of commuters will endure needless delays. And those Chicago residents in the RLE Project corridor will be deprived of quick and affordable access to the rest of the City, stifling economic growth. For these and myriad other reasons, immediate relief is warranted.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)**
**ARBITRARY AND CAPRICIOUS**

122. CTA incorporates by reference the allegations of the preceding paragraphs.

123. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a narrow subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

124. The APA directs courts to "hold unlawful and set aside" final agency actions that are "arbitrary" and "capricious" or "an abuse of discretion." *Id*. § 706(2)(A).

125. Defendants' decision to make the IFR's legal framework applicable to only certain existing grants, thereby freezing CTA's funding, was arbitrary and capricious and an abuse of discretion.

126. Defendants' sole justification for pausing the funding stems from the IFR's conclusion that the prior DBE regulations were unlawful. *See* 90 Fed. Reg. at 47,971. Even when

an agency concludes that a prior policy is unlawful, however, "deciding how best to address a finding of illegality moving forward can involve important policy choices," and therefore the agency must exercise its discretion in a rational manner. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020).

127. Here, Defendants wholly failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Defendants have never explained why they are applying the legal framework in the IFR to some existing grants—issued under a prior set of regulations that were binding at the time—let alone why that new framework should be applied to existing grants while the recertification process set forth in the IFR is still ongoing. It is highly disruptive and inefficient for Defendants to evaluate CTA's (and other existing grantees') compliance, and potentially force CTA to discontinue or renegotiate its contracts under threat of losing federal funding, before even determining whether CTA's existing contractors continue to qualify as DBEs under the new framework. DOT never justifies or even acknowledges this inevitable disruption, which is arbitrary and capricious because the agency "entirely failed to consider an important aspect of the problem." *Id*.

128. Moreover, DOT is effectively penalizing CTA for past compliance with regulations in effect at the time of CTA's conduct, contrary to the presumption against retroactivity—which is a "legal doctrine centuries older than our Republic," based in part on "[e]lementary considerations of fairness dictat[ing] that individuals should have an opportunity to know what the law is and to conform their conduct accordingly[.]" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Defendants never justify suspending funding for some existing grants based solely on

the fact that the grantee previously complied with then-mandatory regulations. Certainly Defendants cannot justify that suspension with respect to the *entirety* of particular grant programs, rather than only the arguably affected portions of the existing grant program. *Cf.* 49 C.F.R. § 21.13(c) ("Any action to suspend … Federal financial assistance … shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.").

129. Defendants' decision to immediately apply its new legal framework to a tiny subset of existing grantees was also arbitrary and capricious because it ignores CTA's and its contractors' reliance interests, and does not provide an explanation that accounts for those reliance interests.

a. With respect to CTA alone, under its two existing grants, Defendants have suspended approximately $2.1 billion in federal funding already awarded specifically to CTA, which CTA intends to use for purposes that Defendants have already approved as worthwhile. Among other things, CTA intends to use this funding to significantly expand the capacity of both the Red and Purple Lines in the greater Chicago region—for the benefit of CTA's hundreds of millions of riders every year.

b. CTA has in fact already contracted with entities to perform the work contemplated by these awards. These entities are actively performing work, and are owed payment pursuant to the terms of their contracts. Collectively, these two awards have created or are expected to create more than approximately 15,000 jobs to perform the necessary work. But Defendants' suspension of CTA's federal funding threatens to disrupt both the performance of the work, and the timely payment of CTA's contractors.

c. Despite these significant reliance interests, Defendants wholly fail to consider them, let alone rationally explain why the new legal framework must be made effective immediately even as to existing grants. "When an agency changes course, as [DOT] did here, it

32

must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. It would be arbitrary and capricious to ignore such matters." *Regents of the Univ. of Calif.*, 591 U.S. at 30 (cleaned up). That is precisely what DOT did here by ignoring the serious reliance interests of the numerous individuals and entities that depend on the work and improvements served by the approximately $2.1 billion in suspended federal funding.

130. Application of the IFR to existing grants—including the summary freeze of CTA's funding—was arbitrary and capricious, and causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

**COUNT II**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)**
**ARBITRARY AND CAPRICIOUS**

131. CTA incorporates by reference the allegations of the preceding paragraphs.

132. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a narrow subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

133. The APA directs courts to "hold unlawful and set aside" final agency actions that are "arbitrary" and "capricious" or "an abuse of discretion." *Id*. § 706(2)(A).

134. Defendants' decision to make the IFR's legal framework applicable to only certain existing grants, thereby suspending CTA's funding, was arbitrary and capricious and an abuse of discretion for the additional reasons that the stated justification for their actions is "incongruent with what the record reveals about the agency's priorities and decisionmaking process," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), and because Defendants in fact relied upon irrelevant and improper factors—namely, political animus—in initiating the funding freezes, *see State Farm*, 463 U.S. at 43.

135. While Defendants' letters to CTA assert that the suspensions are being undertaken because DOT is "reviewing the projects it funds to ensure nondiscrimination," Ex. A; Ex. B, statements made elsewhere by Defendants make clear that Defendants' retroactive application of the IFR to target CTA's projects was for political reasons. This is arbitrary and capricious. *See Dep't of Com.*, 588 U.S. at 785.

136. The real reasons for the suspension, moreover—political animus and leverage in ongoing budget negotiations—are irrelevant and contrary to the agency's statutory obligations. It was arbitrary and capricious for Defendants to base their actions on irrelevant considerations. *See State Farm*, 463 U.S. at 43; *see also, e.g.*, *Robbins v. Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985) ("An agency decision prompted by personal animus would run afoul of the requirement that agencies act in a reasoned, nonarbitrary manner.").

137. Application of the IFR to existing grants—including the summary freeze of CTA's funding—was arbitrary and capricious, and causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT III
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)
## ARBITRARY AND CAPRICIOUS

138. CTA incorporates by reference the allegations of the preceding paragraphs.

139. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a narrow subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

140. The APA directs courts to "hold unlawful and set aside" final agency actions that are "arbitrary" and "capricious" or "an abuse of discretion." *Id.* § 706(2)(A).

141.    Defendants' decision to suspend CTA grants was arbitrary and capricious for an additional reason: even taking Defendants at their word about their stated purpose, there is no basis for the funds to remain frozen.

142.    In December 2025, DOT informed CTA that its initial review was complete and that the grant funds would be restored "provided CTA certifies in writing within 30 days of receipt of this letter that it accepts and will fulfill" particular conditions in connection with each Project.[36]

143.    CTA did exactly that, sending DOT a letter for each project within 10 days[37] providing all relevant certifications—namely, that CTA "shall immediately cease the solicitation, collection, or use of any Diversity Outreach Plans from bidders or contractors," that CTA "shall work in concert with other members of the Illinois [UCP] … to develop a comprehensive timeline for completing the required DBE reevaluation process described in [the IFR]," and that, "[t]o the extent any previously certified DBE contractor that has performed or continues to perform work under a Project contract or subcontract fails to retain its DBE certification after the UCP completes the [recertification] process … , CTA shall take all necessary actions within 60 days of the completion of the reevaluation process to ensure that all such contracts and subcontracts … come into compliance with" the new DBE standards.[38] CTA also complied with the December 1 letter's request that CTA provide DOT with the proposed timeline for completing the DBE reevaluation process: it attested that no such reevaluation process was required for the RPM Project because "there is no outstanding work on the RPM Program for which new contracts will be let," Ex. L, and, with respect to the RLE Project, attached a plan stating that the required reevaluations were in progress and would be completed by "early 2026," Ex. M.

---

[36] Exs. J, K.
[37] Exs. L, M.
[38] Ex. K.

144.     Not only has DOT failed to restore the funding; it has not even bothered to respond to or to identify any deficiencies in CTA's December 10, 2025 responses. Three months later, nothing has happened, despite CTA doing exactly what it was told it needed to do.

145.     This failure to restore funding was unlawful. An agency acts in an arbitrary and capricious manner when its actions are "illogical on [their] own terms," *GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013) (quoting *Am. Fed'n of Gov't Emps., Loc. 2924 v. Fed. Lab. Rels. Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006)), or cannot be justified "on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. An agency is "bound to the standards by which it professes its action to be judged." *Lopez v. FAA*, 318 F.3d 242, 246 (D.C. Cir. 2003).

146.     Here, DOT disregarded its own stated rationale for the freeze. It has continued to withhold CTA's funds even though CTA has accepted every one of DOT's express conditions for the resumption of funding. Although Defendants reserved the right to identify further deficiencies after reviewing CTA's certifications, three months later Defendants have said nothing.

**COUNT IV**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D)**
**CONTRARY TO LAW**
**FAILURE TO CONDUCT NOTICE AND COMMENT**

147.     CTA incorporates by reference the allegations of the preceding paragraphs.

148.     Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

149. The APA directs courts to "hold unlawful and set aside agency action" that is not "in accordance with law," *id.* § 706(2)(A), or that fails to observe "procedure required by law," *id.* § 706(2)(D).

150. Pursuant to 5 U.S.C. § 553(b), an agency must generally publish in the Federal Register a notice of proposed rulemaking before any substantive rule is finalized. The APA provides a narrow exception, "when the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).

151. Here, the IFR is a substantive rule because it has "the force and effect of law." *Azar v. Allina Health Servs.*, 587 U.S. 566, 573 (2019). Thus, pursuant to 5 U.S.C. § 553(b), Defendants were required to provide notice and a period for public comment before finalizing the rule. Defendants' justifications for dispensing with notice and comment do not satisfy good cause, at least as to existing grants.

152. The IFR asserts that "providing advance notice and an opportunity to comment on these regulatory changes … would be impracticable, unnecessary, and contrary to the public interest," because "DOT has determined that race- and sex-based presumptions of the DBE and ACDBE programs violate the U.S. Constitution." 90 Fed. Reg. at 47,974. As discussed above, however, even when an agency concludes that a prior policy was unlawful, the agency must still "exercise[] … discretionary authority in winding down the program," *Regents of the Univ. of Calif.*, 591 U.S. at 26, which is precisely when public participation is most valuable.

153. As to existing grantees, in particular, the need for public participation is heightened given the significant complications associated with changing program requirements midstream. As discussed above, it is highly disruptive for CTA to re-evaluate and potentially renegotiate its

37

existing contracts, as work is being performed on those contracts, and before knowing whether those subcontractors will be recertified as DBEs. The significant disruption caused by the IFR's immediate and retroactive application to existing grants highlights why public participation is critical, to raise these issues for the agency's consideration.

154. Application of the IFR to existing grants—including the summary freezes of CTA's funding—without notice or an opportunity to comment on how existing grantees should be treated under the new legal framework causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT V
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D)
## CONTRARY TO LAW
## FAILURE TO PROVIDE 30-DAY DELAYED EFFECTIVE DATE

155. CTA incorporates by reference the allegations of the preceding paragraphs.

156. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to some existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

157. The APA directs courts to "hold unlawful and set aside agency action" that is not "in accordance with law," *id.* § 706(2)(A), or that fails to observe "procedure required by law," *id.* § 706(2)(D).

158. Pursuant to 5 U.S.C. § 553(d), an agency rule generally must provide at least 30 days before it becomes effective. Again, the APA provides a narrow exception, "for good cause found and published with the rule." *Id.* § 553(d)(3).

159. Here, the IFR repeats essentially the same "good cause" finding as above. But that finding is inadequate, at least as to existing grantees who require at least a "thirty-day waiting period … to adjust their behavior before the final rule takes effect." *E. Bay Sanctuary Covenant v.*

38

*Biden*, 993 F.3d 640, 675 n.15 (9th Cir. 2021). A 30-day waiting period would at least have mitigated some of the severe consequences caused by DOT's sudden imposition of an immediate freeze on CTA's funds.

160. Moreover, the IFR wholly fails to justify why an immediate effective date is required at least as to existing grantees. According to the IFR, DOJ concluded that the relevant regulations were unlawful in June 2025, *see* 90 Fed. Reg. at 47,971 n.8, yet DOT waited over three months to publish an IFR effectuating that decision. Given DOT's own actions, delaying the effective date an additional 30 days plainly would not have imperiled any meaningful interest.

161. Application of the IFR to existing grants—including the summary freeze of CTA's funding—without a 30-day delayed effective date during which CTA could adjust its conduct causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT VI
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)
## CONTRARY TO LAW
## IN EXCESS OF STATUTORY AUTHORITY UNDER TITLE VI, 42 U.S.C. § 2000d-1

162. CTA incorporates by reference the allegations of the preceding paragraphs.

163. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

164. The APA directs courts to "hold unlawful and set aside agency action" that is not "in accordance with law," *id.* § 706(2)(A), that is in excess of statutory authority, *id.* § 706(2)(C), or that fails to observe "procedure required by law," *id.* § 706(2)(D).

165. The IFR expressly invokes "the Department's ability to conduct a review or take action under Title VI or other applicable law regarding compliance with equal protection principles" as to existing grantees, 90 Fed. Reg. at 47,973, and the Freeze Letters informing CTA

of its frozen funds likewise invoke Title VI, *see* Ex. A; Ex. B.

166. In enacting Title VI, however, Congress did not authorize agencies to unilaterally, without notice, suspend funding as to entire grants for an indefinite period. Instead, Title VI requires agencies to satisfy certain conditions before "refus[ing] to grant or to continue assistance" under a program. 42 U.S.C. § 2000d-1. Specifically, the agency must first "advise[] the appropriate person or persons of the failure to comply" with a requirement, "determine[] that compliance cannot be secured by voluntary means," and make "an express finding on the record, after opportunity for hearing, of a failure to comply" with a requirement. *Id.* Additionally, the agency head must "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action," and the action may not "become effective until thirty days have elapsed after the filing of such report." *Id.*

167. Defendants did not comply with any of these mandatory procedures prior to suspending CTA's funding. That non-compliance is unlawful: "when [an agency] act[s] improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

168. Because Defendants suspended CTA's funding but acted "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), Defendants' suspension of existing grant funding must be set aside.

169. Application of the IFR to a subset of existing grants—including the summary suspension of CTA's funding—without following the statutorily mandated processes for that decision, causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

**COUNT VII**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D)**
**CONTRARY TO LAW**
**VIOLATION OF TITLE VI REGULATIONS, 49 C.F.R. PART 21**

170. CTA incorporates by reference the allegations of the preceding paragraphs.

171. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

172. The APA directs courts to "hold unlawful and set aside agency action" that is not "in accordance with law," *id.* § 706(2)(A), or that fails to observe "procedure required by law," *id.* § 706(2)(D).

173. The IFR expressly invokes "the Department's ability to conduct a review or take action under Title VI or other applicable law regarding compliance with equal protection principles" as to existing grantees, 90 Fed. Reg. at 47,973, and the Freeze Letters informing CTA of its frozen funds likewise invoke Title VI, *see* Ex. A; Ex. B.

174. DOT's governing Title VI regulations set forth a detailed process the agency must follow in assessing grantees' compliance with Title VI and taking actions in response. *See generally* 49 C.F.R. §§ 21.11–21.19. In particular, DOT's regulations prohibit the agency from suspending a grantee's funding absent certain procedures. *See id.* § 21.13(c) ("No order suspending, terminating, or refusing to grant or continue Federal financial assistance shall become effective until …"). Those procedures include: (a) an attempt by the agency to secure grantee compliance by voluntary means; (b) an opportunity for a hearing; (c) a written decision making findings and identifying the particular requirements with which a grantee is found to have failed to comply; (d) approval of the decision by the Secretary of the agency; and (e) the Secretary

41

filing a report with Congressional committees regarding the action and then wait at least 30 days. *Id.*; *see also id.* § 21.15 (procedures for hearings); *id.* § 21.17 (procedures for decisions).

175. Defendants did not provide CTA with any of these mandatory procedural protections prior to freezing its funding. That is unlawful: "An agency may not … simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

176. Because Defendants froze CTA's funding but failed to do so "in accordance with" its own Title VI regulations, 5 U.S.C. § 706(2)(A), the freezes on existing grant funding must be set aside.

177. Application of the IFR to existing grants—including the summary freezes of CTA's funding—without the benefit of codified procedural protections causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT VIII
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D) VIOLATION OF FEDERAL FINANCIAL ASSISTANCE REGULATIONS, 2 C.F.R. PART 200

178. CTA incorporates by reference the allegations of the preceding paragraphs.

179. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a subset of existing grants, resulting in a freeze of all disbursements under CTA's two grants. *See* 5 U.S.C. § 704.

180. The APA directs courts to "hold unlawful and set aside agency action" that is not "in accordance with law," *id*. § 706(2)(A), or that fails to observe "procedure required by law," *id.* § 706(2)(D).

181. Defendants' action is further unlawful under the general authorities governing federal financial assistance, 2 C.F.R. part 200, which are also made applicable to DOT, *see* 2

C.F.R. § 1201.1 (DOT regulation adopting those regulations "[e]xcept as otherwise provided in this part").

182. These general financial assistance regulations allow agencies to impose remedies for noncompliance, but only *after* making certain findings and providing certain procedures. Specifically, agencies may "[t]emporarily withhold payments until the recipient or subrecipient takes corrective action," or "[s]uspend or terminate the Federal award in part or in its entirety," 2 C.F.R. § 200.339(a), (c), but must first "determine[] that noncompliance cannot be remedied by imposing specific conditions[.]" *Id.* § 200.339 (citing *id.* § 200.208 to describe specific conditions).

183. Here, DOT did not make a determination "that noncompliance cannot be remedied by imposing specific conditions" before withholding payments and freezing CTA's awards. To the contrary, DOT determined that imposing specific conditions—as set forth in its December 1 letters—*would* remedy any purported noncompliance. Thus, DOT violated § 200.339 by freezing CTA's grants without the necessary finding that "noncompliance cannot be remedied by imposing specific conditions." DOT then further violated § 200.339 by continuing to withhold those payments and suspending CTA's funding even after CTA agreed to the requested conditions and thereby agreed to all necessary "corrective action." *Id.* § 200.339(a).

184. DOT's actions were also contrary to 2 C.F.R. § 200.342, which requires that agencies give grant recipients an opportunity to appeal a remedy for noncompliance. *See id.* ("Upon initiating a remedy for noncompliance (for example, disallowed costs, a corrective action plan, or termination), the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action."). DOT has not provided CTA with any formal

opportunity to object, much less pursuant to "written procedures for processing objections, hearings, and appeals." *Id.*

185. DOT's actions also contravene the express payment requirements within the regulations. In general, funding recipients "must be paid in advance," provided the recipient maintains certain procedures that DOT has never asserted CTA lacks. 2 C.F.R. § 200.305(b)(1). Even when the agency is permitted to implement a reimbursement payment method, the agency still "must make payment within 30 calendar days after receipt of the payment request unless the Federal agency … reasonably believes the request to be improper." *Id.* § 200.305(b)(3). And the regulations withdraw any authority for the agency to withhold payments for unspecified reasons. *See id.* § 200.305(b)(6) ("Payments for allowable costs *must not be withheld* at any time during the period of performance unless required by Federal statute, regulations, or [when] … "[t]he recipient or subrecipient has failed to comply with the terms and conditions of the Federal award," or "is delinquent in a debt to the United States[.]" (emphasis added)). DOT's refusal to disburse CTA's requested funding for the past five months is contrary to these non-discretionary payment requirements.

186. Defendants have not complied with any of these mandatory regulatory procedures and protections, which is unlawful. As noted, "[a]n agency may not … simply disregard rules that are still on the books." *Fox Television Stations*, 556 U.S. at 515.

187. Because Defendants suspended CTA's funding but failed to do so "in accordance with" its general regulations governing federal financial assistance, 5 U.S.C. § 706(2)(A), the freezes on existing grant funding must be set aside.

188. Application of the IFR to existing grants—including the summary freezes of CTA's funding—contrary to these regulations' procedures and protections causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT IX
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(C)
### AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY

189. CTA incorporates by reference the allegations of the preceding paragraphs.

190. Defendants have taken official and final agency action by issuing the IFR, with its legal framework made immediately applicable to a subset of existing grants, resulting in a freeze of all disbursements to the RPM and RLE Projects. *See* 5 U.S.C. § 704.

191. The APA directs courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

192. "An agency … literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citations omitted).

193. The Projects are each governed by the detailed statutory scheme set out in 49 U.S.C. § 5309. Nothing in that statute or any other authorizes Defendants to suspend funding that has been appropriated by Congress and obligated to grant recipients under FFGAs. Accordingly, Defendants lack authority to suspend CTA's funds, and that action must be set aside.

194. Any other result would violate the major questions doctrine. That doctrine presumes that Congress will "speak clearly when authorizing an agency to exercise powers of vast economic and political significance," *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (citation omitted), and provides that agency action of such consequence will be set aside absent a clear statement by Congress granting the asserted power. *See, e.g., Biden v. Nebraska*,

45

600 U.S. 477, 506 (2023); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021).

195. Here, Defendants claim power to unilaterally and indefinitely suspend billions of dollars that Congress has appropriated (and Defendants have obligated) for vital infrastructure projects based upon hypothetical concerns about contractors that grant recipients have hired to carry out those projects. Such a significant power must be clearly granted, and the statute here is devoid of any such clear statement. To the contrary, the statute emphatically announces that "[i]t is in the interest of the United States … to foster the development and revitalization of public transportation systems with the cooperation of both public transportation companies and private companies engaged in public transportation." 49 U.S.C. § 5301(a). Defendants' claimed power to subordinate that express policy in furtherance of the current Administration's unrelated policies violates the major questions doctrine and must be set aside.

196. Moreover, the statute provides that "amount[s] made available or appropriated" to a project "*shall remain available* to that project for 4 fiscal years, including the fiscal year in which the amount is made available or appropriated." *Id.* § 5309(n) (emphasis added). Notwithstanding that command, Defendants claim a counterintuitive power to freeze, at will, any and all funds that Congress has "made available or appropriated" for infrastructure grants like the ones here, contrary to the statute's plain text.

197. Application of the IFR to existing grants—including the summary freeze of CTA's funding—without the benefit of codified procedural protections causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT X
## VIOLATION OF SEPARATION OF POWERS

198. CTA incorporates by reference the allegations of the preceding paragraphs.

46

199. The Constitution vests Congress with the exclusive power to make laws, including the power to obligate federal funds. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 460 (2024) (Alito, J., dissenting) (explaining that the Appropriations Clause "not only 'gives to the Legislature an exclusive authority of raising and granting money,' but … also obligates Congress to keep that authority from 'the hands of the Executive' at all times thereafter").

200. Article II, in turn, commands the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, a directive that extends to Congress's appropriations laws. Accordingly, the Executive lacks unilateral authority to amend or ignore congressional appropriations.

201. The Impoundment Control Act, 2 U.S.C. § 682 *et seq.*, permits the Executive to defer or rescind congressionally appropriated funds only in narrow circumstances and only if certain procedures are followed. None of those requirements are satisfied here.

202. By withholding funds that Congress has appropriated and which have been obligated to CTA under FFGAs, Defendants are violating the separation of powers.

203. This constitutional violation causes immediate, ongoing, and irreparable harm to CTA and its millions of riders.

204. CTA has a non-statutory cause of action to declare unlawful and enjoin Defendants' unconstitutional actions.

## COUNT XI
## VIOLATION OF THE SPENDING CLAUSE

205. CTA incorporates by reference the allegations of the preceding paragraphs.

206. Title VI is spending clause legislation. *Barnes*, 536 U.S. at 185-86. Under the Spending Clause, Title VI operates "much in the nature of a *contract*: in return for federal funds,

the [recipients] agree to comply with federally imposed conditions." *Id*. at 186 (citing *Pennhurst*, 451 U.S. at 17). "The legitimacy of Congress'[s] power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms." *Pennhurst*, 451 U.S. at 17. "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*.

207. In this case, retroactive application of the IFR violates the Spending Clause. All of CTA's conduct that the government cites as the predicate for denying funds occurred *before* the issuance of the IFR. At the time CTA entered into the grant agreements, it was in full compliance with the applicable regulations as they then existed. To the extent the law—or the Executive Branch's interpretation of it—has changed, CTA lacked "clear notice" of that change at the time it entered into the grant agreements with the federal government and at all times prior to the issuance of the IFR.

208. The Spending Clause does not permit the federal government to impose such retroactive legal obligations on CTA under Title VI. *See Pennhurst*, 451 U.S. at 25; *City of Chicago v. U.S. Dep't of Just.*, No. 25 C 13863, 2026 WL 114294, at *8 (N.D. Ill. Jan. 15, 2026) (adding new "open-ended and retroactive" conditions to grant money allocated to Chicago was "impermissibly ambiguous" warranting preliminary injunction on Spending Clause claim). The retroactive application of the IFR thus violates the Spending Clause.

209. Application of the IFR to a subset of existing grants—including the summary freeze of CTA's funding—without providing the constitutionally required clear notice of the terms of the grants, causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

## COUNT XII
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(B)
### AGENCY ACTION CONTRARY TO CONSTITUTIONAL RIGHT
### (SPENDING CLAUSE)

210. CTA incorporates by reference the allegations of the preceding paragraphs.

211. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

212. As explained above, the retroactive application of the IFR, without clear notice to CTA of the terms of its grants, violates the Spending Clause.

213. Application of the IFR to a subset of existing grants—including the summary freeze of CTA's funding—without providing the constitutionally required clear notice of the terms of the grants, causes immediate, ongoing, and irreparable harm to CTA, its contractors, and its customers.

### REQUEST FOR RELIEF

WHEREFORE, CTA respectfully requests the following relief:

A. Declare that the Interim Final Rule's retroactive application to CTA's existing grants is unlawful and unconstitutional;

B. Vacate and set aside the Interim Final Rule as retroactively applied to CTA's existing grants;

C. Pursuant to 5 U.S.C. § 705, postpone the effective date of the Interim Final Rule's retroactive application to CTA's existing grants pending the conclusion of these review proceedings;

D. Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the Interim Final Rule as applied to CTA's existing

grants, including by refusing to disburse funding under CTA's Red Line Extension and Red and Purple Modernization grants;

E.      Grant other such relief as this Court may deem equitable, just, and proper.

Dated: March 20, 2026

Respectfully submitted,

Jeffrey C. Bora
CHICAGO TRANSIT AUTHORITY
567 W. Lake Street, 6th Floor
Chicago, Illinois 60661
(312) 681-3110
JBora@transitchicago.com

By: */s/ Andrianna D. Kastanek*
Andrianna D. Kastanek
Terri L. Mascherin
Jason M. Bradford
Simon A. de Carvalho
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
AKastanek@jenner.com
TMascherin@jenner.com
JBradford@jenner.com
SdeCarvalho@jenner.com