# Exhibit C

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**
**WASHINGTON, D.C.**

# FULL FUNDING GRANT AGREEMENT

**CHICAGO TRANSIT AUTHORITY**

**RED AND PURPLE MODERNIZATION PHASE ONE PROJECT**

**IL-2017-002-00**

# TABLE OF CONTENTS

## FULL FUNDING GRANT AGREEMENT TERMS AND CONDITIONS

SECTION 1. DEFINITIONS ..... 2
SECTION 2. PURPOSES OF AGREEMENT ..... 4
SECTION 3. PREVIOUS FEDERAL DOCUMENTS AND GRANTS ..... 4
SECTION 4. OBLIGATION TO COMPLETE THE PROJECT ..... 5
SECTION 5. REQUIRED COMPLETION DATE AND LEVELS OF SERVICE ..... 6
SECTION 6. NET PROJECT COST ..... 6
SECTION 7. ESTIMATED NET PROJECT COST ..... 7
SECTION 8. LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT ..... 7
SECTION 9. FEDERAL FUNDING—OTHER SOURCES ..... 8
SECTION 10. LOCAL FINANCIAL COMMITMENT—CAPITAL COSTS ..... 8
SECTION 11. AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE ..... 9
SECTION 12. LOCAL FINANCIAL COMMITMENT--OPERATING AND MAINTENANCE COSTS ..... 9
SECTION 13. BASELINE COST ESTIMATE ..... 10
SECTION 14. BASELINE SCHEDULE ..... 10
SECTION 15. PROJECT MANAGEMENT OVERSIGHT ..... 11
SECTION 16. ENVIRONMENTAL PROTECTION ..... 11
SECTION 17. LABOR PROTECTION ..... 11
SECTION 18. GOVERNMENT ACTIONS ..... 12
SECTION 19. REMEDIES ..... 12
SECTION 20. CONTENTS OF AGREEMENT ..... 13
SECTION 21. SIMULTANEOUS CREATION OF AGREEMENT IN ELECTRONIC FORMAT ..... 13
SECTION 22. AMENDMENTS TO AGREEMENT ..... 13
SECTION 23. ATTACHMENTS—INCORPORATION ..... 13
SECTION 24. NOTICES ..... 14
SECTION 25. APPLICABLE LAW ..... 14
SECTION 26. AWARD AND EXECUTION OF AGREEMENT ..... 14
EXECUTION BY GRANTEE ..... 15
AFFIRMATION OF GRANTEE'S ATTORNEY ..... 15

## ATTACHMENTS

ATTACHMENT 1 SCOPE OF THE PROJECT
ATTACHMENT 1A VICINITY MAP
ATTACHMENT 1B PROJECT MAP
ATTACHMENT 2 PROJECT DESCRIPTION
ATTACHMENT 3 BASELINE COST ESTIMATE
ATTACHMENT 3A PROJECT BUDGET
ATTACHMENT 4 BASELINE SCHEDULE
ATTACHMENT 5 PRIOR GRANTS AND RELATED DOCUMENTS
ATTACHMENT 6 SCHEDULE OF FEDERAL FUNDS FOR THE PROJECT
ATTACHMENT 7 MEASURES TO MITIGATE ENVIRONMENTAL IMPACTS
ATTACHMENT 8 "BEFORE AND AFTER" STUDY

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**FULL FUNDING GRANT AGREEMENT**
**(FTA FFGA-23, October 1, 2016)**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Full Funding Grant Agreement, the Government (FTA) has awarded Federal assistance in support of the Project described below. Upon Execution of this Full Funding Grant Agreement by the Grantee named below, the Grantee affirms this Award by the Government (FTA Award), and enters into this Full Funding Grant Agreement with FTA. The following documents are incorporated by reference and made part of this Full Funding Grant Agreement:

(1) "Federal Transit Administration Master Agreement," FTA MA(23), October 1, 2016, [http://www.fta.dot.gov/documents/23-Master.pdf];
(2) The Certifications and Assurances applicable to the Project that the Grantee has selected and provided to FTA; and
(3) Any Award notification containing special conditions or requirements, if issued.

**FTA AWARD**

The Government (FTA) hereby awards a Full Funding Grant as follows:

Project Number(s): IL-2017-002-00

Grantee: Chicago Transit Authority (CTA)

Citation of Statutes Authorizing the Project: 49 U.S.C. §§ 5309(b), 5309(e)

Estimated Net Project Cost: $2,066,702,783

Maximum FTA Amount Awarded, Including This Amendment: $191,131,640

Amount of This FTA Award: $156,131,640

Maximum Federal Core Capacity Improvement Financial Contribution: $956,607,772

Maximum Percentage of FTA Participation: 51.9 percent

Maximum Percentage of Core Capacity Improvement Participation: 46.3 percent

Dates of U. S. Department of Labor Certifications of Transit Employee Protective Arrangements:

| Original Project or Amendment Numbers: | Certification Dates: |
|---|---|
| IL-2017-002-00 | December 21, 2016 |

Required Completion Date: October 22, 2027

Project Description:

The Red and Purple Modernization Phase One Project (the Project) would expand capacity along CTA's Red and Purple heavy rail lines in the 5.6-mile segment between the Belmont and Howard stations on the north side of Chicago. The Project consists of the following elements that will allow CTA to expand service in the corridor:

- **Red-Purple Bypass** — At Clark Junction, where the Brown Line intersects the Red and Purple lines, the Project will construct a flyover that will allow northbound Brown Line trains to turn off the Red and Purple Line alignment without blocking other tracks. This work will also realign and replace approximately 0.3 miles of Red and Purple line tracks in the same area to eliminate sharp curves.
- **Lawrence to Bryn Mawr Modernization**— The Project will reconstruct four stations – Lawrence, Argyle, Berwyn, and Bryn Mawr – with wider platforms. The Project will also reconstruct and expand the approximately 1.3 miles of guideway connecting these stations to accommodate the station expansion.
- **Corridor Signal Improvements**—The Project will install a higher-capacity signal system between approximately the Belmont and Howard stations.
- **Advance System Work**—The Project will upgrade the signal system and infrastructure to accommodate continued train operations during construction.
- **Broadway Substation Upgrades** – The Project will upgrade a power substation to support expanded service after Project completion.
- **Vehicles** – The Project includes the purchase of 32 railcars for expanded service.

For a more detailed description, see Attachments 1 and 2.

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

## FULL FUNDING GRANT AGREEMENT TERMS AND CONDITIONS

**THIS FEDERAL TRANSIT ADMINISTRATION FULL FUNDING GRANT AGREEMENT** (Agreement) is entered into by the Chicago Transit Authority (Grantee) and the United States of America, acting through the United States Department of Transportation, Federal Transit Administration (FTA or Government).

**WHEREAS,** the Grantee has determined through the local planning process that construction of the Red and Purple Modernization Phase One project will effectively and efficiently serve the transportation needs of metropolitan Chicago.

**WHEREAS,** the Grantee has developed a Financial Plan, as herein defined, using a combination of local and Federal funds to finance the costs of the Project and, in accordance with its plan, has requested a Grant, as herein defined, of Federal financial assistance in the Project.

**WHEREAS,** the Government has determined to enter into this Agreement and to support final design and construction of the Project up to a Maximum Federal Core Capacity Improvement Financial Contribution of $956,607,772 in capital Core Capacity Improvement funds subject to all the terms and conditions set forth in this Agreement.

**WHEREAS,** the Grantee has submitted its request for Federal assistance (the Application) and the Government has received and is relying upon the Grantee's assurances, certifications, and all other documents required as conditions precedent to a Grant of assistance by the Government for the Project; and, in its submissions, the Grantee has demonstrated justification for the Project, has demonstrated its financial, organizational, legal, and technical capacity as is necessary to Complete the Project within the maximum amount of Federal assistance set forth in this Agreement, and has demonstrated the capability to secure non-Federal funds as may be necessary for such completion.

**WHEREAS,** the Government has determined that the Project is justified based on a comprehensive review of its mobility improvements, environmental benefits, cost effectiveness, economic development effects, the capacity needs of the corridor, and congestion relief; and the Project is supported by an acceptable degree of local financial commitment, including evidence of stable and dependable financing sources to construct, maintain, and operate the Project.

**WHEREAS,** the Government and the Grantee have agreed that their respective duties and responsibilities as related to the completion of the Project shall be determined by and under the terms and conditions of this Agreement and have agreed that this Agreement shall be recognized as the sole understandings between the Government and the Grantee in

consideration of the mutual promises as set forth in this Agreement.

**THEREFORE,** in consideration of the above and the parties' mutual promises as set forth in this Federal Transit Administration Full Funding Grant Agreement, the Grantee and the Government agree to the specific terms, conditions and provisions set forth in this entire Agreement including, in particular, the specific terms of the following Sections and Attachments:

## SECTION 1. DEFINITIONS

**"Agreement"** means this Federal Transit Administration Full Funding Grant Agreement (FFGA) and consists of all parts and documents listed in Section 20 of this Agreement, "Contents of Agreement," and will include all future addenda, substitutions, modifications and amendments as and when legally executed and effective. (This definition supersedes the definition of "Grant Agreement" set forth in Section 2.a of the Federal Transit Administration Master Agreement (Master Agreement), incorporated by reference and made part of this Agreement.)

**"Application"** means those documents and written submissions filed by or on behalf of the Grantee pursuant to its request for Federal financial assistance for support of the Project and relied upon by the Government as satisfaction of the legal and policy requirements of Grant award. The Application includes all explanatory, supporting, or supplementary documents related to the Project that the Government relied upon in its determination to obligate and award Federal funds for the Project. (This definition is intended to supplement the definition "Application" set forth in Section 2.a of the Master Agreement, incorporated by reference and made part of this Agreement.)

**"Baseline Cost Estimate"** means the Application document described in Section 13 of this Agreement and set forth in the Tables that comprise Attachment 3. The requirements of the Baseline Cost Estimate are set forth in FTA Circular 5200.1A, "Full Funding Grant Agreements Guidance," as may be revised from time to time. The Baseline Cost Estimate reflects the total anticipated cost of the Project as of the Date of this Agreement.

**"Complete the Project"** means to accomplish all of the scope and activities of the Project as described in Attachment 1, "Scope of the Project," and Attachment 2, "Project Description."

**"Date of this Agreement"** means the date the Government awards this Full Funding Grant Agreement.

**"Estimated Net Project Cost"** means the amount that is calculated by subtracting the cost that can reasonably be financed from the Grantee's revenue from the total anticipated cost of the Project as reflected in the "Baseline Cost Estimate," Attachment 3. The Estimated Net Project Cost is set forth in Section 7 of this Agreement.

**"Financial Plan"** means the plan accepted by the Government as part of the Application process describing the Grantee's financial condition and capability to complete the Project and

to maintain and operate the Project together with its existing transit system. It includes all explanatory, supporting and supplementary documents, commitments, and agreements accepted or approved by the Government.

**"Government"** means the United States of America, acting through the Federal Transit Administration of the United States Department of Transportation.

**"Grantee"** means the Chicago Transit Authority (CTA).

**"Grant(s)"** means, in singular and plural forms, the obligation and award of Federal financial assistance by the Government pursuant to the laws codified at 49 U.S.C. Chapter 53.

**"Increased Levels of Service"** means the additional service to be provided upon completion of the project as set forth in Attachment 1, "Scope of the Project."

**"Local Share"** means that portion of the Grantee's local financial commitment that is the Grantee's legally required share of the Net Project Cost.

**"Master Agreement"** means the standard terms and conditions applicable to recipients of Federal financial assistance from the Government. It is updated and published annually. It is incorporated by reference and made part of this Agreement and identified in Federal Fiscal Year 2017 by FTA Form MA(23) (October 1, 2016).

**"Maximum Federal Core Capacity Improvement Financial Contribution"** means the limit of Federal capital Core Capacity Improvement financial participation in the Project. (The amount of the "Maximum Federal Core Capacity Improvement Financial Contribution" is set forth in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment," and is only a portion of the total Federal financial contribution for the Project.)

**"Maximum FTA Amount Awarded"** means the total amount of Federal funds from all sources administered by FTA and awarded for the Project, regardless of source, and available to the Grantee. (This amount is set forth in the first page of this Agreement.)

**"Net Project Cost"** means the cost of the Project that cannot reasonably be financed from the Grantee's revenues.

**"Project"** means the transit/transportation improvements the Grantee has promised to implement as a condition of its Full Funding Grant. A description of the Project is set forth in Attachment 1, "Scope of the Project." Activities to carry out the project scope are set forth in Attachment 2, "Project Description."

**"Project Costs"** means all costs eligible for Federal financial participation under the terms of this Agreement and consistent with the cost principles set forth in Section 7 of the Master Agreement, "Payments to the Recipient."

**"Recovery Plan"** means a plan developed by the Grantee, and accepted by the Government,

whereby the Grantee will take every reasonable measure to minimize any delay in achieving the baseline schedule set forth in Attachment 4 to this Agreement (the Baseline Schedule) and eliminate or otherwise mitigate [recover] any increase in the total Project cost as currently estimated, as compared to the total Project cost identified in Attachment 3 to this Agreement (the Baseline Cost Estimate).

**"Required Completion Date"** means the date certain upon which the Grantee agrees to accomplish the activities and tasks described in Attachments 1 and 2 to this Agreement and begin providing the additional service in the corridor as identified in the application submitted to FTA.

**SECTION 2. PURPOSES OF AGREEMENT**

Pursuant to 49 U.S.C. § 5309, the purposes of this Agreement are to:

(a) provide Federal financial assistance to the Grantee in the form of this Full Funding Grant and possible future awards of financial assistance as contemplated under this Agreement, not to exceed the Maximum Federal Core Capacity Improvement Financial Contribution for the Project, as is and may be awarded under this Agreement and the laws codified at 49 U.S.C. Chapter 53 for purposes that are consistent with those statutes, implementing regulations, and other applicable laws and regulations;

(b) describe the Project and set forth the mutual understandings, terms, conditions, rights and obligations of the parties related to implementing the Project, the future management and operation of the Project, and the manner in which Project real property and equipment will be used;

(c) establish the Maximum Federal Core Capacity Improvement Financial Contribution for the Project, and the manner in which all future Federal funds for the Project, if any, will be awarded and released to the Grantee;

(d) establish the Grantee's financial commitment to the Project including its obligation to fund the Local Share, its obligation to Complete the Project with a specified amount of Federal assistance, its obligation to achieve revenue operation of the Project by a specified date, its obligation to pay all costs necessary to Complete the Project that are in excess of the Estimated Net Project Cost and its obligation to finance the future maintenance and operational costs of the Project; and

(e) facilitate timely and efficient management of the Project.

**SECTION 3. PREVIOUS FEDERAL DOCUMENTS AND GRANTS**

(a) The Government's laws, policies and procedures require the completion of a project development process and environmental review prior to the Award and Execution of this Agreement. Prior Grants of Federal assistance awarded by the Government for this project development process are described in Attachment 5 to this Agreement. These Grants (and any

other documents that are described in Attachment 5, including Letters of No Prejudice) are incorporated by reference and made part of this Agreement, except for the terms and conditions thereof specifically superseded by this Agreement. Further, in executing this Agreement, the Grantee assures that the certifications and assurances (made by the Grantee or on behalf of the Grantee or by a third party) upon which the Government relied in these prior actions were made to the Government in good faith and to the best of the Grantee's knowledge and belief, and that the Grantee has no present knowledge of facts or circumstances substantially affecting the continued validity of these certifications and assurances that the Grantee has not formally conveyed to the Government prior to the Government's Award of funding set forth in this Agreement.

(b) This Agreement does not discharge or rescind any of the terms, conditions, or obligations established under the documents set forth in Attachment 5 unless specifically stated otherwise herein. Further, the terms, conditions and obligations of this Agreement take precedence over the provisions of all prior agreements related to the Project between the Grantee and the Government and will be controlling for all actions related to the Project taken after the Date of this Agreement, unless specifically stated otherwise herein.

(c) No amendments will be sought or approved to increase the amount of funds in the prior Grants listed in Attachment 5 beyond the amounts described in this Agreement as available to the Project.

## SECTION 4. OBLIGATION TO COMPLETE THE PROJECT

(a) The Government has no obligation to provide any financial assistance for the Project beyond the Maximum Federal Core Capacity Improvement Financial Contribution. If the total Federal funding provided under Section 8 of this Agreement, "Limitations of the Federal Funding Commitment," is insufficient to undertake the activities necessary to Complete the Project and increase levels of service, the Grantee agrees to Complete the Project and accepts sole responsibility for the payment of any additional costs (overruns).

(b) If at any time during its efforts to Complete the Project the Grantee determines that the total Project cost will exceed the Baseline Cost Estimate, the Grantee must immediately notify the Government of the amount of the difference and the reasons for the difference. Further, the Grantee must provide the Government with a Recovery Plan that demonstrates the Grantee is taking and will take every reasonable measure to eliminate [recover] the difference between the total project cost and the Baseline Cost Estimate. Insofar as any difference between the total project cost and the Baseline Cost Estimate that cannot be eliminated [recovered], the Grantee must secure and provide such additional resources as are necessary to meet the additional costs and expeditiously Complete the Project without further financial assistance from the Federal capital Core Capacity Improvement program. Further, in its Recovery Plan, the Grantee must identify the sources of funds it will draw upon to meet the additional costs and cover the difference between the total Project cost and the Baseline Cost Estimate.

## SECTION 5. REQUIRED COMPLETION DATE AND INCREASED LEVELS OF SERVICE

(a) The Grantee agrees and promises to Complete the Project on or before October 22, 2027, the Required Completion Date, in accordance with the terms and conditions of this Agreement.

(b) The Required Completion Date is a significant term of this Agreement. The Grantee's failure to complete the Project on or before the Required Completion Date will constitute a breach of this Agreement. Upon the Grantee's request, the Government may determine, at its sole discretion, to waive a breach or an anticipatory breach of this Agreement and to extend the Required Completion Date if there is an unavoidable delay resulting from an event or circumstance beyond the control of the Grantee, or if the Government determines that allowing the delay is in the best interest of the Government and the success of the Project. Requests by the Grantee for waiver of a breach or anticipatory breach of this Agreement and extension of the Required Completion Date for the reasons set forth herein shall be submitted promptly (with appropriate documentation) to the Government. In the exercise of its discretion to waive the breach and extend the Required Completion Date, the Government will take into consideration the actions and measures taken by the Grantee to ensure adherence to its promise to complete the Project on or before the scheduled Required Completion Date.

(c) Delays in appropriations of funds from Congress shall not constitute a basis for extension of the Required Completion Date.

(d) The Government's consent to extend the Required Completion Date pursuant to Paragraph (b) of this Section 5 does not constitute a basis for additional Federal financial assistance beyond the Maximum Federal Core Capacity Improvement Financial Contribution.

(e) Set forth in Attachment 1 to this Agreement, "Scope of Project," is the Increased Levels of Service the Grantee indicated would be provided in the peak-hour in the peak-direction in the Project corridor to qualify for Core Capacity funding. The Grantee will maintain these Increased Levels of Service once the Project is complete and for no less than five years thereafter. These specified Increased Levels of Service are a significant term of this Agreement. The Grantee's failure to achieve and maintain these Increased Levels of Service at the Required Completion Date and for five years thereafter will constitute a breach of this Agreement. Upon the Grantee's request, the Government may determine in its sole discretion to waive a breach of the Grantee's obligation to maintain these specified Increased Levels of Service for events or circumstances beyond the control of the Grantee, or if the Government determines that a waiver is in the interests of the United States. In the exercise of its discretion whether to waive a breach of the specified Increased Levels of Service, the Government will take into consideration the actions and measures taken by the Grantee to achieve and maintain the operational goals of the Project and the Grantee's entire public transportation system for at least five years beyond the completion of the Project.

## SECTION 6. NET PROJECT COST

(a) This Grant is to assist in the payment of actual eligible costs within the scope of the Project under this Agreement, minus any amount that can reasonably be financed from revenues of the

Grantee. If the funds awarded under this Grant exceed the amount necessary to finance the Federal share, those excess funds are not available to the Grantee for payment of costs beyond the scope of this Project supported by this Grant.

(b) In accordance with the FTA Master Agreement, a refund or reduction of the Grantee's Local Share of the Net Project Cost requires a refund to the Government of a proportional amount of the Federal financial assistance provided under this Agreement.

(c) The portion of the Net Project Cost that may be financed by the Government with capital Core Capacity Improvement funds may not exceed the amount of the Maximum Federal Core Capacity Improvement Financial Contribution for this Project as stated in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment."

(d) The Grantee acknowledges that Federal funds may be used only to reimburse eligible expenses for the Project. Should FTA determine that Federal funds have been used to reimburse any expenses that were ineligible for Federal reimbursement, FTA will direct the Grantee either to reimburse FTA with local funds not already committed to the Project or to reduce the total project costs by the amounts found to have been ineligible.

## SECTION 7. ESTIMATED NET PROJECT COST

(a) The Government's determination to provide financial assistance for the Project is based, in significant part, upon the Grantee's estimated costs as set forth in the "Baseline Cost Estimate," Attachment 3 to this Agreement. The Estimated Net Project Cost reported in Attachment 3 is $2,066,702,783.

(b) The Estimated Net Project Cost financed with the Execution of this Agreement is limited by the amount of the Maximum FTA Amount Awarded. The amount of the Estimated Net Project Cost and the amount of the Maximum FTA Amount Awarded are stated in the first page of this Agreement. The amount reimbursable by the Government is limited to the lesser of either the amount of the Maximum FTA Amount Awarded or the maximum percentage of FTA participation permitted by Federal law and regulations. Additional funds will not be provided until a Grant amendment awarding additional funds and amending this Full Funding Grant Agreement is executed.

## SECTION 8. LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT

(a) With its Award set forth in this Agreement, the Government obligates $156,131,640 for a total award of $191,131,640 in Federal capital Core Capacity Improvement financial assistance for the Project. The sources of this Federal financial assistance are set forth in the "Project Budget," Attachment 3A. These funds are in addition to all previous Federal financial commitments to the development of the Project as set forth in the schedule of "Prior Grants and Related Documents," Attachment 5 of this Agreement.

(b)(1) With its Award set forth in this Agreement, the Government also acknowledges its intent to provide Federal capital Core Capacity Improvement financial assistance for the Project in addition to the amount set forth in Paragraph (a) of this Section 8. The amount of additional

capital Core Capacity Improvement funds the Government may provide will not exceed $765,476,132. The anticipated sources of Federal financial assistance in this amount are listed in Attachment 6 to this Agreement, "Schedule of Federal Funds for the Project." Additional funds obligated pursuant to this Paragraph will be subject to all the terms, conditions and obligations established by this Agreement. Accordingly, it is expected that the award of funds will be processed through amendments to this Agreement.

(b)(2) The award by the Government of additional Federal capital Core Capacity Improvement financial assistance to the Project under Paragraph (b)(l) of this Section 8 is subject to the following limitations:

(A) the availability of appropriated funds, and

(B) the Grantee's continued performance under the terms and conditions of this Agreement.

(c) The Maximum Federal Core Capacity Improvement Financial Contribution for this Project under the capital Core Capacity Improvement category of funds is limited to $956,607,772, which is the sum of the amounts set forth in Paragraphs (a) and (b)(1) of this Section.

## SECTION 9. FEDERAL FUNDING—OTHER SOURCES

The Maximum Federal Core Capacity Improvement Financial Contribution specified in Section 8(c) of this Agreement does not include funds other than from the capital Core Capacity Improvement program under 49 U.S.C. Chapter 53. Should such other Federal funds be provided for the Project in addition to the Federal capital Core Capacity Improvement funds set forth in Attachment 6 of this Agreement, the limitation on the Federal funding commitment set forth in Section 8 of this Agreement shall not apply to those funds. Accordingly, such additional funds shall be excluded from the calculation of the Maximum Federal Core Capacity Improvement Financial Contribution. Funds awarded pursuant to this Section will be subject to all other terms, conditions and obligations set forth in the Agreement.

## SECTION 10. LOCAL FINANCIAL COMMITMENT—CAPITAL COSTS

(a) As a condition of the Government's Award of this Full Funding Grant, the Grantee has developed and adopted a Financial Plan for financing all Project Costs necessary to complete the Project. In addition to the amount of Federal funds requested, the Financial Plan includes a statement identifying the local and private sources of funding and the amount of funds available for and committed to the Project from each such source. This Financial Plan, as accepted by the Government, with the supporting documentation (including formal funding agreements and commitments) is hereby incorporated by reference and made part of this Agreement.

(b) The Grantee hereby commits and certifies that it will provide funds in an amount sufficient, together with the Federal contribution (acknowledging the limitations as set forth in this Agreement), to assure timely and full payment of the Project Costs as necessary to Complete the Project.

(c) The Grantee hereby commits and certifies that the Local Share portion of its financial commitment will be provided from funding sources other than Federal funds, receipts from the use of Project facilities or equipment, or revenues of the public transportation system in which such facilities or equipment are used.

(d) Given the Estimated Net Project Cost, as set forth in Section 7 of this Agreement, the Grantee's financial commitment to the Net Project Cost is estimated to total $994,364,474. This amount constitutes the Local Share needed to match the Maximum Federal Core Capacity Improvement Financial Contribution for the Project and Other Federal Sources. In the event that the actual Federal financial contribution for the Project is reduced or is increased or the funding percentage as set forth in this Agreement is changed, the portion of the Grantee's financial contribution for the Project that is identified as Local Share shall be adjusted accordingly.

(e) The Grantee agrees to notify the Government of any change in circumstances or commitments that adversely affect the Grantee's plan to fund the Project Costs necessary to Complete the Project as set forth in the Financial Plan. In its notification, the Grantee shall advise the Government of what actions it has taken or plans to take to ensure adequate funding resources and shall reaffirm its commitment to the Government as set forth in Paragraph (b) of this Section 10.

## SECTION 11. AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE

The Grantee may incur costs or expend local funds for all phases of the Project as is reasonably necessary to advance the Project prior to an award of Federal funding assistance without prejudice to possible future Federal participation in or reimbursement of the Project Costs to the extent that such costs are incurred in accordance with all applicable Federal requirements and this Agreement. It is understood that the authority conferred on the Grantee to advance the Project without prejudice does not constitute a legal commitment by the Government to obligate and award Federal funds.

## SECTION 12. LOCAL FINANCIAL COMMITMENT—OPERATING AND MAINTENANCE COSTS

(a) As a condition of the Government's Award of funding set forth in this Agreement, the Grantee has developed and adopted a Financial Plan to finance the future operation and maintenance of the Project that also takes into consideration the Grantee's continuing financial responsibilities to operate, maintain and reinvest in its existing transit system. This Financial Plan, as accepted by the Government, and the supporting documentation (including specific funding commitments) evidencing stable and dependable funding sources are an essential part of the Grantee's Application and are made part of this Agreement by incorporation of the Application.

(b) With the Execution of this Agreement, the Grantee assures that it has stable and

dependable funding sources, sufficient in amount and in degree of commitment, to operate and maintain its entire mass transportation system at an adequate and efficient level of service, including the future operation and maintenance of the Project without additional Federal assistance beyond the amounts set forth in the Financial Plan. The foregoing assurance does not preclude the Grantee from altering service through contracts with private providers of mass transportation services.

(c) The Grantee will notify the Government of any change in circumstances or commitments that adversely affects the Grantee's plan to fund the maintenance and operating costs of the Project as set forth in the Financial Plan. In its notification, the Grantee will advise the Government of actions it has taken or plans to take to ensure adequate funding resources and will reaffirm to the Government its assurance as set forth in Paragraph (b) of this Section.

**SECTION 13. BASELINE COST ESTIMATE**

(a) In its Application, the Grantee submitted to the Government a Baseline Cost Estimate for the activities constituting the Project. The Baseline Cost Estimate is accepted by the Government and is set forth in the Tables that comprise Attachment 3 of this Agreement. The Baseline Cost Estimate is derived from cost estimates of the individual third party contracts and force account work that, in sum, constitute the Project; it reflects appropriate escalation and Project schedule dates.

(b) The Government intends to use the Baseline Cost Estimate to monitor the Grantee's compliance with certain terms and conditions of this Agreement. The Baseline Cost Estimate established in Attachment 3 serves as the measure of cost estimates as of the Date of this Agreement, and should not be amended or modified during the implementation of the Project.

(c) The Grantee will submit cost reports on the implementation of the Project as required by this Agreement and in a format consistent with the units set forth in the Baseline Cost Estimate so that the Government can, with reasonable diligence, reconcile the Grantee's reports with the Baseline Cost Estimate.

**SECTION 14. BASELINE SCHEDULE**

(a) In its Application, as approved, the Grantee submitted a Baseline Schedule for the Project that demonstrates how the Grantee intends to implement the Project and meet the Required Completion Date. This Baseline Schedule has been accepted by the Government and is Attachment 4 of this Agreement.

(b) The schedule for the Project may be modified from time to time at the discretion of the Grantee. However, the Baseline Schedule is not to be modified because it is to be used as a basis for comparing planned to actual project implementation. The Grantee will notify the Government when a Project schedule modification has the potential to change the Required Completion Date and describe the actions planned to recover the schedule. The Government's acquiescence in such notice will not be deemed approval by the Government of an extension of a Required Completion Date unless the Government expressly grants an extension in writing.

## SECTION 15. PROJECT MANAGEMENT OVERSIGHT

The Project is a "Major Capital Project" as defined in FTA' s Project Management Oversight regulations at 49 C.F.R. § 633.5. Accordingly, the Grantee agrees that all requirements and conditions set forth in the rule at 49 C.F.R. Part 633 apply to the Project activities. Noncompliance with any regulatory requirements shall constitute a breach of this Agreement, unless the Government formally waives the regulatory requirement.

## SECTION 16. ENVIRONMENTAL PROTECTION

(a) As a condition precedent to this Agreement, the environmental impacts of the Project have been assessed as required by law. The results of that assessment and the adopted mitigation measures are described in the environmental documents identified in Attachment 7 of this Agreement. These documents together with related agreements and supporting documentation are incorporated by reference and made part of this Agreement. To assist the Government in monitoring the implementation of the adopted mitigation measures, these measures are specifically referenced in Attachment 7 of this Agreement. It is understood and agreed that the description in Attachment 7 shall not supersede or in any way result in a circumvention of the requirements set forth in the Government's environmental record for the Project.

(b) Certain terms and conditions of this Agreement as related to the Grantee's responsibility to ensure protection of the environment are set forth in Section 26 of the Master Agreement, "Environmental Protections." Under Subsection 26.i, "Mitigation of Adverse Environmental Effects," the Grantee is required, among other actions, to undertake all environmental mitigation measures that are identified in environmental documents prepared for the Project. Accordingly, the Grantee understands that it shall not withdraw or substantially change any of the adopted mitigation measures as described in the Government's environmental record for the Project without the express written approval of the Government.

(c) This Section is intended only to supplement the provisions set forth in Section 26 of the Master Agreement, "Environmental Protections."

## SECTION 17. LABOR PROTECTION

The Grantee will carry out the Project in conformance with the terms and conditions determined by the Secretary of Labor to be fair and equitable to protect the interests of employees affected by the Project and meet the requirements of 49 U.S.C. § 5333(b) and U.S. Department of Labor (USDOL) Guidelines at 29 C.F.R. Part 215. These terms and conditions are identified in the letters of certification from USDOL on the dates set forth on the first page of this Agreement. The Grantee will carry out the Project in compliance with the conditions stated in the USDOL certification letters. Those letters and any documents cited therein are incorporated by reference and made part of this Agreement.

## SECTION 18. GOVERNMENT ACTIONS

(a) In all cases where the Government's review, approval or concurrence is required under the terms and conditions of this Agreement, the Government will provide its response within sixty (60) calendar days of receipt from the Grantee of all materials reasonably necessary for the formulation of the Government's response.

(b) If the Government determines that its position cannot be finalized within that sixty (60) day period, the Government will notify the Grantee, in writing, within thirty (30) days following receipt of the Grantee's submission that the Government's response will be delayed and advise the Grantee of the Government's anticipated time period for response.

(c) Whenever the Government's approval or concurrence is needed on any matter pertaining to or concerning this Agreement, the Government's approval or concurrence will not be unreasonably withheld.

## SECTION 19. REMEDIES

(a) Substantial failure of the Grantee to Complete the Project in accordance with the Application and this Agreement will be a default of this Agreement. In the event of default, the Government will have all remedies at law and equity, including the right to specific performance without further Federal financial assistance, and the rights to termination or suspension as provided by Section 11 of the Master Agreement, "Right of the Federal Government to Terminate." The Grantee recognizes that in the event of default, the Government may demand all Federal funds provided to the Grantee for the Project be returned to the Government. Furthermore, a default of this Agreement will be a factor considered before a decision is made with respect to the approval of future Grants requested by the Grantee.

(b) Under the provisions of Section 15 of this Agreement, "Project Management Oversight," and under the terms and conditions of the Master Agreement, the Government will review performance by the Grantee to determine whether satisfactory progress is being made to complete the Project. In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, under the provisions of Section 11 of the Master Agreement, "Right of the Federal Government to Terminate," until any necessary corrective action, which may be required by the Government, is accomplished. Any breach of this Agreement that is not corrected within a reasonable period of time will be a default of this Agreement. The Government in its discretion may permit the cost of such corrective action to be deemed a Project Cost, provided that such cost is an allowable cost under the requirements of Section 7.b of the Master Agreement, "Eligible Costs," and so long as it remains within the limits of the Maximum Federal Core Capacity Improvement Financial Contribution set forth in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment."

(c) In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days written notice that the Government considers that such a breach has occurred and will

provide the Grantee a reasonable period of time to respond and to take necessary corrective action.

## SECTION 20. CONTENTS OF AGREEMENT

This Full Funding Grant Agreement consists of the text of this Agreement, which includes the first pages setting forth significant characteristics of the Agreement (such as the maximum Federal funds obligated and awarded for expenditure on the Project and the funding ratio of Federal and local funds to be expended for the Project, and such other data), followed by the Terms and Conditions and the Attachments to the Agreement. The Agreement also includes the following documents incorporated by reference and made part of this Agreement: the "Federal Transit Administration Master Agreement," FTA Form MA(23) (October 1, 2016) as may be revised from time to time, the Application, the Government's environmental record for the Project, related agreements, and prior Grant Agreements for the Project referenced in Attachment 5 of this Agreement. Should the Federal assistance award letter include special conditions for the Project, that letter is incorporated by reference and made part of this Agreement. Any inconsistency between the Application and the terms and conditions of this Full Funding Grant Agreement will be resolved according to the clear meaning of the provisions of this Agreement and Attachments hereto.

## SECTION 21. SIMULTANEOUS CREATION OF AGREEMENT IN ELECTRONIC FORMAT

Simultaneous to the Award and Execution of this Agreement set forth in typewritten hard copy, the Agreement is being awarded and executed by electronic means through FTA's electronic award and management system. To the extent any discrepancy may arise between the typewritten version and the electronic version of this Agreement, the typewritten version will prevail. Should any special conditions or requirements for the Project be added separately in the electronic version, those conditions or requirements are incorporated by reference and made part of this Agreement.

## SECTION 22. AMENDMENTS TO AGREEMENT

Amendments to any of the documents referenced in Section 20, "Contents of Agreement," will be made in accordance with the requirements and procedures set forth in FTA Circular 5010.1D, "FTA Project Management Guidelines" (August 27, 2012), as may be amended from time to time, and FTA Circular 5200.1A (December 5, 2002), "Full Funding Grant Agreements Guidance," as may be amended from time to time.

## SECTION 23. ATTACHMENTS—INCORPORATION

Each and every Attachment to this Agreement is incorporated by reference and made part of this Agreement.

**SECTION 24. NOTICES**

Notices required by this Agreement will be addressed as follows:

As to the Government:

Ms. Marisol R. Simón
Regional Administrator
Federal Transit Administration
200 West Adams Street
Suite 320
Chicago, Illinois 60606

As to the Grantee:

Dorval R. Carter, Jr.
President
Chicago Transit Authority
567 West Lake Street
5th Floor
Chicago, Illinois 60661-1465

**SECTION 25. APPLICABLE LAW**

If neither Federal statute nor Federal common law governs the interpretation of the provisions of this Agreement, the state law of the State of Illinois will apply. This provision is intended only to supplement Section 3.g of the Master Agreement, "Application of Federal, State, and Local Laws, Regulations, Requirements, and Guidance."

**SECTION 26. AWARD AND EXECUTION OF AGREEMENT**

There are several identical counterparts of this Agreement in typewritten hard copy; each counterpart is to be fully signed in writing by the parties and each counterpart is deemed to be an original having identical legal effect. When signed and dated by the authorized official of the Government, this instrument will constitute an Award that should be executed by the Grantee within ninety (90) days of the date of the Government's Award (FTA Award). The Government may withdraw its Award of financial assistance and obligation of funds if this Agreement is not executed within the ninety (90) day period. Upon full Execution of this Agreement by the Grantee, the effective date will be the date the Government awarded funding under this Agreement as set forth below.

**THE GOVERNMENT HEREBY AWARDS THIS FULL FUNDING GRANT AGREEMENT THIS**

9th DAY OF January, 2017

Signature: Carolyn Flowers

Carolyn Flowers
Acting Federal Transit Administrator
FEDERAL TRANSIT ADMINISTRATION

**EXECUTION BY GRANTEE**

The Grantee, by executing this Agreement, affirms this FTA Award; adopts and ratifies all statements, representations, warranties, covenants, and materials it has submitted to FTA; consents to this Award; and agrees to all terms and conditions set forth in this Agreement.

**THE GRANTEE HEREBY EXECUTES THIS FULL FUNDING GRANT AGREEMENT THIS**

9th **DAY** OF January, 2017

Signature: Dorval R Carter

Dorval R. Carter, Jr.
President
Chicago Transit Authority

**ATTESTED BY:**

Signature: ____________________

Gregory P. Longhini
Assistant Secretary to the Board
Chicago Transit Board, Chicago Transit Authority

## AFFIRMATION OF GRANTEE'S ATTORNEY

As the undersigned Attorney for the Grantee, I affirm to the Grantee that I have examined this Agreement and the proceedings taken by the Grantee relating to it. As a result of this examination I hereby affirm to the Grantee the Execution of the Agreement by the Grantee is duly authorized under state and local law. In addition, I find that in all respects the Execution of this Agreement is due and proper and in accordance with applicable State and local law. Further, in my opinion, this Agreement constitutes a legal and binding obligation of the Grantee in accordance with the terms of the Agreement. Finally, I affirm to the Grantee that, to the best of my knowledge, there is no legislation or litigation pending or imminent that might adversely affect the full implementation of the Project in accordance with the terms thereof.

DATED 9th DAY OF January, 2017

AFFIRMED BY:

Signature: Karen G Seimetz
Karen G. Seimetz
General Counsel
Chicago Transit Authority

**Attachment 1**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Scope of the Project**

The Red and Purple Modernization Phase One Project (the Project) would expand capacity along CTA's Red and Purple heavy rail lines in the 5.6-mile segment between approximately the Belmont and Howard stations on the north side of Chicago. The Core Capacity Project consists of the following elements that will allow CTA to expand service in the corridor:

- **Red-Purple Bypass** – Where the Brown Line intersects the Red and Purple lines at Clark Junction, the Project will construct a flyover that will allow northbound Brown Line trains to turn off the Red and Purple Line alignment without blocking other tracks. This work will also realign and replace approximately 0.3 miles of Red and Purple line tracks in the same area to eliminate sharp curves and allow for faster train speeds.
- **Lawrence to Bryn Mawr Modernization** – The Project will reconstruct the Lawrence, Argyle, Berwyn, and Bryn Mawr stations with wider platforms. The Project will also reconstruct and expand the approximately 1.3 miles of guideway connecting these stations to accommodate the station expansions.
- **Corridor Signal Improvements** – The Project will install a higher-capacity signal system between the Barry interlocking near the Belmont station and the Jarvis interlocking near the Howard station.
- **Advance System Work** – The Project will upgrade the signal system and infrastructure to accommodate continued train operations during construction.
- **Broadway Substation Upgrades** – The Project will increase traction power capacity to support expanded service.
- **Vehicles** – The Project includes the purchase of 32 railcars for expanded service.

The Red Line provides local service in the Project corridor 24 hours a day, seven days a week, while the Purple Line provides express service during weekday rush hours only. During the peak hour in the peak direction, defined as 7:30-8:30 a.m. in the southbound direction, CTA currently operates 23 Red Line trains and six Purple Line trains. Upon completion of the Project in 2027, CTA will increase peak-hour, peak-direction service to 26 Red Line trains and seven Purple Line trains.

The completion date for the Project is October 22, 2027.

**Attachment 1A**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Project Vicinity Map**



**Attachment 1B**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Project Location Map**



**Attachment 2**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Project Description**

Narrative Description

The RPM Phase One Project would expand four Red Line stations, re-align and reconstruct approximately 1.6 miles of track, structures and viaducts, construct a bypass (flyover) for the Brown Line at Clark Junction, and install a new higher-capacity signal system. Other upgrades to signaling and traction power are included, as well as the purchase of 32 vehicles.

Project Description by Standard Cost Category

The following provides a description of the Project by Standard Cost Category (SCC). These SCCs are the basis for the Baseline Cost Estimate and Baseline Schedule contained in Attachments 3 and 4, respectively.

SCC 10 – Guideway and Track Elements

This SCC includes guideway and track element upgrades in the following applicable subcategories:

SCC 10.04 – Guideway: Aerial structure

The Project will construct a new four-track elevated guideway for the Red and Purple lines approximately between Belmont Avenue and Cornelia Avenue, and approximately between Leland Avenue and Ardmore Avenue. The Project will also construct a single-track flyover structure for the northbound Brown Line from Clark Junction to approximately Seminary Avenue. The scope of work within this subcategory includes foundations, columns, track stringers, bents, bearing assemblies, decking, sound walls, and drainage systems.

SCC 10.08 – Guideway: Retained cut or fill

This subcategory provides for the excavation, backfill and retaining walls to support the aerial guideway work.

SCC 10.09 – Track: Direct fixation

This subcategory provides for the construction of new direct fixation track along new aerial guideway, as described under SCC 10.04.

SCC 10.12 – Track: Special (switches, turnouts)

This subcategory provides for the construction of special track, switches and turnouts for new interlockings and to support construction phasing.

SCC 20 – Station, Stops, Terminals, Intermodal

This SCC includes improvements associated with the expansion of four stations at Lawrence, Argyle, Berwyn and Bryn Mawr. SCC 20 includes the following applicable subcategories:

SCC 20.02 – Aerial station, stop, shelter, mall, terminal, platform

This subcategory includes expansion of stationhouses and platforms at Lawrence, Argyle, Berwyn, and Bryn Mawr and additional station entrances. The station elements include footings, platforms, canopies, tactile warning tile, mechanical, electric, and plumbing systems, informational kiosks, railings, station furnishings and signage necessary to manage the increased station capacity.

SCC 20.07 – Elevators, escalators

This subcategory provides for the installation of escalators at the expanded Argyle and Bryn Mawr Stations.

SCC 30 – Support Facilities; Yards, Shops, Administration Buildings

There are no scope and costs in this SCC category.

SCC 40 – Sitework and Special Conditions

This SCC includes all necessary site work and special work associated with utilities, hazardous materials, environmental mitigations, landscaping, temporary facilities, bus service during construction, and all associated general conditions including labor for train and vehicular control in support of increasing the capacity of guideways and stations. SCC 40 includes the following applicable subcategories:

SCC 40.01 – Demolition, Clearing, Earthwork

This subcategory includes site clearing, earthwork, demolition of existing structure and buildings in support of guideway and station construction. This includes removal of existing elements consisting of retained embankments, elevated track structures, track, traction power, systems components and rail stations to make way for the new expansion elements.

SCC 40.02 – Site Utilities, Utility Relocation

This subcategory includes relocation of existing utilities from within the right of way construction envelope. These utilities include electric, fiber optic, communication, cable, water, sewer and gas. This subcategory also includes new permanent and temporary site utilities in connection with the Project.

SCC 40.03 – Hazardous material, contaminated soil removal/mitigation, ground water treatments

This subcategory includes properly handling, disposing, or treating contaminated soil and water in support of the retained cut for the guideway expansion in SCC 10.08. It also includes handling, abatement or disposing of hazardous materials in existing facilities that are being demolished.

SCC 40.04 – Environmental mitigation, e.g. wetlands, historic archeological, parks

This subcategory includes the relocation and permanent placement of the National Register of Historic Places-eligible building located at 947-949 W. Newport Ave. to accommodate the guideway re-alignment adjacent to the property.

SCC 40.06 – Pedestrian/bike access and accommodation, landscaping

This subcategory includes construction and installation of sidewalks and associated curbs, gutters, permanent fencing, furnishings, and functional hardscapes and landscapes at the four stations.

SCC 40.08 – Temporary facilities and other indirect costs during construction

This subcategory includes mobilization and de-mobilization of field offices, equipment and all other associated general condition costs, vehicular and train traffic control, temporary way-finding signage, temporary utilities, temporary protection of work and public, temporary bus service during construction

closures as required and all elements of temporary station construction supporting interim phasing for the capacity expansion.

SCC 50 – Systems

This SCC includes the train control, traction power supply and distribution, communications, and fare collection systems required for the Project. SCC 50 includes the following applicable subcategories:

SCC 50.01 – Train control and signals

This subcategory includes installation of the higher capacity corridor signal improvements between the Barry interlocking and the Jarvis interlocking including installation, testing, commissioning and cutovers.

SCC 50.03 – Traction power supply: substations

This subcategory includes traction power equipment upgrades and cabling at the Broadway power substation and building envelope repairs to protect the new equipment, as well as building envelope repair and equipment reconfiguration as required to accommodate the guideway re-alignment near the Clark substation.

SCC 50.04 – Traction power distribution: catenary and third rail

This subcategory provides for the installation of new and reconfigured traction power contact rail and cabling approximately between Belmont and Howard stations.

SCC 50.05 – Communications

This subcategory provides for the installation of communication cables, right-of-way and station cameras, pole mounts and power supplies, fiber optic cables, fiber CCTV, wayside phone system and worker's ahead notification, as well as passenger information systems at the four expanded stations and temporary stations during construction.

SCC 50.06 – Fare collection system and equipment

This subcategory provides for the installation of additional fare collection equipment, ticket vending machines and customer kiosks at the four expanded stations and temporary stations during construction.

SCC 60 – Right-of-Way, Land, Existing Improvements

This SCC includes the acquisition of right-of-way, including relocations, as well as permanent and temporary easements required for construction of the Project. SCC 60 includes the following applicable subcategories:

SCC 60.01 – Purchase or lease of real estate

This subcategory provides for the acquisition of right-of-way, property rights, and temporary easements required for construction and operation of the capacity expansion project.

SCC 60.02 – Relocation of existing household and businesses

This subcategory includes all relocation costs associated with property acquisitions.

SCC 70 – Vehicles

This SCC provides for the procurement of rail cars needed for capacity expansion of the Project. SCC 70 includes the following applicable subcategories:

SCC 70.02 – Heavy Rail

This subcategory includes the fabrication, inspection, delivery, testing, and commissioning of 32 new rail cars for more frequent service in the Project corridor.

SCC 80 – Professional Services

This SCC includes all the costs of engineering, project management, construction administration and management, permits and fees, legal fees, training, start-up, testing, and other direct costs. SCC 80 includes the following applicable subcategories:

SCC 80.01 – Project Development

This subcategory includes the costs for providing professional and technical services during the Project Development phase.

SCC 80.02 – Engineering

This subcategory includes the costs for providing professional and technical services, including architectural services, design services, and specialty engineering support services, from Engineering and continuing through Project closeout.

SCC 80.03 – Project Management for Design and Construction

This subcategory includes the costs of project management for design and construction including CTA staff and other contracted professional services to manage and administer the Project through closeout.

SCC 80.04 – Construction Administration and Management

This subcategory includes the professional consultants contracted for program and construction management services which includes project scheduling, design support coordination, construction coordination, inspection, field engineering, quality assurance, safety certification, change order processing, preparation of independent cost estimates required in support of the Project.

SCC 80.06 – Legal: Permits; Review Fees by other agencies, cities, etc.

This subcategory includes the cost of legal services and permit fees required for the Project.

SCC 80.07 – Surveys, Testing, Investigation, Inspection

This subcategory includes the survey and inspection costs required for the Project.

SCC 90 – Unallocated Contingency

This SCC category represents the unallocated contingency for the Project. It provides a management reserve to address non-specified additional costs and uncertainty due to risk factors such as differing site conditions, commodity pricing fluctuations, unfavorable market conditions, and bid risk. It also covers unforeseen expenses and variances between estimates and actual costs. Contingency will be managed over the life of the Project in accordance with the Risk and Contingency Management Plan.

SCC 100 - Finance Charges

This category includes finance charges expected to be paid prior to either completion of the Project or the receipt of all the Section 5309 Core Capacity funding, whichever occurs later in time.

**Attachment 3**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Baseline Cost Estimate For the Core Capacity Project**

**Table 1 – BCE for the Core Capacity Project by Standard Cost Category**

| *Applicable Line Items Only* | | YOE Dollars Total |
|---|---|---|
| **10 GUIDEWAY & TRACK ELEMENTS (5.56 miles)** | | **$501,721,227** |
| 10.04 | Guideway: Aerial structure | $447,057,341 |
| 10.08 | Guideway: Retained cut or fill | $928,576 |
| 10.09 | Track: Direct fixation | $39,547,141 |
| 10.12 | Track: Special (switches, turnouts) | $14,188,169 |
| **20 STATIONS, STOPS, TERMINALS, INTERMODAL (4 stations)** | | **$41,119,384** |
| 20.02 | Aerial station, stop, shelter, mall, terminal, platform | $39,034,368 |
| 20.07 | Elevators, escalators | $2,085,016 |
| **40 SITEWORK & SPECIAL CONDITIONS** | | **$345,905,549** |
| 40.01 | Demolition, Clearing, Earthwork | $26,394,469 |
| 40.02 | Site Utilities, Utility Relocation | $140,021,269 |
| 40.04 | Environmental mitigation, e.g. wetlands, historic/archeologic, parks | $8,431,165 |
| 40.06 | Pedestrian / bike access and accommodation, landscaping | $201,570 |
| 40.08 | Temporary Facilities and other indirect costs during construction | $169,055,646 |
| **50 SYSTEMS** | | **$381,395,262** |
| 50.01 | Train control and signals | $237,456,178 |
| 50.03 | Traction power supply: substations | $10,427,581 |
| 50.04 | Traction power distribution: catenary and third rail | $112,908,483 |
| 50.05 | Communications | $16,926,638 |
| 50.06 | Fare collection system and equipment | $3,950,816 |
| **60 ROW, LAND, EXISTING IMPROVEMENTS** | | **$54,305,264** |
| 60.01 | Purchase or lease of real estate | $48,994,262 |
| 60.02 | Relocation of existing households and businesses | $5,312,204 |
| **70 VEHICLES (32)** | | **$68,590,134** |
| 70.02 | Heavy Rail | $68,590,134 |
| **80 PROFESSIONAL SERVICES (applies to Cats. 10-50)** | | **$270,046,770** |
| 80.01 | Project Development | $26,914,056 |
| 80.02 | Engineering | $33,358,529 |
| 80.03 | Project Management for Design and Construction | $85,390,602 |
| 80.04 | Construction Administration & Management | $109,570,385 |
| 80.06 | Legal; Permits; Review Fees by other agencies, cities, etc. | $14,299,084 |
| 80.07 | Surveys, Testing, Investigation, Inspection | $516,680 |
| **Subtotal (10 - 80)** | | **$1,663,083,590** |
| **90 UNALLOCATED CONTINGENCY** | | **$219,486,967** |
| **Subtotal (10 - 90)** | | **$1,882,570,557** |
| **100 FINANCE CHARGES** | | **$184,132,226** |
| **Total Project Cost (10 - 100)** | | **$2,066,702,783** |

**Attachment 3**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Baseline Cost Estimate For the Core Capacity Project**

**Table 2 – Inflated Cost to Year of Expenditure**

| Standard Cost Category Description | Base Year Dollars w/o Contingency | Base Year Dollars Allocated Contingency | Base Year Dollars TOTAL | Inflation Factor | YOE Dollars TOTAL |
|---|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (5.56 miles) | $371,840,821 | $26,475,736 | $398,316,557 | 1.2596 | $501,721,227 |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (4 stations) | $28,604,058 | $2,068,626 | $30,672,684 | 1.3406 | $41,119,384 |
| 40 SITEWORK & SPECIAL CONDITIONS | $180,535,425 | $112,296,122 | $292,831,546 | 1.1812 | $345,905,549 |
| 50 SYSTEMS | $294,915,417 | $13,769,526 | $308,684,943 | 1.2355 | $381,395,262 |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | $41,669,970 | $11,717,809 | $53,387,779 | 1.0172 | $54,305,264 |
| 70 VEHICLES (32) | $50,240,000 | $10,048,000 | $60,288,000 | 1.1377 | $68,590,134 |
| 80 PROFESSIONAL SERVICES (applies to Cats. 10-50) | $222,094,263 | $8,890,396 | $230,984,659 | 1.1691 | $270,046,770 |
| 90 UNALLOCATED CONTINGENCY | | | $178,078,377 | 1.2325 | $219,486,967 |
| 100 FINANCE CHARGES | | | $137,401,821 | 1.3401 | $184,132,226 |
| **Total Project Cost (10 - 100)** | | | **$1,690,646,367** | 1.2224 | **$2,066,702,783** |

**Attachment 3**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**
**Baseline Cost Estimate For the Core Capacity Project**

**Table 3 – BCE by Source of Funding**

| | **Total Project Cost in YOE Dollars** | **Federal 5309 Core Capacity** | **Federal Congestion Mitigation and Air Quality** | **Local** |
|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (5.56 miles) | $501,721,227 | $217,854,041 | $94,932,237 | $188,934,950 |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (4 stations) | $41,119,384 | $19,821,658 | $0 | $21,297,726 |
| 40 SITEWORK & SPECIAL CONDITIONS | $345,905,549 | $190,445,705 | $18,998,064 | $136,461,780 |
| 50 SYSTEMS | $381,395,262 | $183,984,426 | $819,032 | $196,591,804 |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | $54,305,264 | $32,420,845 | $155,546 | $21,728,873 |
| 70 VEHICLES (32) | $68,590,134 | $33,063,973 | $0 | $35,526,161 |
| 80 PROFESSIONAL SERVICES (applies to Cats. 10-50) | $270,046,770 | $124,071,546 | $825,657 | $145,149,566 |
| 90 UNALLOCATED CONTINGENCY | $219,486,967 | $104,660,475 | $0 | $114,826,492 |
| 100 FINANCE CHARGES | $184,132,226 | $50,285,102 | $0 | $133,847,123 |
| **Total Project Cost (10 - 100)** | **$2,066,702,783** | **$956,607,772** | **$115,730,537** | **$994,364,474** |

**Sources of Federal Funding and Matching Share Ratios**

| | Costs Attributed to Source of Funds | Federal/Local Matching Ratio within Source | All Federal Funds | Local Funds |
|---|---|---|---|---|
| Federal 5309 Core Capacity | $1,922,039,612 | 50/50 | $956,607,772 | $965,431,840 |
| Other Federal: CMAQ | $144,663,171 | 80/20 | $115,730,537 | $28,932,634 |
| **Total** | **$2,066,702,783** | | **$1,072,338,309** | **$994,364,474** |
| **Overall Federal Share of Project** | | **51.89%** | | |
| **Core Capacity Share of Project** | | **46.29%** | | |

**Attachment 3A**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Core Capacity Project Budget**

**Table 3A – Scope and Activity Description**

| Scope Code | ALI Code | Scope and Activity Line Item Descriptions | Qty | Total Federal % | Federal 5309 Core Capacity | | | Federal Congestion Mitigation and Air Quality | | | Project Totals | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Federal | Local | Total | Federal | Local | Total | Federal | Local | Total |
| 14010 | 14.01.10 | GUIDEWAY & TRACK ELEMENTS | 5.56 | 62.34% | $217,854,041 | $165,201,890 | $383,055,931 | $94,932,237 | $23,733,059 | $118,665,296 | $312,786,278 | $188,934,950 | $501,721,227 |
| 14020 | 14.02.20 | STATIONS, STOPS, TERMINALS, INTERMODAL | 4 | 48.21% | $19,821,658 | $21,297,726 | $41,119,384 | $0 | $0 | $0 | $19,821,658 | $21,297,726 | $41,119,384 |
| 14040 | 14.04.40 | SITEWORK & SPECIAL CONDITIONS | | 60.55% | $190,445,705 | $131,712,264 | $322,157,969 | $18,998,064 | $4,749,516 | $23,747,580 | $209,443,769 | $136,461,780 | $345,905,549 |
| 14050 | 14.05.50 | SYSTEMS | | 48.45% | $183,984,426 | $196,387,046 | $380,371,472 | $819,032 | $204,758 | $1,023,790 | $184,803,458 | $196,591,804 | $381,395,262 |
| 14060 | 14.06.60 | ROW, LAND, EXISTING IMPROVEMENTS | | 59.99% | $32,420,845 | $21,689,986 | $54,110,831 | $155,546 | $38,887 | $194,433 | $32,576,392 | $21,728,873 | $54,305,264 |
| 14070 | 13.13.70 | VEHICLES | 32 | 48.21% | $33,063,973 | $35,526,161 | $68,590,134 | $0 | $0 | $0 | $33,063,973 | $35,526,161 | $68,590,134 |
| 14080 | 14.08.80 | PROFESSIONAL SERVICES | | 46.25% | $124,071,546 | $144,943,152 | $269,014,698 | $825,657 | $206,414 | $1,032,072 | $124,897,203 | $145,149,566 | $270,046,770 |
| 14090 | 14.09.90 | UNALLOCATED CONTINGENCY | | 47.68% | $104,660,475 | $114,826,492 | $219,486,967 | $0 | $0 | $0 | $104,660,475 | $114,826,492 | $219,486,967 |
| 14100 | 14.10.10 | FINANCE CHARGES | | 27.31% | $50,285,102 | $133,847,123 | $184,132,226 | $0 | $0 | $0 | $50,285,102 | $133,847,123 | $184,132,226 |
| **Total Project Cost (10 - 100)** | | | | 51.89% | $956,607,772 | $965,431,840 | $1,922,039,612 | $115,730,537 | $28,932,634 | $144,663,171 | $1,072,338,309 | $994,364,474 | $2,066,702,783 |

# Attachment 4
# Chicago Transit Authority (CTA)
# Red and Purple Modernization Phase One Project
# Chicago, Illinois

## Baseline Schedule

| SCHEDULE | Start Date | End Date | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (5.56 MILES) | 7.17.2020 | 9.20.2024 | | | | | | | | | | | | | | | | |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (4 STATIONS) | 9.14.2022 | 3.22.2025 | | | | | | | | | | | | | | | | |
| 40 SITEWORK & SPECIAL CONDITIONS | 9.01.2015 | 2.17.2025 | | | | | | | | | | | | | | | | |
| 50 SYSTEMS | 9.29.2017 | 3.12.2025 | | | | | | | | | | | | | | | | |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | 11.18.2015 | 8.23.2018 | | | | | | | | | | | | | | | | |
| 70 VEHICLES (32) | 8.01.2024 | 6.07.2025 | | | | | | | | | | | | | | | | |
| 80 PROFESSIONAL SERVICES (applies to Cats. 10-50) | 2.14.2014 | 9.09.2026 | | | | | | | | | | | | | | | | |
| 90 UNALLOCATED CONTINGENCY | 1.01.2017 | 10.22.2027 | | | | | | | | | | | | | | | | |
| 100 FINANCE CHARGES | 10.01.2016 | 10.22.2027 | | | | | | | | | | | | | | | | |
| PROJECT COMPLETION (Expanded Service begins) | | 10.22.2027 | | | | | | | | | | | | | | | | |
| BEFORE AND AFTER STUDY, 2 YEARS POST COMPLETION | 10.22.2027 | 10.22.2029 | | | | | | | | | | | | | | | | |
| FULLFILLMENT OF THE CORE CAPACITY FUNDING COMMITMENT | | 9.30.2024 | | | | | | | | | | | | | | | | |
| COMPLETION OF PROJECT CLOSE-OUT, RESOLUTION OF CLAIMS | | 10.22.2029 | | | | | | | | | | | | | | | | |

**Attachment 5**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Prior Grants and Related Documents**

## I. Prior Grants (not included in the FFGA)

| Project Number | Obligation Date | Federal Amount | Funding Source | Purpose |
|---|---|---|---|---|
| IL-80-0006 | 7/1/2009 | $407,131 | Section 5303 Metropolitan Transportation Planning | Planning |
| IL-03-0279 | 4/8/2011 | $3,750,000 | Section 5309 Fixed Guideway Modernization | Planning |
| IL-80-0008 | 7/1/2011 | $406,500 | Section 5303 Metropolitan Transportation Planning | Planning |
| IL-80-0009 | 7/1/2012 | $80,640 | Section 5303 Metropolitan Transportation Planning | Planning |
| IL-80-0009 | 7/1/2012 | $414,000 | Section 5303 Metropolitan Transportation Planning | Planning |

## II. Related Documents

a. Adoption of Fiscally Constrained Long Range Transportation Plan with Locally Preferred Alternative________ October 13, 2010

b. Intent to Prepare Environmental Impact Statement________ January 3, 2011

c. North Red and Purple Modernization Project – Scoping Report________ August 18, 2011

d. Supplemental Notice of Intent to Prepare an Environmental Impact Statement________ July 26, 2012

e. FTA Approval to Enter Core Capacity Project Development________ November 19, 2013

f. Notice to Rescind Notice of Intent to Prepare an Environmental Impact Statement for Proposed Transit Improvements to Red and Purple Lines ________ April 23, 2014

g. Lawrence to Bryn Mawr Modernization Environmental Assessment________ April 29, 2015

h. Red-Purple Bypass Environmental Assessment________ May 19, 2015

i. Categorical Exclusions for Signal and Power Improvements July 20, 2015

j. Finding of No Significant Impact for the Lawrence to Bryn Mawr Modernization________ October 1, 2015

k. Finding of No Significant Impact for the Red-Purple Bypass Environmental Assessment________ October 29, 2015

l. FTA Approval to Enter Core Capacity Engineering________ December 21, 2015

m. Re-Evaluation for RPM Program Corridor Signal and Power Improvements and Red-Purple Bypass________ April 5, 2016

## III. FFGA Grant History (*Grants Under the FFGA*)

| Project No. | Obligation Date | Federal Amount | Funding Source | Purpose |
|---|---|---|---|---|
| IL-03-0285 | 8/7/2014 | $35,000,000 | FTA Section 5309 Core Capacity | Project Development |

**Attachment 6**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Schedule of Federal Funds**

Section 3005 of the Fixing America's Surface Transportation (FAST) Act (Pub. L. 114-94; Dec. 4, 2015) authorizes FTA to award discretionary Federal capital investment funds for design and construction of the CTA Red and Purple Modernization Phase One Project ("Project"), which is a Core Capacity Improvement project. *See*, 49 U.S.C. § 5309(e). In accordance with Federal transit law at 49 U.S.C. Chapter 53 and FTA Circular 5200.1A, Full Funding Grant Agreements Guidance (December 5, 2002), by the execution of this Agreement the Government is limiting its commitment to provide Federal Core Capacity funds for the Project to those funds that have been or may be appropriated during the term of the FAST Act and subsequent authorizations. The Government and the Grantee recognize, however, that the period of time necessary to complete the Project will extend beyond the FAST Act, as evidenced by Attachment 4 to this Agreement (Baseline Schedule).

Currently, the Government and the project sponsor anticipate that the Core Capacity funds will be provided for the Project as follows:

**Proposed Schedule of Federal Funds**
**(Based on Year of Appropriation)**

| Fiscal Year | Section 5309 Core Capacity Funding | Federal CMAQ Funding | Local Funding | Total Funding |
|---|---|---|---|---|
| 2016 and prior | $191,131,640 | $0 | $177,233,725 | $368,365,365 |
| 2017 | $125,000,000 | $0 | $115,910,770 | $240,910,770 |
| 2018 | $100,000,000 | $23,463,806 | $114,486,279 | $237,950,085 |
| 2019 | $100,000,000 | $0 | $92,728,616 | $192,728,616 |
| 2020 | $100,000,000 | $92,266,731 | $178,286,279 | $370,553,010 |
| 2021 | $100,000,000 | $0 | $92,728,616 | $192,728,616 |
| 2022 | $100,000,000 | $0 | $92,728,616 | $192,728,616 |
| 2023 | $100,000,000 | $0 | $92,728,616 | $192,728,616 |
| 2024 | $40,476,132 | $0 | $37,532,957 | $78,009,089 |
| **Total** | **$956,607,772** | **$115,730,537** | **$994,364,474** | **$2,066,702,783** |

**Attachment 7**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Measures to Mitigate Environmental Impacts**

The measures to mitigate the environmental impacts of the Red and Purple Modernization Phase One Project (the Project) are included in the environmental record and include the following documents, which are incorporated within.

- Lawrence to Bryn Mawr Modernization Project Environmental Assessment ____ April 29, 2015
- Red-Purple Bypass Project Environmental Assessment ____ May 19, 2015
- RPM Program Corridor Signal and Power Improvements Categorical Exclusions ____ July 20, 2015
- RPM Program Interim and Advance Infrastructure Improvements Categorical Exclusion ____ July 20, 2015
- Lawrence to Bryn Mawr Modernization Project Finding of No Significant Impact ____ October 1, 2015
- Red Purple Bypass Project Finding of No Significant Impact ____ October 29, 2015
- Re-Evaluation for RPM Program Corridor Signal and Power Improvements and Red-Purple Bypass ____ April 5, 2016

The mitigation measures and other project features that reduce adverse environmental and community impacts to which FTA and CTA committed in the FONSIs may not be eliminated from the Project, except by FTA's written consent and in accordance with applicable laws and regulations. These mitigation measures include commitments to perform further consultation with certain stakeholders on environmental and related matters. On September 1, 2016, CTA transmitted to FTA a Management Plan for Mitigation Actions that listed the status of the mitigation measures identified in the FONSIs. The table's purpose is to facilitate monitoring of the implementation of the mitigation measures during final design and construction. That table and its periodic revisions to add the measures resulting from required consultations, permit approvals, and FTA-approved changes, and to update the implementation status of the measures are incorporated herein by reference.

**Attachment 8**
**Chicago Transit Authority (CTA)**
**Red and Purple Modernization Phase One Project**
**Chicago, Illinois**

**Implementation of a Before and After Study**

The Chicago Transit Authority (CTA) will assemble information and conduct analyses to identify the actual outcomes of the Red and Purple Modernization Phase One Project (the Project) and evaluate the reliability of the predictions of those outcomes prepared during the planning and development of the project. CTA will assemble the information and conduct the analyses in accordance with the Before-and-After Study Plan prepared by CTA and approved by the Federal Transit Administration (FTA). Specifically, the plan addresses the following requirements:

## I. Required Information

CTA will assemble information on five key characteristics of the Project and its associated transit services:

1. Project scope: The physical components of the Project, including environmental mitigation and other related elements;
2. Capital cost: The total Project capital costs in constant dollars, formatted in FTA's Standard Cost Categories, and annual expenditures in year-of-expenditure dollars;
3. Service Levels: The service characteristics on the Project, feeder buses, and other affected transit services in the corridor;
4. Operation and maintenance (O&M) costs: Estimates the incremental operating/maintenance (O&M) costs of the project and the transit system as a whole;
5. Ridership: Describes peak-hour/peak-direction ridership and capacity on the project as well as overall ridership in the corridor.

## II. Milestones

CTA will assemble predictions of Project outcomes at two milestones during development of the Project and will collect data at two milestones during its implementation. At each milestone, CTA will archive the assembled information, data, and documentation and provide to FTA a copy of the archive.

1. Entry into Engineering: The predicted outcomes on all five Project characteristics provided by CTA in support of its request to advance the Project;
2. Full Funding Grant Agreement: The predicted outcomes on all five Project characteristics provided by CTA in support of its request for a funding commitment, plus an analysis of the accuracy of predictions at the previous milestone compared to predictions at this milestone;
3. Actual Conditions before the Project: Data collected on existing transit services, O&M costs, and transit ridership immediately prior to any significant changes in transit services levels caused by either the construction or the opening of the Project; and

4. Actual Conditions after Project Completion: Data collected on the actual physical scope and capital costs of the Project when it is completed and on transit service levels, O&M costs and ridership two years after the start of the expanded service.

**III. Final Report**

Within 36 months after Project opening, CTA will complete a final report that for each project outcome (1) documents the actual outcome of the Project, (2) evaluates the accuracy of the predicted outcomes that were prepared during planning and development of the project, and (3) identifies any lessons learned about the preparation of those predictions that may be useful for future projects. The body of the final report will be 15-20 pages that will highlight findings, conclusions, and lessons learned. Appendices to the final report will provide details supporting the findings and conclusions.

**IV. Coordination with FTA**

CTA will maintain communication with FTA and its contractors on progress in implementing the Before-and-After Study Plan and provide opportunities for early review and for commenting on draft products. CTA must obtain approval in advance of any changes in the scope or schedule for the Study as defined in the Study Plan approved by FTA.