# Exhibit D

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**
**WASHINGTON, D.C.**

# FULL FUNDING GRANT AGREEMENT

**CHICAGO TRANSIT AUTHORITY**

**CHICAGO, IL**

**RED LINE EXTENSION PROJECT**

IL-2025-001-00

## TABLE OF CONTENTS

### FULL FUNDING GRANT AGREEMENT TERMS AND CONDITIONS


SECTION 1. DEFINITIONS ....2
SECTION 2. PURPOSES OF AGREEMENT ....3
SECTION 3. PREVIOUS FEDERAL DOCUMENTS AND GRANTS ....4
SECTION 4. OBLIGATION TO COMPLETE THE PROJECT ....4
SECTION 5. REVENUE SERVICE DATE AND LEVELS OF SERVICE ....5
SECTION 6. NET PROJECT COST ....6
SECTION 7. ESTIMATED NET PROJECT COST ....6
SECTION 8. LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT ....6
SECTION 9. FEDERAL FUNDING—OTHER SOURCES ....7
SECTION 10. LOCAL FINANCIAL COMMITMENT—CAPITAL COSTS ....7
SECTION 11. AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE ....8
SECTION 12. LOCAL FINANCIAL COMMITMENT—OPERATING ANDMAINTENANCE COSTS ....8
SECTION 13. BASELINE COST ESTIMATE ....9
SECTION 14. BASELINE SCHEDULE ....9
SECTION 15. PROJECT MANAGEMENT OVERSIGHT ....10
SECTION 16. ENVIRONMENTAL PROTECTION ....10
SECTION 17. LABOR PROTECTION ....10
SECTION 18. GOVERNMENT ACTIONS ....11
SECTION 19. REMEDIES ....11
SECTION 20. CONTENTS OF AGREEMENT ....12
SECTION 21. SIMULTANEOUS CREATION OF AGREEMENT IN ELECTRONICFORMAT ....12
SECTION 22. AMENDMENTS TO AGREEMENT ....12
SECTION 23. ATTACHMENTS—INCORPORATION ....12
SECTION 24. NOTICES ....13
SECTION 25. APPLICABLE LAW ....13
SECTION 26. AWARD AND EXECUTION OF AGREEMENT ....13
EXECUTION BY GRANTEE ....14
AFFIRMATION OF GRANTEE'S ATTORNEY ....15


### ATTACHMENTS


| | |
|---|---|
| ATTACHMENT 1 | SCOPE OF PROJECT |
| ATTACHMENT 1A | PROJECT VICINITY MAP |
| ATTACHMENT 1B | PROJECT LOCATION MAP |
| ATTACHMENT 2 | PROJECT DESCRIPTION |
| ATTACHMENT 3 | BASELINE COST ESTIMATE |
| ATTACHMENT 3A | PROJECT BUDGET |
| ATTACHMENT 4 | BASELINE SCHEDULE |
| ATTACHMENT 5 | PRIOR GRANTS AND RELATED DOCUMENTS |
| ATTACHMENT 6 | SCHEDULE OF FEDERAL FUNDS |
| ATTACHMENT 7 | MEASURES TO MITIGATE ENVIRONMENTAL IMPACTS |
| ATTACHMENT 8 | INFORMATION COLLECTION AND ANALYSIS PLAN |

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

# FULL FUNDING GRANT AGREEMENT

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Full Funding Grant Agreement, the Government (FTA) has awarded Federal assistance in support of the Project described below. Upon execution of this Full Funding Grant Agreement by the Grantee named below, the Grantee affirms this Award by Government (FTA Award), and enters into this Full Funding Grant Agreement with FTA. The following documents are incorporated by reference and made part of this Full Funding Grant Agreement:

(1) "Federal Transit Administration Master Agreement," FTA MA (31), May 2, 2024;
(2) The FTA Certifications and Assurances applicable to the Project that the Grantee has selected and provided to FTA; and
(3) Any Award notification containing special conditions or requirements, if issued.

## FTA AWARD

The Government (FTA) hereby awards a Full Funding Grant as follows:

Project Number(s): IL-2025-001-00

Grantee: Chicago Transit Authority (CTA), Chicago, IL

Citation of Statutes Authorizing the Project: 49 U.S.C. §§ 5309(b), 5309(d)

Estimated Net Project Cost: $5,750,004,647

Maximum FTA Amount Awarded: $1,973,978,348

Amount of This FTA Award: $746,000,000

Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution: $1,973,978,348

Maximum Percentage of FTA Participation: 36.6 percent

Maximum Percentage of Section 5309 Capital Investment Grant Program Participation: 34.3 percent

Dates of U.S. Department of Labor Certifications of Transit Employee Protective Arrangements:

| Original Project or Amendment Numbers: | Certification Dates: |
| --- | --- |
| IL-2025-001-00 | December 12, 2024 |

Revenue Service Date: August 5, 2031

Project Description:

The Red Line Extension Project (the Project) is a 5.5-mile heavy rail extension to the existing Red Line Dan Ryan branch on Chicago's Far South Side from the present 95th Street Terminal to the 130th Street area. The Project plans to operate heavy rail rapid transit service on an elevated structure from approximately 95th Street to 118th Street, where it transitions to an at-grade profile and then continues at grade before terminating near 130th Street. The 103rd Street, 111th Street, and Michigan Avenue stations will be elevated, and the 130th Street station will be at-grade. The Project includes four stations, parking facilities with approximately 1,200 spaces, new traction power substations, a new railyard and maintenance shop near 120th Street, and the purchase of 78 rail cars.

For a more detailed Project description, see Attachments 1 and 2.

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

# FULL FUNDING GRANT AGREEMENT TERMS AND CONDITIONS

**THIS FEDERAL TRANSIT ADMINISTRATION FULL FUNDING GRANT AGREEMENT** (Agreement) is entered into by Chicago Transit Authority, Chicago, IL (Grantee), and the United States of America, acting through the United States Department of Transportation, Federal Transit Administration (FTA or Government).

**WHEREAS,** the Grantee has determined through the local planning process that construction of the Red Line Extension Project (Project) will effectively and efficiently serve the transportation needs of the corridor from the present 95th Street Terminal to the 130th Street area.

**WHEREAS,** the Grantee has developed a Financial Plan, as herein defined, using a combination of local, state, and Federal funds to finance the costs of the Project and, in accordance with its plan, has requested a Grant, as herein defined, of Federal financial assistance in the Project.

**WHEREAS,** the Government has determined to enter into this Agreement and to support final design and construction of the Project up to a Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution of $1,973,978,348, subject to all the terms and conditions set forth in this Agreement.

**WHEREAS,** the Grantee has submitted its request for Federal assistance (the Application) and the Government has received and is relying upon the Grantee's assurances, certifications, and all other documents required as conditions precedent to a Grant of assistance by the Government for the Project; and, in its submissions, the Grantee has demonstrated justification for the Project, has demonstrated its financial, organizational, legal, and technical capacity as is necessary to Complete the Project within the maximum amount of Federal assistance set forth in this Agreement, and has demonstrated the capability to secure non-Federal funds as may be necessary for such completion.

**WHEREAS,** the Government has determined that the Project is justified based on a comprehensive review of its mobility improvements, environmental benefits, cost effectiveness, land use, economic development effects, and congestion relief; and the Project is supported by an acceptable degree of local financial commitment, including evidence of stable and dependable financing sources to construct, maintain, and operate the Project.

**WHEREAS,** the Government and the Grantee have agreed that their respective duties and responsibilities as related to the completion of the Project shall be determined by and under the terms and conditions of this Agreement and have agreed that this Agreement shall be recognized as the sole understanding between the Government and the Grantee in consideration of the mutual promises as set forth in this Agreement.

**THEREFORE,** in consideration of the above and the parties' mutual promises as set forth in this Federal Transit Administration Full Funding Grant Agreement, the Grantee and the Government agree to the specific terms, conditions, and provisions set forth in this entire Agreement including, in particular, the specific terms of the following Sections and Attachments.

## SECTION 1. DEFINITIONS

**"Agreement"** means this Federal Transit Administration Full Funding Grant Agreement (FFGA) and consists of all parts and documents listed in Section 20 of this Agreement, "Contents of Agreement," and will include all future addenda, substitutions, modifications, and amendments as and when legally executed and effective. (This definition supersedes the definition of "Grant Agreement" set forth in Section 2(a) of the Federal Transit Administration Master Agreement (Master Agreement), incorporated by reference and made part of this Agreement).

**"Application"** means those documents and written submissions filed by or on behalf of the Grantee pursuant to its request for Federal financial assistance for support of the Project and relied upon by the Government as satisfaction of the legal and policy requirements of Grant award. The Application includes all explanatory, supporting, or supplementary documents related to the Project that the Government relied upon in its determination to obligate and award Federal funds for the Project. (This definition is intended to supplement the definition "Application" set forth in Section 2(a) of the Master Agreement, incorporated by reference and made part of this Agreement.)

**"Baseline Cost Estimate"** means the Application document described in Section 13 of this Agreement and set forth in the Tables that comprise Attachment 3. The requirements of the Baseline Cost Estimate are set forth in FTA Circular 5200.1A, "Full Funding Grant Agreements Guidance," as may be revised from time to time. The Baseline Cost Estimate reflects the total anticipated cost of the Project as of the Date of this Agreement.

**"Complete the Project"** means to accomplish all of the scope and activities of the Project as described in Attachment 1, "Scope of the Project," and Attachment 2, "Project Description."

**"Date of this Agreement"** means the date the Government awards this Full Funding Grant Agreement.

**"Estimated Net Project Cost"** means the amount that is calculated by subtracting the cost that can reasonably be financed from the Grantee's revenue from the total anticipated cost of the

Project as reflected in the "Baseline Cost Estimate," Attachment 3. The Estimated Net Project Cost is set forth in Section 7 of this Agreement.

**"Financial Plan"** means the plan accepted by the Government as part of the Application process describing the Grantee's financial condition and capability to Complete the Project and to maintain and operate the Project together with its existing transit system. It includes all explanatory, supporting, and supplementary documents, commitments, and agreements accepted or approved by the Government.

**"Government"** means the United States of America, acting through the Federal Transit Administration of the United States Department of Transportation.

**"Grantee"** means Chicago Transit Authority, Chicago, IL.

**"Grant(s)"** means, in singular and plural forms, the obligation and award of Federal financial assistance by the Government pursuant to the laws codified at 49 U.S.C. Chapter 53.

**"Levels of Service"** means the hours of service and the service headways set forth in Attachment 1, "Scope of the Project."

**"Local Share"** means that portion of the Grantee's local financial commitment that is the Grantee's legally required share of the Net Project Cost.

**"Master Agreement"** means the standard terms and conditions applicable to recipients of Federal financial assistance from the Government. It is updated and published annually. It is incorporated by reference and made part of this Agreement and identified in Federal Fiscal Year 2024 by FTA Form MA(31) (May 2, 2024).

**"Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution"** means the limit of Federal Section 5309 Capital Investment Grants Program financial participation in the Project. (The amount of the "Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution" is set forth in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment," and is only a portion of the total Federal financial contribution for the Project.)

**"Maximum FTA Amount Awarded"** means the total amount of Federal funds from all sources administered by FTA and awarded for the Project, regardless of source, and available to the Grantee. (This amount is set forth in the first page of this Agreement.)

**"Net Project Cost"** means the cost of the Project that cannot reasonably be financed from the Grantee's revenues.

**"Project"** means the transit/transportation improvements the Grantee has promised to implement as a condition of its Full Funding Grant. A description of the Project is set forth in Attachment 1, "Scope of the Project." Activities to carry out the Project scope are set forth in Attachment 2, "Project Description."

**"Project Cost"** means all costs eligible for Federal financial participation under the terms of this Agreement and consistent with the cost principles set forth in Section 7 of the Master Agreement, "Payments to the Recipient."

**"Recovery Plan"** means a plan developed by the Grantee, and accepted by the Government, whereby the Grantee will take every reasonable measure to minimize any delay in achieving the baseline schedule set forth in Attachment 4 to this Agreement (the Baseline Schedule) and eliminate or otherwise mitigate (recover) any increase in the total Project costs as currently estimated, as compared to the total Project cost identified in Attachment 3 to this Agreement (the Baseline Cost Estimate).

**"Revenue Service Date"** means the date certain upon which the Grantee shall commence revenue operations of the full Project as defined in Section 5 of this Agreement.

## SECTION 2. PURPOSES OF AGREEMENT

Pursuant to 49 U.S.C. § 5309, the purposes of this Agreement are to:

(a) provide Federal financial assistance to the Grantee in the form of this Full Funding Grant and possible future awards of financial assistance as contemplated under this Agreement, not to exceed the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for the Project, as is and may be awarded under this Agreement and the laws codified at 49 U.S.C. Chapter 53 for purposes that are consistent with those statutes, implementing regulations, and other applicable laws and regulations;

(b) describe the Project and set forth the mutual understandings, terms, conditions, rights, and obligations of the parties related to implementing the Project, the future management and operation of the Project, and the manner in which Project real property and equipment will be used;

(c) establish the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for the Project, and the manner in which all future Federal funds for the Project, if any, will be awarded and released to the Grantee;

(d) establish the Grantee's financial commitment to the Project including its obligation to fund the Local Share, its obligation to Complete the Project with a specified amount of Federal assistance, its obligation to achieve revenue operation of the Project by a specified date, its obligation to pay all costs necessary to Complete the Project that are in excess of the Estimated Net Project Cost, and its obligation to finance the future maintenance and operational costs of the Project; and

(e) facilitate timely and efficient management of the Project.

## SECTION 3. PREVIOUS FEDERAL DOCUMENTS AND GRANTS

(a) Federal law, procedure, and policy require the completion of a project development process and environmental review prior to the Award and Execution of this Agreement. Prior Grants of Federal assistance awarded by the Government for this project development process are described in Attachment 5 to this Agreement. These Grants (and any other previous documents identified in Attachment 5, including Letters of No Prejudice) are incorporated by reference and made part of this Agreement, except for the terms and conditions thereof specifically superseded by this Agreement. Further, in executing this Agreement, the Grantee assures the Government that the Certifications and Assurances (made by the Grantee, or on behalf of the Grantee by a third party), upon which the Government relied in these prior actions were made in good faith and to the best of the Grantee's knowledge and belief, and that the Grantee has no present knowledge of facts or circumstances substantially affecting the continued validity of these Certifications and Assurances that the Grantee has not formally conveyed to the Government prior to the Government's Award of funding set forth in this Agreement.

(b) This Agreement does not discharge or rescind any of the terms, conditions, or obligations established under the documents set forth in Attachment 5 unless specifically stated otherwise herein. Furthermore, the terms, conditions, and obligations of this Agreement take precedence over the provisions of all prior agreements between the Grantee and the Government related to the Project and will be controlling for all actions related to the Project taken after the Date of this Agreement unless specifically stated otherwise herein.

(c) No amendments will be sought or approved to increase the amount of funds in the prior Grants listed in Attachment 5 beyond the amounts described in this Agreement as available to the Project.

## SECTION 4. OBLIGATION TO COMPLETE THE PROJECT

(a) The Government has no obligation to provide any financial assistance for the Project beyond the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution. If the total Federal funding provided under Section 8 of this Agreement, "Limitations of the Federal Funding Commitment," is insufficient to undertake the activities necessary to Complete the Project and begin revenue operations, the Grantee agrees to Complete the Project and accepts sole responsibility for the payment of any additional costs (overruns).

(b) If at any time during its efforts to Complete the Project the Grantee determines that the total Project Cost will exceed the Baseline Cost Estimate, the Grantee must immediately notify the Government of the amount of the difference and the reasons for the difference. Further, the Grantee must provide the Government with a Recovery Plan that demonstrates the Grantee is taking and will take every reasonable measure to recover the difference between the total project cost and the Baseline Cost Estimate. Insofar as any difference between the total Project cost and the Baseline Cost Estimate cannot be recovered, the Grantee must secure and provide such additional resources as are necessary to meet the additional costs and expeditiously Complete the Project without further financial assistance from the Federal Section 5309 Capital

Investment Grants Program. Further, in its Recovery Plan, the Grantee must identify the sources of funds it will draw upon to meet the additional costs and cover the difference between the total Project Cost and the Baseline Cost Estimate.

## SECTION 5. REVENUE SERVICE DATE AND LEVELS OF SERVICE

(a) The Grantee agrees and promises to achieve revenue operations of the Project on or before August 5, 2031 (the Revenue Service Date), in accordance with the terms and conditions of this Agreement.

(b) The Revenue Service Date is a significant term of this Agreement. The Grantee's failure to achieve the operational functions of the Project on or before the Revenue Service Date will constitute a breach of this Agreement. Upon the Grantee's request, the Government may determine, at its sole discretion, to waive a breach or an anticipatory breach of this Agreement and to extend the Revenue Service Date if there is an unavoidable delay in achieving the operational goals of the Project resulting from an event or circumstance beyond the control of the Grantee, or if the Government determines that allowing the delay is in the best interest of the Government and the success of the Project. Requests by the Grantee for waiver of a breach or anticipatory breach of this Agreement and extension of the Revenue Service Date for the reasons set forth herein shall be submitted promptly (with appropriate documentation) to the Government. In the exercise of its discretion to waive the breach and extend the Revenue Service Date, the Government will take into consideration the actions and measures taken by the Grantee to ensure adherence to its promise to achieve the operational goals of the Project on or before the scheduled Revenue Service Date.

(c) Delays in appropriations of funds from Congress shall not constitute a basis for extension of the Revenue Service Date.

(d) The Government's consent to extend the Revenue Service Date pursuant to Paragraph (b) of this Section 5 does not constitute a basis for additional Federal financial assistance beyond the Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution.

(e) Set forth in Attachment 1 to this Agreement, "Scope of Project," are the hours of service and headways the Grantee will maintain once the Project is opened to revenue service and for no less than five years thereafter. These specified Levels of Service are a significant term of this Agreement. The Grantee's failure to achieve and maintain these Levels of Service at the Revenue Service Date and for five years thereafter constitutes a breach of this Agreement. Upon the Grantee's request, the Government may determine in its sole discretion to waive a breach of Grantee's obligation to maintain these specified Levels of Service for events or circumstances beyond the control of the Grantee, or if the Government determines that a waiver is in the interests of the United States. In the exercise of its discretion whether to waive a breach of the specified Levels of Service, the Government will take into consideration the actions and measures taken by the Grantee to achieve and maintain the operational goals of the Project and the Grantee's entire public transportation system for at least five years beyond the opening of the Project to revenue service.

## SECTION 6. NET PROJECT COST

(a) This Grant is to assist in the payment of actual eligible costs within the scope of the Project under this Agreement, minus any amount that can reasonably be financed from revenues of the Grantee. If the funds awarded under this Grant exceed the amount necessary to finance the Federal share, those excess funds are not available to the Grantee for payment of costs beyond the scope of the Project supported by this Grant.

(b) In accordance with FTA Master Agreement, a refund or reduction of the Grantee's Local Share of the Net Project Cost requires a refund to the Government of a proportional amount of the Federal financial assistance provided under this Agreement.

(c) The portion of the Net Project Cost that may be financed by the Government with Federal Section 5309 Capital Investment Grants Program funds may not exceed the amount of the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for this Project as stated in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment."

(d) The Grantee acknowledges that Federal funds may be used only to reimburse eligible expenses for the Project. Should FTA determine that Federal funds have been used to reimburse any expenses that were ineligible for Federal reimbursement, FTA will direct the Grantee either to reimburse FTA with local funds not already committed to the Project or to reduce the total Project costs by the amounts found to have been ineligible.

## SECTION 7. ESTIMATED NET PROJECT COST

(a) The Government's determination to provide financial assistance for the Project is based, in significant part, upon the Grantee's estimated Project costs as set forth in the "Baseline Cost Estimate," Attachment 3 to this Agreement. The Estimated Net Project Cost reported in Attachment 3 is $5,750,004,647.

(b) The Estimated Net Project Cost financed with the Execution of this Agreement is limited by the amount of the Maximum FTA Amount Awarded. The amount of the Estimated Net Project Cost and the amount of the Maximum FTA Amount Awarded are stated in the first page of this Agreement. The amount reimbursable by the Government is limited to the lesser of either the amount of the Maximum FTA Amount Awarded or the maximum percentage of FTA participation permitted by Federal law and regulations. Additional funds will not be provided until a Grant amendment awarding additional funds and amending this Full FundingGrant Agreement is executed.

## SECTION 8. LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT

(a) With its Award set forth in this Agreement, the Government obligates $746,000,000 for a total award of $1,973,978,348 in Section 5309 Capital Investment Grants Program financial assistance for the Project. FTA has not previously awarded Section 5309 Capital Investment Grants Program funds for the Project. The sources of this Federal financial assistance are set forth in the "Project Budget," Attachment 3A. These funds are in addition to all previous

Federal financial commitments in the development of the Project as set forth in the schedule of "Prior Grants and Related Documents," Attachment 5 of this Agreement.

(b) The award by the Government of the Section 5309 Capital Investment Grants Program financial assistance to the Project under Paragraph (a) of this Section 8 is subject to the following limitations:

(1) the availability of appropriated funds; and

(2) the Grantee's continued performance under the terms and conditions of this Agreement.

(c) The Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for the Project is limited to $1,973,978,348.

## SECTION 9. FEDERAL FUNDING—OTHER SOURCES

The Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution specified in Section 8(c) of this Agreement does not include funds other than from the Capital Investment Grants program under 49 U.S.C. Chapter 53. Should such other Federal funds be provided for the Project in addition to the Section 5309 Capital Investment Grants Program funds set forth in Attachment 6 of this Agreement, the limitation on the Federal funding commitment set forth in Section 8 of this Agreement shall not apply to those funds.

Accordingly, such additional funds shall be excluded from the calculation of the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution. Funds awarded pursuant to this Section will be subject to all other terms, conditions and obligations set forth in the Agreement.

## SECTION 10. LOCAL FINANCIAL COMMITMENT—CAPITAL COSTS

(a) As a condition of the Government's Award of this Full Funding Grant, the Grantee has developed and adopted a Financial Plan for financing all Project Costs necessary to Complete the Project. In addition to the amount of Federal funds requested, the Financial Plan includes a statement identifying the State, local and/or private sources of funding and the amount of funds available for and committed to the Project from each such source. This Financial Plan, as accepted by the Government, with the supporting documentation (including formal funding agreements and commitments) is hereby incorporated by reference and made part of this Agreement.

(b) The Grantee hereby commits and certifies that it will provide funds in an amount sufficient, together with the Federal contribution (acknowledging the limitations as set forth in this Agreement), to assure timely and full payment of the Project Costs as necessary to Complete the Project.

(c) The Grantee hereby commits and certifies that the Local Share portion of its financial commitment will be provided from funding sources other than Federal funds (except as may

otherwise be authorized by Federal statute), receipts from the use of Project facilities or equipment (except as may otherwise be authorized by Federal statute), or revenues of the public transportation system in which such facilities or equipment are used.

(d) Given the Estimated Net Project Cost, as set forth in Section 7 of this Agreement, the Grantee's financial commitment to the Net Project Cost is estimated to total $3,644,076,299. This amount constitutes the Local Share needed to match the Maximum Section 5309 Capital Investment Grants Program Financial Contribution for the Project and Other Federal Sources. In the event that the actual Federal financial contribution for the Project is reduced or is increased or the funding percentage as set forth in this Agreement is changed, the portion of the Grantee's financial contribution for the Project that is identified as Local Share shall be adjusted accordingly.

(e) The Grantee agrees to notify the Government of any change in circumstances or commitments that adversely affect the Grantee's plan to fund the Project Costs necessary to Complete the Project as set forth in the Financial Plan. In its notification, the Grantee shall advise the Government of what actions it has taken or plans to take to ensure adequate funding resources and shall reaffirm its commitment to the Government as set forth in Paragraph (b) of this Section 10.

## SECTION 11. AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE

The Grantee may incur costs or expend local funds for all phases of the Project as is reasonably necessary to advance the Project prior to an award of Federal funding assistance without prejudice to possible future Federal participation in or reimbursement of the Project Costs to the extent that such costs are incurred in accordance with all applicable Federal requirements and this Agreement. It is understood that the authority conferred on the Grantee to advance the Project without prejudice does not constitute a legal commitment by the Government to obligate and award Federal funds.

## SECTION 12. LOCAL FINANCIAL COMMITMENT—OPERATING AND MAINTENANCE COSTS

(a) As a condition of the Government's Award of funding set forth in this Agreement, the Grantee has developed and adopted a Financial Plan to finance the future operation and maintenance of the Project that also takes into consideration the Grantee's continuing financial responsibilities to operate, maintain, and reinvest in its existing transit system. This Financial Plan, as accepted by the Government, and the supporting documentation (including specific funding commitments) evidencing stable and dependable funding sources are an essential part of the Grantee's Application and are made part of this Agreement by incorporation of the Application.

(b) With the Execution of this Agreement, the Grantee assures that it has stable and dependable funding sources, sufficient in amount and in degree of commitment, to operate and maintain its entire mass transportation system at an adequate and efficient level of service, including the future operation and maintenance of the Project without additional Federal assistance beyond

the amounts set forth in the Financial Plan. The foregoing assurance does not preclude the Grantee from altering service through contracts with private providers of mass transportation services.

(c) The Grantee will notify the Government of any change in circumstances or commitments that adversely affects the Grantee's plan to fund the maintenance and operating costs of the Project as set forth in the Financial Plan. In its notification, the Grantee will advise the Government of actions it has taken or plans to take to ensure adequate funding resources and will reaffirm to the Government its assurance as set forth in Paragraph (b) of this Section.

**SECTION 13. BASELINE COST ESTIMATE**

(a) In its Application, the Grantee submitted to the Government a Baseline Cost Estimate for the activities constituting the Project. The Baseline Cost Estimate is accepted by the Government and is Attachment 3 of this Agreement. The Baseline Cost Estimate is derived from cost estimates of the individual third-party contracts and force account work that, in sum, constitute the Project; it reflects appropriate escalation and Project schedule dates.

(b) The Government intends to use the Baseline Cost Estimate to monitor the Grantee's compliance with certain terms and conditions of this Agreement. The Baseline Cost Estimate established in Attachment 3 serves as the measure of cost estimates as of the Date of this Agreement, and should not be amended or modified during the implementation of the Project.

(c) The Grantee will submit cost reports on the implementation of the Project as required by this Agreement and in a format consistent with the units set forth in the Baseline Cost Estimate so that the Government can, with reasonable diligence, reconcile the Grantee's reports with the Baseline Cost Estimate.

**SECTION 14. BASELINE SCHEDULE**

(a) In its Application, as approved, the Grantee submitted a Baseline Schedule for the Project that demonstrates how the Grantee intends to implement the Project and meet the Revenue Service Date. This Baseline Schedule has been accepted by the Government and is Attachment 4 of this Agreement.

(b) The schedule for the Project may be modified from time to time at the discretion of the Grantee. However, the Baseline Schedule is not to be modified because it is to be used as a basis for comparing planned to actual Project implementation. The Grantee will notify the Government when a Project schedule modification has the potential to change the Revenue Service Date and describe the actions planned to recover the schedule. The Government's acquiescence in such notice will not be deemed approval by the Government of an extension of a Revenue Service Date unless the Government expressly grants an extension in writing.

## SECTION 15. PROJECT MANAGEMENT OVERSIGHT

The Project is a "Major Capital Project" as defined in FTA's Project Management Oversight regulations at 49 CFR § 633.5. Accordingly, the Grantee agrees that all requirements and conditions set forth in the rule at 49 CFR Part 633 apply to the Project activities. Noncompliance with any regulatory requirements shall constitute a breach of this Agreement unless the Government formally waives the regulatory requirement.

## SECTION 16. ENVIRONMENTAL PROTECTION

(a) As a condition precedent to this Agreement, the environmental impacts of the Project have been assessed as required by law. The results of that assessment and the adopted mitigation measures are described in the environmental documents identified in Attachment 7 of this Agreement. These documents together with related agreements and supporting documentation are incorporated by reference and made part of this Agreement. To assist the Government in monitoring the implementation of the adopted mitigation measures, these measures are specifically referenced in Attachment 7 of this Agreement. It is understood and agreed that the description in Attachment 7 shall not supersede or in any way result in a circumvention of the requirements set forth in the Government's environmental record for the Project.

(b) Certain terms and conditions of this Agreement as related to the Grantee's responsibility to ensure protection of the environment are set forth in Section 26 of the Master Agreement, "Environmental Protections." Under Subsection 26(i), "Mitigation of Adverse Environmental Effects," the Grantee is required, among other actions, to undertake all environmental mitigation measures that are identified in environmental documents prepared for the Project. Accordingly, the Grantee understands that it shall not withdraw or substantially change any of the adopted mitigation measures as described in the Government's environmental record for the Project without the express written approval of the Government.

(c) This Section is intended only to supplement the provisions set forth in Section 26 of the Master Agreement, "Environmental Protections."

## SECTION 17. LABOR PROTECTION

The Grantee will carry out the Project in conformance with the terms and conditions determined by the Secretary of Labor to be fair and equitable to protect the interests of employees affected by the Project and meet the requirements of 49 U.S.C. § 5333(b) and U.S. Department of Labor (USDOL) Guidelines at 29 CFR Part 215. These terms and conditions are identified in the letters of certification from USDOL on the dates set forth on the first page of this Agreement. The Grantee will carry out the Project in compliance with the conditions stated in the USDOL certification letters. Those letters and any documents cited therein are incorporated by reference and made part of this Agreement.

## SECTION 18. GOVERNMENT ACTIONS

(a) In all cases where the Government's review, approval, or concurrence is required under the terms and conditions of this Agreement, the Government will provide its response within sixty (60) calendar days of receipt from the Grantee of all materials reasonably necessary for the formulation of the Government's response.

(b) If the Government determines that its position cannot be finalized within that sixty (60) day period, the Government will notify the Grantee, in writing, within thirty (30) days following receipt of the Grantee's submission that the Government's response will be delayed and advise the Grantee of the Government's anticipated time period for response.

(c) Whenever the Government's approval or concurrence is needed on any matter pertaining to or concerning this Agreement, the Government's approval or concurrence will not be unreasonably withheld.

## SECTION 19. REMEDIES

(a) Substantial failure of the Grantee to Complete the Project in accordance with the Application and this Agreement will be a default of this Agreement. In the event of default, the Government will have all remedies at law and equity, including the right to specific performance without further Federal financial assistance, and the rights to termination or suspension as provided by Section 11 of the Master Agreement, "Right of the Federal Government to Terminate." The Grantee recognizes that in the event of default, the Government may demand all Federal funds provided to the Grantee for the Project be returned to the Government. Furthermore, a default of this Agreement will be a factor considered before a decision is made with respect to the approval of future Grants requested by the Grantee.

Under the provisions of Section 15 of this Agreement, "Project Management Oversight," and under the terms and conditions of the Master Agreement, the Government will review performance by the Grantee to determine whether satisfactory progress is being made to Complete the Project. In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, under the provisions of Section 11 of the Master Agreement, "Right of the Federal Government to Terminate," until any necessary corrective action, which may be required by the Government, is accomplished. Any breach of this Agreement that is not corrected within a reasonable period of time will be a default of this Agreement. The Government in its discretion may permit the cost of such corrective action to be deemed a Project Cost, provided that such cost is an allowable cost under the requirements of Section 7(b) of the Master Agreement, "Eligible Costs," and so long as it remains within the limits of the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution set forth in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment."

(b) In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days' written notice that the Government considers that such a breach has occurred and will

provide the Grantee a reasonable period of time to respond and to take necessary corrective action.

## SECTION 20. CONTENTS OF AGREEMENT

This Full Funding Grant Agreement consists of the text of this Agreement, which includes the first pages setting forth significant characteristics of the Agreement (such as the maximum Federal funds obligated and awarded for expenditure on the Project and the funding ratio of Federal and local funds to be expended for the Project, and such other data), followed by the Terms and Conditions and the Attachments to the Agreement. The Agreement also includes the following documents incorporated by reference and made part of this Agreement: the "Federal Transit Administration Master Agreement," FTA Form MA(31) (May 2, 2024), as may be revised from time to time, the Application, the Government's environmental record for the Project, related agreements, and prior Grant Agreements for the Project referenced in Attachment 5 of this Agreement. Should the Federal financial assistance award letter include special conditions for the Project, that letter is incorporated by reference and made part of this Agreement. Any inconsistency between the Application and the terms and conditions of this Full Funding Grant Agreement will be resolved according to the clear meaning of the provisions of this Agreement and Attachments hereto.

## SECTION 21. SIMULTANEOUS CREATION OF AGREEMENT IN ELECTRONIC FORMAT

Simultaneous to the Award and Execution of this Agreement set forth in typewritten hard copy, the Agreement is being awarded and executed by electronic means through FTA's electronic award and management system. To the extent any discrepancy may arise between the typewritten version and the electronic version of this Agreement, the typewritten version will prevail. Should any special conditions or requirements for the Project be added separately in the electronic version, those conditions or requirements are incorporated by reference and made part of this Agreement.

## SECTION 22. AMENDMENTS TO AGREEMENT

Amendments to any of the documents referenced in Section 20, "Contents of Agreement," will be made in accordance with the requirements and procedures set forth in FTA Circular 5010.1F, "Award Management Requirements" (November 1, 2024), as may be amended from time to time, and FTA Circular 5200.1A (December 5, 2002), "Full Funding Grant Agreements Guidance," as may be amended from time to time.

## SECTION 23. ATTACHMENTS—INCORPORATION

Each and every Attachment to this Agreement is incorporated by reference and made part of this Agreement.

**SECTION 24. NOTICES**

Notices required by this Agreement will be addressed as follows:

As to the Government:

Ms. Kelley Brookins
Regional Administrator
Federal Transit Administration, Region V
200 West Adams Street, Suite 320
Chicago, Illinois 60606

As to the Grantee:

Mr. Dorval R. Carter, Jr.
President
Chicago Transit Authority
567 West Lake Street, 5th Floor
Chicago, Illinois 60661-1465

With a copy to:

General Counsel
Chicago Transit Authority
567 West Lake Street, 6th Floor
Chicago, Illinois 60661-1465

**SECTION 25. APPLICABLE LAW**

If neither Federal statute nor Federal common law governs the interpretation of the provisions of this Agreement, the state law of the State of Illinois will apply. This provision is intended only to supplement Section 3(g) of the Master Agreement, "Application of Federal, State, and Local Laws, Regulations, Requirements, and Guidance."

**SECTION 26. AWARD AND EXECUTION OF AGREEMENT**

There are several identical counterparts of this Agreement in typewritten hard copy; each counterpart is to be fully signed in writing by the parties and each counterpart is deemed to be an original having identical legal effect. When signed and dated by the authorized official of the Government, this instrument will constitute an Award that should be executed by the Grantee within ninety (90) days of the date of the Government's Award (FTA Award). The Government may withdraw its Award of financial assistance and obligation of funds if this Agreement is not executed within the ninety (90) day period. Upon full Execution of this Agreement by the Grantee, the effective date will be the date the Government awarded funding under this Agreement as set forth below.

**THE GOVERNMENT HEREBY AWARDS THIS FULL FUNDING GRANT AGREEMENT THIS**

10th DAY OF January, 2025

Signature: ______________________

Veronica Vanterpool
Deputy Administrator
FEDERAL TRANSIT ADMINISTRATION

**EXECUTION BY GRANTEE**

The Grantee, by executing this Agreement, affirms this FTA Award; adopts and ratifies all statements, representations, warranties, covenants, and materials it has submitted to FTA; consents to this Award; and agrees to all terms and conditions set forth in this Agreement.

**THE GRANTEE HEREBY EXECUTES THIS FULL FUNDING GRANT AGREEMENT THIS**

10th DAY OF January, 2025

Signature: ______________________

Dorval R. Carter, Jr.
President
Chicago Transit Authority

**ATTESTED BY:**

Signature: ______________________

Georgette L. Greenlee
Secretary to the Board
Chicago Transit Board, Chicago Transit Authority

**AFFIRMATION OF GRANTEE'S ATTORNEY**

As the undersigned Attorney for the Grantee, I affirm to the Grantee that I have examined this Agreement and the proceedings taken by the Grantee relating to it. As a result of this examination, I hereby affirm to the Grantee the Execution of the Agreement by the Grantee is duly authorized under state and local law. In addition, I find that in all respects the Execution of this Agreement is due and proper and in accordance with applicable State and local law. Further, in my opinion, this Agreement constitutes a legal and binding obligation of the Grantee in accordance with the terms of the Agreement. Finally, I affirm to the Grantee that, to the best of my knowledge, there is no legislation or litigation pending or imminent that might adversely affect the full implementation of the Project in accordance with the terms thereof.

10th DAY OF January, 2025

AFFIRMED BY:

Signature: ______________________

Kent Ray
General Counsel
Chicago Transit Authority

**Attachment 1**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Scope of the Project**

The Red Line Extension Project (the Project) is a planned 5.5-mile heavy rail extension to the existing Red Line Dan Ryan branch on Chicago's Far South Side from the present 95th Street Terminal to the 130th Street area. The Project plans to operate heavy rail rapid transit service on an elevated structure from approximately 95th Street to 118th Street, where it transitions to an at-grade profile and then continues at grade before terminating near 130th Street. The 103rd Street, 111th Street, and Michigan Avenue stations will be elevated, and the 130th Street station will be at-grade. The Project includes four stations, parking facilities with approximately 1,200 spaces, new traction power substations, a new railyard and maintenance shop near 120th Street, and the purchase of 78 rail cars.

Service is planned to operate 24 hours per day, seven days per week with trains every three to six minutes during weekday peak periods, every seven to eight minutes during weekday off-peak periods, every eight to 15 minutes during weekday evenings, and every seven to 15 minutes on weekends. The forecasted ridership on the Project, using current year inputs of population and employment, is 36,400 daily linked trips. This number is expected to grow to 41,500 daily linked trips by the horizon year of 2040.

The capital cost of the Project is estimated to be $5,750,004,647 in year-of-expenditure (YOE) dollars. CTA is seeking $1,973,978,348 (34.3 percent) in Section 5309 Capital Investment Grants (CIG) funds. The Revenue Service Date is August 5, 2031.

## Attachment 1A

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Project Vicinity Map**

Chicago Transit Authority
Chicago, Illinois



# Attachment 1B

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Project Location Map**




NICTD/CSS & SBRR = Northern Indiana Commuter Transportation District/Chicago South Shore & South Bend Railroad, CN/MED = Canadian National/Metra Electric District, UPRR = Union Pacific Railroad

## Attachment 2

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Project Description**

**Narrative Description:**

The Red Line Extension Project (the Project) is a planned 5.5-mile heavy rail extension to the existing Red Line Dan Ryan branch on Chicago's Far South Side from the present 95th Street Terminal to the 130th Street area. The Project plans to operate heavy rail rapid transit service on an elevated structure from approximately 95th Street to 118th Street, where it transitions to an at-grade profile and then continues at grade before terminating near 130th Street. The 103rd Street, 111th Street, and Michigan Avenue stations will be elevated, and the 130th Street station will be at-grade. The Project includes four stations, parking facilities with approximately 1,200 spaces, new traction power substations, a new railyard and maintenance shop near 120th Street, and the purchase of 78 rail cars.

Service is planned to operate 24 hours per day, seven days per week with trains every three to six minutes during weekday peak periods, every seven to eight minutes during weekday off-peak periods, every eight to 15 minutes during weekday evenings, and every seven to 15 minutes on weekends. The forecasted ridership on the Project, using current year inputs of population and employment, is 36,400 daily linked trips. This number is expected to grow to 41,500 daily linked trips by the horizon year of 2040.

**Project Description by Standard Cost Category:**
The following descriptions follow the Federal Transit Administration (FTA) Standard Cost Categories (SCC) for construction. These SCCs are the basis for the Baseline Cost Estimate and the Baseline Schedule contained in Attachments 3 and 4, respectively.

### SCC 10 – GUIDEWAY AND TRACK ELEMENTS
The Guideway SCC includes all the civil and structural costs directly associated with construction of the guideway structures, roadbed, and pavement or track.

#### 10.01 Guideway: At-Grade Exclusive Right-of-Way
1.58 miles of at-grade guideway, primarily from the yard to the terminal station and from 95th Street station to the retained fill.

#### 10.04 Guideway: Aerial Structure
3.76 miles of aerial structure carrying two tracks from south of the existing 95th/Dan Ryan station to south of the crossing over Metra/CN, adjacent to the 120th Street Yard and Shop. This aerial structure separates the Project guideway from Interstate 57, various railroads, and multiple city streets.

**10.08 Guideway: Retained Cut or Fill**
At the transitions between structure and at-grade, the inclines will be supported by retained fill. The total of the two retained fill sections are 0.11 miles.

**10.09 Track: Direct Fixation**
All track on the aerial structure (3.76 miles) is direct fixation.

**10.11 Track: Ballasted**
Track at-grade (1.58 miles) and on retained fill (0.11 miles) is ballasted (total of 1.69 miles).

**10.12 Track: Special (Switches, Turnouts)**
There are four groupings of special trackwork on the Project. At the transition from the existing Red Line, two turnouts and a diamond crossover are used. Near the 111th Street station platform, the emergency crossover is a diamond configuration. At the terminal station, a diamond configuration is used (allowing movement from one track to another). Finally, the yard leads include crossovers and turnouts.

**SCC 20 - STATIONS, STOPS, TERMINALS, INTERMODAL**
The Stations SCC includes construction costs for four station platforms, platform fixtures, canopies, and passenger amenities, along with costs for vertical circulation (elevators, escalators, and stairs) to the platform where necessary.

**20.01 At-Grade Station, Stop, Shelter, Mall, Terminal, Platform**
One station including station house, platform, paid and unpaid passenger areas, back-of-house operations, and all other stations appurtenances.

**20.02 Aerial Station, Stop, Shelter, Mall, Terminal, Platform**
Three stations including station house, platform, vertical circulation (not applicable at the 130th Street station), paid and unpaid passenger areas, back-of-house operations, and all other stations appurtenances.

**20.06 Automobile Parking Multi-Story Structure**
At the 130th Street station, a four-story, above-grade parking structure with approximately 620 spaces.

**20.07 Elevators, Escalators**
The 103rd Street, 111th Street, and Michigan Avenue stations have both elevators (meeting ADA requirements) and escalators. The 130th Street station will not feature elevators or escalators but will meet ADA requirements.

**SCC 30 – SUPPORT FACILITIES: YARDS, SHOPS, ADMINISTRATION BUILDINGS**
The Support Facilities SCC includes the capital costs of maintenance and railcar storage for the Project.

**30.03 Heavy Maintenance Facility**
The Project includes a new, modern maintenance facility for the railcars. This facility includes inspection and maintenance bays, wheel truing, a railcar washer, and a railcar interior care track

(for cleaning and care of the interior of the railcars). The shop also includes support areas including parts room, loading docks, locker rooms, supervisory offices, and other required appurtenances. The shop also supports the yard master office.

**30.05 Yard and Yard Track**
The Project includes a railcar storage yard, adjacent to and connected to the shop, where overnight and midday storage of railcars takes place. The yard includes all features such as storage tracks, lead tracks, turnouts, and switches.

**SCC 40 – SITEWORK AND SPECIAL CONDITIONS**
The Sitework and Special Conditions SCC includes estimated costs for all other construction elements that were not accounted for in the Guideway, Stations, Support Facilities, or Systems categories.

**40.01 Demolition, Clearing, Earthwork**
Scope of work primarily includes demolition of occupied buildings on acquired parcels which are in the path of the alignment. Clearing mainly includes the retained earth and at-grade portions of the Project but also includes station areas, parking facilities, traction power substations, and drainage facilities. Earthwork mainly includes the yard and at-grade track areas, the shop, the traction power substations (due to the vaults), stations (for elevator and escalator pits), and for drainage basins.

**40.02 Site Utilities and Utility Relocation**
Utility work includes both relocation of existing utilities that interfere with project components (e.g., relocation of an 8-inch watermain that obstructs a series of proposed caissons) and the installation of services to the various facilities (stations, traction power substations, and shop).

**40.03 Hazardous Materials, Contaminated Soil Removal/Mitigation, Ground Water Treatments**
The soil management plan (supported by field investigations and soil/groundwater sampling) is informing cost estimate quantities for various contaminated soil removals. Some areas have minimal soil removal (e.g., caisson drilling) while other areas have more extensive excavation with soil disposal (e.g., shop basement).

**40.04 Environmental Mitigation, e.g., Wetlands, Historic/Archaeologic, Parks**
Environmental mitigation scope includes soil remediation of Beaubien Woods for the Forest Preserves of Cook County.

**40.05 Site Structures Including Retaining Walls, Sound Walls**
Retaining walls associated with the track support are included in SCC 10. This SCC category only includes the structures associated with the bridge carrying 130th Street over the Project tracks (as the terminal tracks approach the 130th Street station).

**40.06 Pedestrian/Bike Access and Landscaping**
Each station includes improvements to pedestrian access as well as landscaping. (Some of the landscaping, particularly at surface parking lots, is required by local ordinance.) At the 130th Street station, this category includes a portion of multiuse (bike) trail associated with the station.

**40.07 Automobile, bus, and van access, including roads, traffic signals and signs, parking lots, and pavement markings**
Surface parking lots and the kiss-and-ride facility at the 103rd Street (approx. 225 parking spaces), 111th Street (approx. 175 parking spaces), Michigan Avenue (approx. 180 parking spaces) and 130th Street (approx. 620 spaces among structure and lot) stations are included in this category. Additionally, this category includes the relocation of alleys (as applicable), construction of cul-de-sacs (to prevent the dead-end of streets from being under the aerial structure, and relocating Cottage Grove Avenue outside the footprint of the yard facility. At the 111th Street station, this also includes the new (half-block long) accessway on the east side of Agape Community Center.

**40.08 Temporary Facilities and Other Indirect Costs During Construction**
This category mainly includes staging, laydown, and construction administration areas. At the connection to the existing Red Line, temporary elements include traction power cables necessary for operations during construction and cut-over. Maintenance of traffic costs are included in this category.

**SCC 50 – SYSTEMS**
The Systems SCC includes capital costs for many elements, including train control signals, communication systems, central control hardware and software, traction power systems substations, underground duct-banks, fare collection, grade crossing protection, and roadway traffic signal systems.

**50.01 Train Control and Signals**
This category includes all the mainline (including yard leads off the mainline) train control signal components, from wayside equipment to the relay houses.

**50.02 Traffic Signals and Crossing Protection**
Traffic signal work is limited on this project and includes one new signalized intersection, several signal timing modifications, and installation of a mid-block crossing warning light system. This category also includes the modification of at-grade railroad crossing devices at the applicable crossings. (These are entirely roadway and pedestrian crossing of nearby freight rail tracks, not the crossing of CTA tracks.)

**50.03 Traction Power Supply Substations**
Five traction power substations are proposed with the Project, including the yard substation.

**50.04 Traction Power Distribution: Catenary and Third Rail**
The CTA rail system uses third-rail distribution. This cost category includes the third-rail power sections as well as feeder cables and additional negative return (where applicable).

**50.05 Communications**
Communications includes all Supervisory Control and Data Acquisition (SCADA) the fiber optic backbone, closed-circuit television (CCTV), radio, phone, communication rooms (back-of-office at stations), and other technology associated with communications and security.

**50.06 Fare Collection System and Equipment**
Each station will have fare gates and fare vending consistent with the entire CTA system. The current system is Ventra, and fare payment is allowed with Ventra card, mobile device, or bank cards allowing the "tap and pay" feature.

**50.07 Central Control**
The CTA rail system already has a 24-hour-a-day, 365-day-a-year control center. This cost category includes the connection of the systems along the extension to this control center.

**SCC 60 – RIGHT-OF-WAY (ROW), LAND, EXISTING IMPROVEMENTS**
The Right of Way SCC includes costs for acquisition and any applicable relocation costs for right of way needed for construction and operation of the Project.

**60.01 Purchase or Lease of Real Estate**
Real estate is required throughout the corridor for the alignment, stations (with station-area features), traction power substations, and the shop and yard.

**60.02 Relocation of Existing Households and Businesses**
As per the Uniform Act, those properties with owners or renters will be relocated.

**SCC 70 - VEHICLES**
The Vehicles SCC includes costs for commuter rail vehicles and spare parts.

**70.02 Heavy Rail**
A total of 78 railcars to support the operating plan including spares.

**70.07 Spare Parts**
Spare parts associated with the purchase of railcars.

**SCC 80 – PROFESSIONAL SERVICES**
Estimates for CTA and major contract consultants are based on a detailed staffing plan that aligns with the Project Management Capacity and Capability Plan (MCCP), available under separate cover.

**80.01 Project Development**
Project Development phase services including NEPA and Preliminary Engineering

**80.02 Engineering**
This subcategory includes engineering services for the Project.

**80.03 Project Management for Design and Construction**
Program Management through the Design and Construction phases

**80.04 Construction Administration and Management**
Construction Management during the Construction phase (including a portion of the Procurement phase)

**80.05 Professional Liability and other Non-Construction Insurance**
Reflects owner-controlled insurances cost.

**80.06 Legal; Permits; Review Fees by Other Agencies, Cities, Etc.**
Includes costs for third party reviews.

**80.08 Start Up**
Start-up cost includes operator training on the extension and all safety-security and other certification taking place after Contractor turn-over of the facility to CTA prior to revenue operations.

**SCC 90 – UNALLOCATED CONTINGENCY**
This SCC includes Project contingency not specifically allocated to an individual cost category.

**SCC 100 – FINANCE CHARGES**
This category includes finance charges for the Project.

## Attachment 3

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**
**Baseline Cost Estimate**

**Table 1 – BCE by Standard Cost Category**

| Applicable Line Items Only | | YOE Dollars Total ($) |
|---|---|---|
| **10 GUIDEWAY & TRACK ELEMENTS (5.45 Route Miles)** | | **655,453,890** |
| 10.01 | Guideway: At-grade exclusive right-of-way | 49,175,031 |
| 10.04 | Guideway: Aerial structure | 442,575,283 |
| 10.08 | Guideway: Retained cut or fill | 30,883,659 |
| 10.09 | Track: Direct fixation | 79,067,998 |
| 10.11 | Track: Ballasted | 29,439,663 |
| 10.12 | Track: Special (switches, turnouts) | 17,690,200 |
| 10.13 | Track: Vibration and noise dampening | 6,622,055 |
| **20 STATIONS, STOPS, TERMINALS, INTERMODAL (4 Stations)** | | **581,865,665** |
| 20.01 | At-grade station, stop, shelter, mall, terminal, platform | 130,653,113 |
| 20.02 | Aerial station, stop, shelter, mall, terminal, platform | 391.959.337 |
| 20.06 | Automobile parking multi-story structure | 29,999,979 |
| 20.07 | Elevators, escalators | 29,253,236 |
| **30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS** | | **312,546,290** |
| 30.02 | Light Maintenance Facility | 1,643,682 |
| 30.03 | Heavy Maintenance Facility | 160,778,986 |
| 30.05 | Yard and Yard Track | 150,123,622 |
| **40 SITEWORK & SPECIAL CONDITIONS** | | **567,819,452** |
| 40.01 | Demolition, Clearing, Earthwork | 129,115,507 |
| 40.02 | Site Utilities, Utility Relocation | 56,776,112 |
| 40.03 | Haz. mat'l, contam'd soil removal/mitig. ground water treatments | 153,336,346 |
| 40.04 | Environmental mitigation, e.g., wetlands, historic/arch, parks | 7,433,359 |
| 40.06 | Pedestrian / bike access and accommodation, landscaping | 11,578,559 |
| 40.07 | Automobile, bus, van accessways including roads, parking lots | 63,999,555 |
| 40.08 | Temporary Facilities and other indirect costs during construction | 145,580,014 |
| **50 SYSTEMS** | | **738,465,391** |
| 50.01 | Train control and signals | 330,313,299 |
| 50.02 | Traffic signals and crossing protection | 9,006,883 |
| 50.03 | Traction power supply: substations | 224,172,552 |
| 50.04 | Traction power distribution: catenary and third rail | 130,358,177 |
| 50.05 | Communications | 23,527,187 |
| 50.06 | Fare collection system and equipment | 17,008,624 |
| 50.07 | Central Control | 4,078,669 |

**Table 1 – BCE by Standard Cost Category**

| Applicable Line Items Only | | YOE Dollars Total ($) |
|---|---|---|
| **Construction Subtotal (10 - 50)** | | **2,856,150,687** |
| **60 ROW, LAND, EXISTING IMPROVEMENTS** | | **116,019,157** |
| 60.01 | Purchase or lease of real estate | 103,038,708 |
| 60.02 | Relocation of existing households and businesses | 12,980,449 |
| **70 VEHICLES (78 Cars)** | | **322,695,107** |
| 70.02 | Heavy Rail | 306,560,352 |
| 70.07 | Spare parts | 16,134,755 |
| **80 PROFESSIONAL SERVICES (applies to Cats. 10-50)** | | **1,236,555,888** |
| 80.01 | Project Development | 52,010,036 |
| 80.02 | Engineering | 656,711,381 |
| 80.03 | Project Management for Design and Construction | 261,659,726 |
| 80.04 | Construction Administration & Management | 206,691,401 |
| 80.06 | Legal; Permits; Review Fees by other agencies, cities, etc. | 39,118,681 |
| 80.08 | Start up | 20,364,663 |
| **Subtotal (10 - 80)** | | **4,531,420,840** |
| **90 UNALLOCATED CONTINGENCY** | | **745,176,579** |
| **Subtotal (10 - 90)** | | **5,276,597,420** |
| **100 FINANCE CHARGES** | | **473,407,227** |
| **Total Project Cost (10 - 100)** | | **5,750,004,647** |

## Attachment 3

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Baseline Cost Estimate**

**Table 2 – Inflated Cost to Year of Expenditure**

| | Base Year Dollars w/o Contingency ($) | Base Year Dollars Allocated Contingency ($) | Base Year Dollars TOTAL ($) | Inflation Factor | YOE Dollars TOTAL ($) |
|---|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (5.45 route miles) | 598,652,351 | 0 | 598,652,351 | 1.0949 | 655,453,890 |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (4) | 523,840,536 | 764,537 | 524,605,073 | 1.1091 | 581,865,665 |
| 30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS | 228,158,424 | 51,595,407 | 279,753,832 | 1.1172 | 312,546,290 |
| 40 SITEWORK & SPECIAL CONDITIONS | 476,968,119 | 49,355,885 | 526,324,004 | 1.0788 | 567,819,452 |
| 50 SYSTEMS | 633,233,488 | 12,798,812 | 646,032,300 | 1.1431 | 738,465,391 |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | 88,777,585 | 31,674,944 | 120,452,529 | 0.9632 | 116,019,157 |
| 70 VEHICLES (78 rail-cars) | 268,253,294 | 13,412,665 | 281,665,959 | 1.1457 | 322,695,107 |
| 80 PROFESSIONAL SERVICES | 1,094,880,447 | 44,220,945 | 1,139,101,392 | 1.0856 | 1,236,555,888 |
| 90 UNALLOCATED CONTINGENCY | | | 638,680,486 | 1.1667 | 745,176,579 |
| 100 FINANCE CHARGES | | | 402,933,662 | 1.1749 | 473,407,227 |
| **Total Project Cost (10 - 100)** | | | **5,158,201,589** | **1.1147** | **5,750,004,647** |

**Attachment 3**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Baseline Cost Estimate**

| Table 3 – Baseline Cost Estimate by Funding Source | Total Project Cost in YOE Dollars | Federal 5309 CIG in YOE Dollars | Federal Other in YOE Dollars | Local in YOE Dollars |
|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (5.45 route miles) | $655,453,890 | $232,997,104 | $16,434,351 | $406,022,435 |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (4) | $581,865,665 | $206,838,371 | $14,589,256 | $360,438,038 |
| 30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS | $312,546,290 | $111,102,217 | $7,836,547 | $193,607,525 |
| 40 SITEWORK & SPECIAL CONDITIONS | $567,819,452 | $201,845,301 | $14,237,072 | $351,737,079 |
| 50 SYSTEMS | $738,465,391 | $262,505,571 | $18,515,718 | $457,444,102 |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | $116,019,157 | $13,826,889 | $975,274 | $101,216,994 |
| 70 VEHICLES (78) | $322,695,107 | $143,146,972 | $10,096,811 | $169,451,324 |
| 80 PROFESSIONAL SERVICES (applies to Cats. 10-50) | $1,236,555,888 | $405,914,133 | $30,580,980 | $800,060,775 |
| 90 UNALLOCATED CONTINGENCY | $745,176,579 | $264,891,227 | $18,683,990 | $461,601,363 |
| 100 FINANCE CHARGES | $473,407,227 | $130,910,563 | $0 | $342,496,664 |
| **Total Project Cost (10 - 100)** | **$5,750,004,647** | **$1,973,978,348** | **$131,950,000** | **$3,644,076,299** |

**Attachment 3**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Baseline Cost Estimate**

**Table 4 - Sources of Federal Funding and Matching Share Ratios**

| | Costs Attributed to Source of Funds | Federal/ Local Matching Ratio | All Federal Funds | Local Funds |
|---|---|---|---|---|
| Federal 5309 New Starts | $5,585,504,647 | 35.34% | $1,973,978,348 | $3,611,526,299 |
| Congestion Mitigation and Air Quality (CMAQ) | $37,500,000 | 80.00% | $30,000,000 | $7,500,000 |
| Carbon Reduction Program (CRP) | $125,000,000 | 80.00% | $100,000,000 | $25,000,000 |
| HUD Community Project Funding | $1,500,000 | 100.00% | $1,500,000 | $0 |
| FTA Areas of Persistent Poverty | $500,000 | 90.00% | $450,000 | $50,000 |
| **Total** | **$5,750,004,647** | | **$2,105,928,348** | **$3,644,076,299** |
| **Overall Federal Share of Project** | | **36.62%** | | |
| **New Starts Share of Project** | | **34.33%** | | |

## Attachment 3A

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Project Budget**

| SCOPE AND ACTIVITY DESCRIPTION | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scope Code | ALI Code | Scope and Activity Line Item Descriptions | Qty | | Section 5309 FTA New Starts CIG Funds | | | Federal Other | | | Project Totals | | | |
| | | | | Total Federal % | Federal | Local | Total | Federal | Local | Total | Federal | Local | Total | |
| 14010 | 140110 | GUIDEWAY & TRACK ELEMENTS | 5.45 | 38.05% | 232,997,104 | 402,401,290 | 635,398,393 | 16,434,351 | 3,621,145 | 20,055,496 | 249,431,455 | 406,022,435 | 655,453,890 | |
| 14020 | 140220 | STATIONS, STOPS, TERMINALS, INTERMODAL | 4 | 38.05% | 206,838,371 | 357,223,441 | 564,061,812 | 14,589,256 | 3,214,597 | 17,803,853 | 221,427,627 | 360,438,038 | 581,865,665 | |
| 14030 | 140330 | SUPPORT FACILITIES, YARDS, SHOPS, ADMIN. BLDGS. | | 38.05% | 111,102,217 | 191,880,820 | 302,983,037 | 7,836,547 | 1,726,705 | 9,563,252 | 118,938,765 | 193,607,525 | 312,546,290 | |
| 14040 | 140440 | SITEWORK & SPECIAL CONDITIONS | | 38.05% | 201,845,301 | 348,600,082 | 550,445,384 | 14,237,072 | 3,136,997 | 17,374,069 | 216,082,374 | 351,737,079 | 567,819,452 | |
| 14050 | 140550 | SYSTEMS | | 38.05% | 262,505,571 | 453,364,348 | 715,869,919 | 18,515,718 | 4,079,754 | 22,595,472 | 281,021,289 | 457,444,102 | 738,465,391 | |
| 14060 | 140660 | ROW, LAND, EXISTING IMPROVEMENTS | | 12.76% | 13,826,889 | 100,314,282 | 114,141,171 | 975,274 | 902,712 | 1,877,986 | 14,802,163 | 101,216,994 | 116,019,157 | |
| 14070 | | VEHICLES | 78 | 47.49% | 143,146,972 | 167,940,059 | 311,087,031 | 10,096,811 | 1,511,266 | 11,608,076 | 153,243,783 | 169,451,324 | 322,695,107 | |
| 14080 | 140880 | PROFESSIONAL SERVICES | | 35.30% | 405,914,133 | 792,925,366 | 1,198,839,499 | 30,580,980 | 7,135,409 | 37,716,389 | 436,495,114 | 800,060,775 | 1,236,555,888 | |
| 14090 | 140990 | UNALLOCATED CONTINGENCY | | 38.05% | 264,891,227 | 457,484,533 | 722,375,759 | 18,683,990 | 4,116,830 | 22,800,820 | 283,575,216 | 461,601,363 | 745,176,579 | |
| 14100 | 141010 | FINANCE CHARGES | | 27.65% | 130,910,563 | 339,442,079 | 470,352,642 | - | 3,054,585 | 3,054,585 | 130,910,563 | 342,496,664 | 473,407,227 | |
| **Total Project Cost (SCC 10 - 100)** | | | | **36.62%** | **1,973,978,348** | **3,611,576,299** | **5,585,554,647** | **131,950,000** | **32,500,000** | **164,450,000** | **2,105,928,348** | **3,644,076,299** | **5,750,004,647** | |

# Attachment 4

## Chicago Transit Authority (CTA)
## Red Line Extension Project
## Chicago, Illinois

### Baseline Schedule

| | Start Date | End Date | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS | 12/13/24 | 04/18/29 | | | | | | | | | | | | | |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL | 01/02/26 | 12/13/28 | | | | | | | | | | | | | |
| 30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS | 05/22/26 | 12/20/29 | | | | | | | | | | | | | |
| 40 SITEWORK & SPECIAL CONDITIONS | 10/07/24 | 07/23/29 | | | | | | | | | | | | | |
| 50 SYSTEMS | 08/26/26 | 07/31/29 | | | | | | | | | | | | | |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | 01/14/20 | 05/23/25 | | | | | | | | | | | | | |
| 70 VEHICLES | 01/04/27 | 06/29/29 | | | | | | | | | | | | | |
| 80 PROFESSIONAL SERVICES (applies to Cats. 10-50) | 07/01/19 | 02/28/31 | | | | | | | | | | | | | |
| 90 UNALLOCATED CONTINGENCY | 10/02/24 | 02/28/31 | | | | | | | | | | | | | |
| 100 FINANCE CHARGES | 06/01/24 | 12/01/30 | | | | | | | | | | | | | |
| FFGA REVENUE OPERATIONS (with Contingency) | 08/05/31 | 08/05/31 | | | | | | | | | | | | | |
| CLOSEOUT | 08/06/31 | 03/02/32 | | | | | | | | | | | | | |

**Attachment 5**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Related Documents and Grants**

## I. Prior Grants (Not included in the FFGA)

| Project Number | Federal Amount | Funding Source | Purpose |
|---|---|---|---|
| IL-2023-042 | $450,000 | Areas of Persistent Poverty | Development and Implementation of Locally Led Engagement Plan |

## II. Related Documents

| Milestone | Date |
|---|---|
| Selection of Locally Preferred Alternative (LPA) | August 12, 2009 |
| Adoption of LPA into financially constrained Regional Long-Range Transportation Plan | October 1, 2010 |
| Selection of Preferred Alignment | January 26, 2018 |
| Entry into New Starts Project Development | December 15, 2020 |
| NEPA Completion – Receipt of a Record of Decision (ROD) | August 12, 2022 |
| Approval of Project Development Extension Request | November 30, 2022 |
| FTA Approval of Entry into Engineering | August 28, 2023 |
| NEPA Reevaluation due to Yard Shop Relocation | March 25, 2024 |
| NEPA Reevaluation due to scope changes during contract procurement | October 3, 2024 |
| Revenue Service Date | August 5, 2031 |

## III. FFGA Grant History (Grants Under the FFGA)

| Project Number | Federal Amount | Funding Source | Purpose |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

**Attachment 6**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Schedule of Federal Funds**

Section 30005 of the Infrastructure Investment and Jobs Act (IIJA) (Pub. L. 117-58; November 15, 2021) authorizes FTA to award Federal Capital Investment Grants (CIG) Program funds for design and construction of the Red Line Extension Project (the Project). In accordance with the Federal transit law at 49 U.S.C. Chapter 53 and FTA Circular 5200.1A, Full Funding Grant Agreements Guidance (December 5, 2002), by the execution of this Agreement the Government is limiting its commitment to provide CIG funding for the Project to those funds that have been or may be appropriated during the term of IIJA and subsequent authorizations. The Government and the Grantee recognize, however, that the period of time necessary to complete the Project may extend beyond the IIJA, as evidenced below and by Attachment 4 of this Agreement (Baseline Schedule).

Currently, the Government and the Grantee anticipate that the CIG funds will be provided for the Project as follows:

**Proposed Schedule of Federal Funds**
**(Based on Federal Fiscal Year of Appropriation)**

| Fiscal Year | Section 5309 New Starts Funds | Other Federal Funding | State/Local Funding | Total |
|---|---|---|---|---|
| FY 2024 and prior | $746,000,000 | $31,950,000 | $251,170,974 | $1,029,120,974 |
| FY 2025 | $350,000,000 | $0 | $153,233,106 | $503,233,106 |
| FY 2026 | $350,000,000 | $40,000,000 | $264,154,067 | $654,154,067 |
| FY 2027 | $132,000,000 | $15,000,000 | $964,759,462 | $1,111,759,462 |
| FY 2028 | $132,000,000 | $45,000,000 | $1,125,767,996 | $1,302,767,996 |
| FY 2029 | $132,000,000 | $0 | $617,002,745 | $749,002,745 |
| FY 2030 | $131,978,348 | $0 | $191,989,386 | $323,967,734 |
| FY 2031 | $0 | $0 | $75,998,563 | $75,998,563 |
| **Total** | **$1,973,978,348** | **$131,950,000** | **$3,644,076,299** | **$5,750,004,647** |

**Attachment 7**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Measures to Mitigate Environmental Impacts**

In accordance with National Environmental Policy Act (NEPA) requirements, the combined Final Environmental Impact Statement, Record of Decision (combined Final EIS/ROD),[1] and Section 4(f) Evaluation for the Project was signed by the Federal Transit Administration (FTA) on July 28, 2022, and published on August 12, 2022. The combined Final EIS/ROD documents the evaluation of the impacts and benefits of the Preferred Alignment in comparison to the No Build Alternative, includes corresponding public and agency coordination, and establishes final mitigation measures to address any environmental impacts to the surrounding community. In 2023, the Project's combined Final EIS/ROD received the Outstanding Achievement Award for Excellence in Environmental Document Preparation from the FTA.

After the signing of the Project's combined Final EIS/ROD, a NEPA re-evaluation was undertaken in early 2024 due to refinements to the location of the 120th Street Yard and Shop. CTA received concurrence from FTA on March 25, 2024, that the modifications described in the NEPA re-evaluation will not result in no new impacts to the environment, that appropriate measures have been incorporated into the project to mitigate the impacts of the changes where needed, and that the findings of the signed combined Final EIS/ROD and Section 4(f) Evaluation published on August 12, 2022, remain in effect and valid.

An additional NEPA re-evaluation was completed for the Project due to refinements from contractor negotiations as part of CTA's Design-Build procurement process, specifically during the Best and Final Offer stage, as well as a displacement type change to two real estate parcels. On October 9, 2024, FTA provided concurrence that these refinements will not result in new significant, or potentially significant, environmental impacts, and therefore the findings of the signed combined Final EIS/ROD and Section 4(f) Evaluation published on August 12, 2022, remain in effect and valid.

The Mitigation Plan for the Project is available in the ROD as Attachment A: Commitments and Mitigation Summary.

CTA understands that these mitigation measures may not be substantially changed or eliminated from the Project except by FTA's written consent. CTA will ensure the mitigation commitments are implemented in accordance with the Final EIS/ROD. CTA has established a tracker to monitor the implementation of mitigation commitments during final design and construction of the Project.

---

[1] Accessible at: https://www.transitchicago.com/rle/finaleis/

**Attachment 8**

**Chicago Transit Authority (CTA)**
**Red Line Extension Project**
**Chicago, Illinois**

**Information Collection and Analysis Plan**

The CTA will conduct an Information Collection and Analysis Plan for the Red Line Extension Project to assess the consistency between the predicted Project characteristics and performance and actual Project characteristics and performance. CTA will collect and analyze information to document actual outcomes of the Project, evaluate the accuracy of forecasts prepared during the development of the Project, and identify any lessons learned that may be useful to future projects.

## I. Information

CTA will assemble information on five key characteristics of the Project and its associated transit services in addition to information on the current public transportation system regarding transit services levels and ridership patterns:

1. Project scope: The physical components of the Project, including environmental mitigation and other related elements;

2. Capital cost: The total Project capital costs in constant dollars, formatted in FTA's Standard Cost Categories, and annual expenditures in year-of-expenditure dollars;

3. Transit service levels: The service levels of the Project and feeder bus services;

4. Operation and maintenance (O&M) costs: O&M costs for the Project and the transit system as a whole;

5. Ridership: Trips on the Project, in the Project corridor, and on the transit system as a whole; and

CTA has also elected to document the following supporting characteristic:

- **Access to jobs:** Estimates the Project's impact on the number of newly accessible jobs within an hour commute of the Project Area. This analysis will estimate the increase in the number of jobs accessible via transit after the completion of the Project as compared with the No-Build scenario.

## II. Milestones

CTA will assemble documentation at four Project milestones: two decision milestones during development of the Project to document predicted outcomes, as well as before and after Project

opening to document actual conditions and outcomes. At each milestone, the CTA will archive the assembled information, data, and documentation and provide to FTA a copy of the archive.

1. Predicted Outcomes at Entry into Engineering: Assembly, documentation, and archiving of the predicted outcomes on all six characteristics of the Project at the point when CTA requested FTA approval for Entry into Engineering;

2. Predicted Outcomes at the Full Funding Grant Agreement: Assembly, documentation, and archiving of the predicted outcomes on all six characteristics of the Project at the signing of the FFGA and an analysis of any significant differences in the predicted outcomes compared to the predictions at Entry into Engineering;

3. Actual Conditions Before Project Opening: Collection, documentation, and archiving of data on existing transit services, O&M costs, transit ridership, and access to jobs immediately prior to any significant changes in transit service levels caused by the opening of the Project; and

4. Actual Conditions After Project Opening: Collection, documentation, and archiving of data on the actual outcomes of the Project on all six characteristics for two years after the start of service, and analysis of any significant differences in the actual conditions after Project opening compared to predictions at FFGA or actual conditions before Project opening.

## III. Final Report

Within 36 months after Project opening, CTA will complete a final report that (1) documents the actual outcomes of the Project on all six characteristics and (2) analyzes the accuracy of predictions of those outcomes that were prepared during the Project's development. The body of the final report will highlight findings, conclusions, and lessons learned. To support the findings and conclusions, CTA will include appendices to document the detailed analysis of each Project outcome.

## IV. Coordination with FTA

CTA will maintain communication with FTA on progress in implementing the plan and provide opportunities for early review and for commenting on draft products. CTA must obtain approval in advance of any changes in the scope or schedule for the plan approved by FTA.