UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 26 C 3140 |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | Judge Durkin |
| TRANSPORTATION, FEDERAL | ) | |
| TRANSIT ADMINISTRATION, AND | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

**Table of Contents**

Table of Authorities .............................................................................................................. ii

Introduction.........................................................................................................................1

Background .........................................................................................................................2

     A.     CTA's Federal Funding .................................................................................2

     B.     The Instant Complaint...................................................................................4

Argument ...........................................................................................................................5

     I.     This Court Lacks Jurisdiction Based on Tucker Act Principles ............................5

          A.     *California* and *NIH* Control..................................................................7

          B.     Source of Plaintiff's Rights.........................................................................10

          C.     Plaintiff's Requested Remedies ................................................................14

     II.     Plaintiff Cannot Show Irreparable Harm ................................................................16

     III.     The Equities Weight Against Emergency Relief......................................................18

Conclusion .......................................................................................................................19

**Table of Authorities**

Cases

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470 (9th Cir. 1985).................... 17

*Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39 (1st Cir. 2025)........................................................ 9

*American Association of Physics Teachers, Inc. v. National Science Foundation*, 804 F. Supp. 3d 45 (D.D.C. 2025) ................................................................................................................ 9

*Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398 (2d Cir. 2015) ............................................... 6, 11

*B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713 (2d Cir. 1983) ........................................................ 15

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023)............................................. 5

*California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass. 2025) .................................. 7, 8

*California*, 604 U.S. 650 (2025) ........................................................................................... passim

*Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) ......................... 12, 13, 14

*Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999)............................................................ 5

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38 (1st Cir. 2021)................................................................ 18

*Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d 563 (E.D. Va. 2025) ............................... 16

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).......................................... 8

*Henke v. United States Dep't of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996)............................... 8

*Hometown Connections v. Noem*, 165 F.4th 835 (4th Cir. 2026).............................................. 14

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985).................................. 6, 12, 14

*Lane v. Pena*, 518 U.S. 187 (1996)............................................................................................. 5

*Maryland v. King*, 567 U.S. 1301 (2012) .................................................................................. 18

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ..................................................... 6, 7, 8

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. ---, 145 S. Ct. 2658 (2025)......... passim

ii

*New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562 (S.D.N.Y. 2025).................................. 12, 13

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................... 5, 18

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)........................................ 6

*Phillip Morris USA Inc. v. Scott*, 56 U.S. 1301 (2010).............................................. 17, 18

*Presidential Gardens Assocs. v. U.S. ex rel. Secretary of Housing and Urban Dev.*,
    175 F.3d 132 (2d Cir. 1999)........................................................................ 15

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597
    (9th Cir. 1991)........................................................................................ 17

*She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)...................... 6

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985)..................... 10

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ....................................... 17

*Sustainability Institute v. Trump*, 165 F.4th 817 (4th. Cir, 2026).................................. 10, 13, 14

*Thakur v. Trump*, 163 4th 1198 (9th Cir. 2025)............................................................. 9

*Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992).... 6

*Trump v. Boyle*, 660 U.S. ---, 145 S. Ct. 2653 (2025) ...................................................... 7

*Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998)................. 10

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. Mar. 11,
    2025) ........................................................................................................ 16

*Up State Fed. Credit Union v. Walker,* 198 F.3d 372 (2d Cir. 1999)............................................ 6

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................ 5

Statutes

5 U.S.C. § 702................................................................................................... 5

28 U.S.C. 1491(a)(1)........................................................................................... 8

28 U.S.C. § 1491................................................................................................. 6

iii

Regulations

2 C.F.R. Part 200 ................................................................................................................ 4

49 C.F.R. Part 26................................................................................................................. 3

Other Authorities

Executive Order 14173 .................................................................................................. 2, 3

**Introduction**

Plaintiff Chicago Transit Authority operates the public transportation system in Chicago, which includes the fixed rail system known as the "L" (elevated train). The CTA is currently engaged in two long-term improvement projects on the L that are partially funded by federal grants from the United States Department of Transportation. The CTA now challenges the government's October 3, 2025 suspension of federal funding for these two projects. The CTA claims it was unlawful under the APA and the Constitution for the government to suspend funding while it conducted an administrative review to determine whether the CTA was using federal funds in violation of federal nondiscrimination laws and to continue this funding suspension even after the administrative review was complete and after the CTA satisfied all requirements under the review. Specifically, the CTA claims that the funding suspension is arbitrary and capricious, politically motivated, and violated a variety of contractual and regulatory requirements that limit the circumstances under which the government may suspend federal funding. For relief, plaintiff asks the court to direct the government to resume funding these projects under the terms of the grant agreements.

Despite plaintiff styling its action as an APA and constitutional challenge to DOT's decision to suspend funding and only seeking equitable relief, at bottom, this action is one for breach of contract regarding funding agreements between the government and CTA. And the remedy CTA seeks is to compel the government to comply with its contractual obligations, *i.e.*, specific performance. Under the Tucker Act, a breach of contract action against the federal government must be brought in the Court of Federal Claims. For the reasons explained below, the court lacks jurisdiction over those contract claims under the Tucker Act. Accordingly, the motion for temporary restraining order should be denied.

**Background**

### A.  CTA's Federal Funding

Plaintiff Chicago Transit Authority is an Illinois corporation that operates a large public transportation system in Chicago and the surrounding suburbs, including a fixed rail system commonly known as the "L", consisting of eight color-coded rail lines — Red, Blue, Brown, Orange, Green, Pink, Purple, and Yellow.  Compl. ¶¶ 24, 64-65.  The CTA is currently engaged in two long-term transit improvement projects: (1) the Red and Purple Modernization Project ("RPM Project") to rebuild Red and Purple Line track structures and stations (Compl. ¶¶ 69-70); and (2) the Red Line Extension ("RLE Project"), which will add five miles of new track and four stations to the Red Line on Chicago's southern border (Compl. ¶¶ 76-80).  In 2017, the CTA and DOT entered into a funding agreement known as full funding grant agreement ("FFGA") to provide just over $1 billion to help fund the RPM Project.  Compl. ¶ 71; Ex. C (FFGA grant governing the RPM Project).  In January 2025, the CTA and DOT entered into a second FFGA to provide almost $2 billion to help fund the RLE Project.  Compl. ¶ 78; Ex. D (FFGA grant governing the RLE Project).  The terms of each grant govern (1) what constitutes a breach of contract or event of default; (2) the circumstances in which DOT may withhold funding from CTA or suspend CTA's drawdown of funds; and (3) the procedural requirements attendant to the government's withholding or suspension of funding.  *Id.*

DOT notified CTA by letters of October 3, 2025, that it was undertaking an administrative review of these two FFGA grants to examine compliance with the Equal Protection Clause of the U.S. Constitution, nondiscrimination requirements of applicable federal civil rights laws, and Executive Order 14173, which is aimed at eliminating discriminatory and illegal preferences. Compl., Ex. A (review of the RPM Project); Compl., Ex. B (review of the RLE Project).  These letters also advised that the review would result in a temporary pause in disbursements for each of

2

the two grants. *Id.* Since then, CTA has submitted reimbursement requests under the FFGA grants for almost $10 million, which remain unpaid because of DOT's funding suspension. Compl. ¶ 104.

The parties subsequently engaged in correspondence regarding DOT's administrative review. Compl., Exs. G-I. On December 1, 2025, DOT notified CTA of the completion of its administrative review respecting both grants. Compl., Exs. J, K. In each letter, DOT advised it had found that CTA "appear[s] to have considered race and sex as part of both the prime and subcontract bidding and contract awards" and that the resulting requirements CTA had imposed on its contractors were "plainly inconsistent with the Equal Protection principles of the U.S. Constitution." *Id.*[1] Each letter required CTA to certify its commitment to take actions necessary to safeguard compliance with principles underlying the Equal Protection Clause within 30 days of receipt. In addition, the letter respecting the RLE Project further required CTA to develop a comprehensive timeline for reevaluating applicable contracts. Compl. Ex. K at 2. Finally, DOT advised that, upon review of the certifications CTA was required to make, as well as review of the timeline requested with respect to the RLE Project in particular, it would notify CTA of any additional deficiencies that might need to be addressed before funding would resume.

CTA provided certifications for each project along with the requested timeline for the RLE Project on December 10, 2025. Compl., Exs. L-M. No further correspondence occurred between the parties. Disbursements involving each grant remain paused at this time. Compl. ¶ 12.

---

[1] DOT had concluded earlier in 2025 that considering race or gender in determining subcontract requirements for Disadvantaged Business Enterprises (DBE) programs under 49 C.F.R. Part 26 was unconstitutional. Compl. ¶ 4. Accordingly, on September 30, 2025, DOT announced an interim final rule ("IFR"), eliminating from DBE program regulations the race- and gender-based presumptions of social and economic disadvantage for purposes of DBE participation. Compl. ¶ 84.

**B.      The Instant Complaint**

The CTA alleges in its complaint that DOT's suspension of funding under the CTA's FFGA grants and its refusal to pay outstanding and ongoing bills is unlawful under the Administrative Procedure Act and the Constitution.  Specifically, the CTA claims that DOT's funding suspension is arbitrary and capricious because DOT (1) provided no reasoned or reasonable explanation for suspending disbursements initially or for continuing that suspension after the government completed its review; (2) improperly relied on pretext to justify its decision; and (3) failed to consider the CTA's reliance interests in suspending disbursements.  Compl. Counts I-III.  The CTA further alleges that DOT's funding suspension violated procedural requirements that allow the government to impose remedies for noncompliance, including (1) requirements under Title VI and its implementing regulations (*id.*, Counts VI, VII); and (2) requirements under the federal financial assistance regulations under 2 C.F.R. Part 200 (*id.*, Count VIII).  The CTA also alleges DOT failed to comply with procedural requirements when issuing the Interim Final Rule concerning DBE program requirements ("IFR"), including the notice-and-comment and delayed-effectiveness requirements.  *Id.*, Counts IV, V.  For its final APA claim, the CTA asserts that DOT had no statutory authority to suspend CTA's grant funding.  *Id.*, Count IX.

In addition to these APA claims, the CTA alleges DOT's funding suspension violates the Separation of Powers and the Spending Clause.  *Id*. Counts X-XII.  For relief, the CTA seeks to enjoin defendants from refusing to disburse funding under either of CTA's FFGA grants.  Compl. at 49 (Prayer for Relief D) (asking this court to preliminarily and permanently enjoin defendants from "refusing to disburse funding under the CTA's Red Line Extension and Red and Purple Modernization grants").  On March 20, 2026, the CTA filed its motion for a temporary restraining order.  Dkt. 10.

**Argument**

The CTA is not entitled to any emergency relief. A preliminary injunction is "'an extraordinary remedy never awarded as of right.'" *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The movant "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Bevis*, 85 F.4th at 1188 (quoting W*inter*, 555 U.S. at 20). For the first factor, the movant must make a "'strong' showing that reveals how it proposes to prove its case." *Id.* For the second factor, "a mere possibility of irreparable harm will not suffice." *Id.* Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The CTA cannot satisfy these requirements.

**I.     This Court Lacks Jurisdiction Based on Tucker Act Principles.**

The federal government enjoys sovereign immunity and may be subject to suit only when it has explicitly waived that immunity. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). Waivers of sovereign immunity must be strictly construed to protect the prerogatives of the government and to ensure the courts stay within the jurisdiction provided by Congress. *Lane v. Pena*, 518 U.S. 187, 192 (1996).

In the APA, Congress provided a limited waiver of sovereign immunity for claims against the United States by persons "adversely affected . . . by agency action" if they "seek[ ] relief other than money damages." 5 U.S.C. § 702. However, the APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*

For contract claims against the government, the Tucker Act establishes review in the Court of Federal Claims. 28 U.S.C. § 1491. When it applies, Tucker Act jurisdiction is exclusive and precludes jurisdiction in district court under the APA's waiver of sovereign immunity. The Court of Federal Claims is the "single, uniquely qualified forum for the resolution of contractual disputes." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

Because Congress has limited the forum and the remedies for contract claims against the government, a litigant whose claim is essentially contractual cannot "avoid the jurisdictional and hence remedial) restrictions of the Tucker Act" by simply asking for injunctive relief in district court. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (explaining that Section 702 of the APA "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes"); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual."); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("[T]he APA does not waive sovereign immunity for contract claims seeking specific relief."). In other words, the Tucker Act impliedly forbids an APA action seeking injunctive and declaratory relief if that action is a disguised breach-of-contract claim. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam) ("*California*").

"Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit*

*Union v. Walker,* 198 F.3d 372, 375 (2d Cir. 1999) and *Megapulse,* 672 F.2d at 968)*.* Thus, this jurisdictional inquiry, known as the *Megapulse* framework, does not turn on a plaintiff's preferred characterization of its claim.

      A.       ***California* and *NIH* Control.**

The Supreme Court's recent orders in *California* and *NIH* foreclose plaintiff's attempt to bring APA challenges, seeking the restoration of government funding pursuant to grant contracts, in district court. *See NIH,* 145 S. Ct. at 2664 (Gorsuch, J., concurring part and dissenting in part) (emphasizing that the "reasoning" of Supreme Court decisions regarding interim relief "binds lower courts as a matter of vertical *stare decisis*"); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (explaining that the Supreme Court's "interim orders . . . inform how a court should exercise its equitable discretion in like cases").

In *California*, the plaintiffs challenged under the APA the Department of Education's termination of various education related grants under certain federal grant programs. 604 U.S. at 650. They alleged that the grant terminations were arbitrary and capricious in violation of the APA and sought a temporary restraining order from a district court "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and continue paying obligations as they accrue." *Id*. The district court had found that plaintiffs were likely to succeed on the merits of their claim that the grant terminations were arbitrary and capricious under the APA since the agency failed to conduct individualized analyses of the grants or offer a reasoned explanation for its *en masse* grant terminations. *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 76-78 (D. Mass. 2025). As a remedy, the district court ordered the government to pay out past due grant obligations and continue to pay its grant obligations, holding that the Tucker Act did not preclude jurisdiction

7

because the plaintiffs invoked federal statutes and regulations and did not style their action as one for money damages. *Id*. at 76, 80.

The Supreme Court subsequently stayed the district court's order. *See California*, 604 U.S. 650. As the Court explained, the district court had "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying grant obligations as they accrue." *Id*. But the district court likely lacked jurisdiction because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, such suits must be brought in the Court of Federal Claims, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. 1491(a)(1)).

Rooted in *California* is the principle that a plaintiff's putative APA claim, disguised as a breach-of-contract claim, belongs in the Court of Federal Claims. The Department of Education's grant agreements had "the essential elements of a contract"—offer, acceptance, and consideration. *See Henke v. United States Dep't of Commerce*, 83 F.3d 1445, 1450-1451 (D.C. Cir. 1996). And those grant agreements were "the source of the rights upon which" the plaintiffs based their claims. *Megapulse*, 672 F.2d at 968. Without a grant agreement (a contract), the plaintiffs would have had no right to payment in the first place.

The Supreme Court reiterated its holding in *NIH*. There, the government changed its funding to align with changed policy priorities mandated by several executive orders. *NIH*, 145 S. Ct. at 2660 (Barrett, J., concurring in part). In doing so, the government issued internal guidance

documents describing those priorities and terminating numerous grants. *Id*. at 2661 (Barrett, J., concurring in part). The district court concluded that the government's grant termination decision was arbitrary and capricious under the APA. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 791 F. Supp. 3d 119, 179 (D. Mass. 2025). In upholding the district court's finding that it had subject matter jurisdiction over the grant terminations, the First Circuit reasoned the case could proceed because the district court provided "declaratory relief that is unavailable in the Court of Federal Claims" and the case does not "depend on the terms or conditions of any contract." *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 43–44, 47, 50 (1st Cir. 2025). The First Circuit distinguished *California* on the grounds that *California* was limited to an order "to pay out past-due grant obligations." *Id.* at 50–51 (quoting *California*, 604 U.S. at 650).

The Supreme Court disagreed and stayed the district court's judgment that has vacated the government's termination of the individual grants. *NIH*, 145 S. Ct. at 2660. The Supreme Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* at 2660 (cleaned up).

In light of the Supreme Court's orders in *California* and *NIH*, various courts have found that APA claims, brought by grantees or beneficiaries of government grants, are barred by the Tucker Act. *See Thakur v. Trump*, 163 4th 1198, 1204 (9th Cir. 2025) (court likely lacked jurisdiction over APA claim that the government's termination of research grants was arbitrary and capricious because it was designed to enforce an obligation to pay money pursuant to the grants); *American Association of Physics Teachers, Inc. v. National Science Foundation*, 804 F. Supp. 3d 45 (D.D.C. 2025) (court likely lacked jurisdiction over claims brought by grantees who

sought declaratory and injunctive relief on the grounds that the termination of their grants and the change in priorities violated the APA).

Applying the *Megapulse* framework to the claims at issue here makes clear that plaintiff's claims are in essence contractual claims for payment of the suspended funding over which this court lacks jurisdiction.

## B.      Source of Plaintiff's Rights

First, though the CTA, like the plaintiffs in *California* and *NIH*, styled its claims as stemming from the APA, the essence of the complaint is that the government should not have suspended funding and must continue performing pursuant to the FFGA grants. The CTA's complaint is that the federal government is unlawfully suspending performance required by the FFGAs.  That is contract enforcement, full stop.  Critically, there is no freestanding statutory obligation requiring continued transit funding.  Plaintiff cites no legal duty independent of the FFGAs as authority requiring funding from the government.  Indeed, in the absence of the FFGA grants, plaintiff would not have any cause of action at all.  Therefore, regardless of the labels plaintiff attaches to its claims, they are in essence contractual. *See, e.g., NIH*, 145 S. Ct. at 2658 (APA claims relating to grant terminations belong in Federal Court of Claims); *Sustainability Institute v. Trump*, 165 F.4th 817 (4th. Cir, 2026) ("the alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims before us on appeal"); *Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (where one claim was a due process claim, explaining that "[b]ecause the United States's obligation is in the first instance dependent on the contract, these claims are contractually based" and "the district court lacks jurisdiction under the Tucker Act"); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that district court lacked jurisdiction

10

pursuant to the Tucker Act because the right to payment "is created in the first instance by the contract, not by the Debt Collection Act," the statutory vehicle through which plaintiff asserted its claim).

Indeed, it is the FFGA grants that impose procedural requirements for funding suspensions and the agreements that set out the substantive standards pursuant to which funding under the grants or loans can be suspended. The suspension of funding that plaintiff challenges is actionable only by reference to the FFGA grant's terms, conditions, and performance requirements. Because no cause of action would exist without the FFGA, the CTA's APA claims are necessarily "based on' the [] grants," *NIH*, 145 S. Ct. at 2658 (quoting *California*, 604 U.S. at 651), and this court lacks jurisdiction. To conclude otherwise and determine that the CTA has some independent extra-contractual basis to bring an APA claim, would swallow the rule. It would mean that any state or beneficiary affected by a federal contract could bypass the Court of Federal Claims, obtain equitable relief in district court, and force continued performance of federal contracts through the APA. That would gut the Tucker Act's exclusivity and undo Congress's deliberate channeling of contract disputes with the United States.

In *California*, the plaintiffs brought APA claims alleging that across-the-board cuts to DEI-related grants were arbitrary and capricious and that the grant terminations were "contrary to the Department's regulations and arbitrary and capricious when viewed in light of the statutes authorizing those grants." *See* Opposition to Application at 22, *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (No. 24A910), 2025 WL 963588. They claimed that "[t]he controversy thus centers around federal statutes and regulations" rather than contract rights. *Id*. Yet the Supreme Court still found that the government was likely to succeed in showing that the claims belonged in the Court of Federal Claims under the Tucker Act. *California*, 640 U.S. at 651.

11

Similarly, in *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) ("*Climate United*"), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025), a grantee alleged that EPA's termination of its grant agreements violated OMB guidance, which the grantees interpreted to prohibit termination. The court reasoned that any violation of law "expressly refers to and incorporates the grant agreements," and that "the fact that the government's termination of a contract 'also arguably violates certain other regulations does not transform the action into one based solely on those regulations.'" *Id.* at 821 (quoting *Ingersoll-Rand*, 780 F.2d at 78). The court stated that the plaintiffs' argument that EPA failed to properly notice termination was akin to a claim that "the government stopped performing on [a] contract without sufficient warning," and that the substance of the grantees' claim "can be analyzed solely on contract principles." *Id.* (cleaned up). The court also held that plaintiffs' arbitrary and capricious claim could be evaluated only by reference to and incorporation of the relevant contracts—the grantee's argument that the termination is arbitrary and capricious is simply a claim that the government breached the grant agreements by terminating them with impunity. *Id.* at 823. The source of the plaintiff's' rights was, therefore, not independent of the contracts. *Id.* Indeed, the court noted that to hold otherwise would "effectively circumvent[]" Congressional intent "to limit contract remedies against the government to damages in the Court of Federal Claims." *Id.* at 822 (cleaned up).

Further, in *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562 (S.D.N.Y. 2025), 16 states brought an action against the government challenging a directive by the National Science Foundation ("NSF") and the NSF's termination of grant awards. Specifically, the plaintiffs argued that termination of the grant awards pursuant to the directive was arbitrary and capricious and contrary to law, in violation of the APA. *Id.* at 573. The court held that "[w]hile the complaint

12

pleads classic APA violations [], the application for a preliminary injunction is predominantly focused on breach-of-contract remedies in the form of reversing the grant terminations and reinstating the awards." *Id*. at 583. The court concluded that this was a request for specific performance of the grant agreements and that Tucker Act exclusivity precluded district court jurisdiction. *Id*. at 586.

In *American Association of Physics Teachers, Inc. v. National Science Foundation*, 804 F. Supp. 3d 45 (D.D.C. 2025), plaintiff-grantees sought to challenge the NSF's abrupt termination of approximately 1,600 grants worth over $1 billion pursuant to a change in agency priorities. The grantees brought suit under the APA alleging that the termination of their grants was arbitrary and capricious, and they sought declaratory and injunctive relief. *Id*. at 62. Like in *Climate United*, the court held that the source of plaintiff's rights arose in contract. *Id*. The court explained "[t]ellingly, the thrust of Plaintiffs' claim that NSF's action was arbitrary and capricious under the APA is that NSF previously promised grant funding and then withdrew that funding without explanation, which sounds like a complaint about breach." *Id*.

Further, in *Sustainability Institute*, nonprofit organizations and local governments that were awarded or were subrecipients of federal grants brought APA challenges concerning the government's termination or suspension of environmental and agricultural grants pursuant to executive orders. Plaintiffs argued that their APA claims arose from the Constitution and federal statutes rather than contract because they sought "forward-looking injunctive and declaratory relief." 165 F.4th at 828. The Fourth Circuit rejected that argument, explaining that the alleged statutory and constitutional violations did not alter the essentially contractual nature of plaintiffs' claims. *Id*. The *Sustainability Institute* plaintiffs identified "no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued payments on those grants." *Id*. at

13

827. Thus, the court found, the plaintiffs' "injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id*. (quoting *NIH*, 145 S. Ct at 2664). Accordingly, the Fourth Circuit held that the plaintiffs' claims were foreclosed by *California* and *NIH*. *See also Solutions in Hometown Connections v. Noem*, 165 F.4th 835, 843 (4th Cir. 2026) ("Without that contractual basis, the plaintiffs could claim no relief.").

The same principles apply here. The CTA's allegations that the government violated law or failed to follow its own regulations in suspending the FFGA grants cannot transform this action into one based solely on those laws and regulations. Nor can its claim that the government acted without reason in suspending funding. Those are claims that must be analyzed solely based on contract principles in the Court of Federal Claims.

### C.    The CTA's Requested Remedies

The relief that the CTA seeks is likewise contractual in nature. It seeks an injunction restraining the government from refusing to disburse funding under the FFGA grants. Compl. at 49 (Prayer for Relief D) (asking this court to preliminarily and permanently enjoin defendants from "refusing to disburse funding under the CTA's Red Line Extension and Red and Purple Modernization grants"). In other words, the CTA asks the court to rescind the October 3, 2025 funding suspension, reinstate past due FFGA payments, and compel continued federal performance under the FFGA grants (by paying money). That relief is functionally indistinguishable from specific performance.

These classic contractual remedies are generally *unavailable* against the government. *Ingersoll-Rand Co.*, 780 F.2d at 79–80 (order "reinstating the original award of [a] contract . . . amount[ed] to a request for specific performance"); *Climate United*, 154 F.4th at 823 (seeking an

14

injunction barring termination and ordering disbursement of grant funds was identical to requesting "specific performance" of a grant agreement). As courts have repeatedly held, a plaintiff may not use the APA to compel the United States to perform contractual obligations, regardless of whether the relief is characterized as equitable or non-monetary. *Presidential Gardens Assocs. v. U.S. ex rel. Secretary of Housing and Urban Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States." (citing *B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713, 728 (2d Cir. 1983)).

Like the *California* and *NIH* plaintiffs, the CTA seeks relief in the form of declaratory and injunctive relief that requires the government to pay money on contracts. Like the *California* and *NIH* plaintiffs, the CTA challenges the termination or suspension decision under the APA, on the grounds that it is arbitrary and capricious and contrary to law. And like the district courts in *California* and *NIH*, this court too "lack[s] jurisdiction . . . under the APA" to compel the Government "to pay money" under the grant agreements, *California*, 604 U.S. at 651, or "to order relief designed to enforce any obligation to pay money pursuant to those grants," *NIH*, 145 S. Ct. at 2658 (internal quotation marks omitted).

It is of no moment that the CTA seeks only declaratory and injunctive relief to set aside the October 3, 2025 decision to suspend payments under the FFGA grants. Compl., at 49 (Prayer for Relief D). The result would still in essence require the government to pay money. The *NIH* plaintiff similarly "invoked the APA only to vacate the government's decision to terminate" grants rather than seeking past due sums, and the Supreme Court's stay order affirms that such cases must be heard in the Court of Federal Claims. *NIH*, 145 S. Ct. at 2664 (2025) (Gorsuch, J. concurring in part and dissenting in part); *see also id.* ("[A]n order vacating the government's decision to

15

terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants."); *see also Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d 563, 569 (E.D. Va. 2025) (fact that plaintiffs did not explicitly request money damages, but rather declaratory and injunctive relief, did not help them plead around Tucker Act jurisdiction), appeal docketed, Nos. 25-2087 and 25- 2107 (4th Cir. Aug. 29, 2025). And with good reason: if plaintiffs could evade the Tucker Act just by requesting declaratory relief, virtually *any* contract suit could be transmuted into an APA claim. *See U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 165 (D.D.C. Mar. 11, 2025) ("Sure, the [plaintiff] seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the [plaintiff]. This is not standard injunctive fare.").

When plaintiff's claim is "[s]tripped of its equitable flair," the "requested relief seeks one thing: [T]he Court to order the Government to stop withholding the money due" under its grant agreements. *Catholic Bishops*, 770 F. Supp. 3d at 163. "In even plainer English: [they] want[] the Government to keep paying up." *Id.* Such a claim for "the classic contractual remedy of specific performance," "must be resolved by the Claims Court." *Id.* (citations omitted). [2]

---

[2] A district court recently issued a TRO to enjoin DOT's suspension of grant funding with similar facts. In that case, the district court distinguished the Supreme Court's decisions in *NIH* and *California* because "those cases concerned grant recipients who were able to pursue their claims in the Court of Federal Claims." *New Jersey v. DOT*, No. 1:26-cv-00939, 2026 WL 323341, at *4 (S.D.N.Y. Feb. 6, 2026). The district court concluded that there could not be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act. *Id.* (citing to *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006); *see also Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025)). Because the plaintiff states in that case were not the grant recipients and could not themselves bring their claims in the Court of Federal Claims, the Tucker Act did not preclude their APA claims. Here, the CTA is the direct recipient under FFGA and can bring its claim for breach of contract in the Court of Federal Claims. As such, the Tucker Act's exclusive jurisdiction divests this court of jurisdiction over CTA's claims.

16

**II.     The CTA Cannot Show Irreparable Harm.**

Even were the court to conclude it has jurisdiction over the CTA's claims, the CTA is not entitled to a temporary restraining order because it has not shown irreparable harm for three reasons. *First*, CTA cannot establish irreparable harm stemming from the DOT's Interim Final Rule concerning DBE contractors ("IFR"). Apart from its claims challenging DOT's funding suspension, the CTA also makes several independent claims directed at the IFR. The CTA alleges that DOT violated the APA by failing to comply with procedural requirements when issuing the new regulation, including notice-and-comment and delayed-effectiveness requirements. Compl., Counts IV, V. Even assuming jurisdiction exists in the district court to pursue these independent APA claims regarding the IFR, there is no imminent, irreparable injury based on such claims. The alleged imminent, irreparable harm is only based on DOT's funding suspension. And as explained in DOT's correspondence, its decision to suspend funding was based on DOT's administrative review to ensure that the CTA's disbursements to its contractors under the federal grants were consistent with Equal Protection principles and nondiscrimination requirements under Federal civil rights laws. Compl., Exs. A-B. Indeed, according to the CTA, the funding suspension persists even though DOT has completed its review and the CTA has agreed to comply with the IFR and other conditions required by DOT for continued funding. Therefore, to the extent irreparable harm exists to justify emergency relief, it cannot be based on alleged procedural irregularities related to the IFR.

*Second*, the CTA cannot otherwise make a showing of irreparable harm here because, fundamentally, the harm it asserts is economic. Plaintiff seeks the payment of federal funds pursuant to their contracts with the federal government. The associated injuries plaintiff asserts are thus definitionally not irreparable, *see, e.g.*, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320-21 (9th Cir. 1994); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d

17

597, 603 (9th Cir. 1991), particularly because the plaintiffs allege no "threat of being driven out of business." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) (citation omitted).

*Third*, the Supreme Court recently held that the government is irreparably harmed where grant funds are released to a plaintiff that "'cannot be recouped' and are thus 'irrevocably expended.'" *NIH*, 145 S. Ct. at 2658 (quoting *Phillip Morris USA Inc. v. Scott*, 56 U.S. 1301, 1304 (2010)). In *NIH*, the Court found irreparable harm to the government from the release of grant funds to plaintiffs, who did "not state they will repay grant money if the Government ultimately prevails," and who contended that they lacked the resources to continue to fund their project without the funds as this was "inconsistent with the proposition that they have the resources to make the Government whole for money already spent." *Id*. The same is true here. Plaintiff has not stated that it will repay the government for the expended funds should the government prevail. And, as in *NIH*, the CTA claims it cannot continue with either of its projects without the funding, which is inconsistent with the notion that the CTA will repay the government for any expended funds. As such, should the government prevail, any funds released to the CTA would be "irrevocably expended." *NIH*, 145 S. Ct. at 2658.

## III.    The Equities Weigh Against Emergency Relief.

Finally, the CTA cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction. These final two factors merge in cases where relief is sought from the government. *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in its favor, the CTA primarily relies on the notion that it is likely to prevail on the merits and that there is no public interest in the perpetuating

18

unlawful agency action. But that is just a repackaged version of the CTA's merits arguments, which are not likely to succeed, and not an independent basis for relief.

Meanwhile, contrary to the CTA's assertions that the government will suffer no cognizable harm if a temporary restraining order is granted, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021) (citing same language from *King* in a decision granting a stay pending appeal of a preliminary injunction against a federal agency rulemaking).

### Conclusion

For these reasons, this court should deny plaintiff's motion for a temporary restraining order.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Patrick Johnson
    JELENA KOLIC
    PATRICK JOHNSON
    Assistant United States Attorneys
    219 S. Dearborn Street, 5th Floor
    Chicago, Illinois 60604
    (312) 886-2055
    (312) 353-5327
    jelena.kolic@usdoj.gov
    patrick.johnson2@usdoj.gov