**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |
|---|---|
| CHICAGO TRANSIT AUTHORITY,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION;<br><br>FEDERAL TRANSIT ADMINISTRATION; and<br><br>UNITED STATES OF AMERICA,<br><br>      Defendants. | Case No. 1:26-cv-3140 |

**PLAINTIFF'S REPLY IN SUPPORT OF**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

The Department of Transportation ("DOT"), through the Federal Transit Administration ("FTA"), has frozen approximately $2.1 billion in federal funding that has already been awarded and obligated to the Chicago Transit Authority ("CTA") for critical transportation projects. That funding freeze is patently unlawful. Indeed, even the government does not contest this point; the government *offers no defense at all* on the merits of CTA's claims. Nor does the government dispute any of the facts as alleged and established by CTA's declarations—*i.e.*, that the funding freeze is a direct implementation of DOT's September 30, 2025 interim final rule ("IFR"); that the IFR's retroactive application to CTA's grants was pretextual and undertaken in an effort to gain political leverage; and that, unless this Court grants relief prior to this Friday (March 27, 2026), hundreds of workers will soon be out of jobs and CTA's ongoing projects will be jeopardized.

In the face of all of this, the government retreats primarily to a jurisdictional point—arguing that CTA's claims are barred by the Tucker Act and belong in the Court of Federal Claims. But this argument misstates both the nature of CTA's claims and the applicable legal framework. There are three independent reasons why CTA's claims are properly before this Court:

1.      CTA's claims are expressly authorized by Title VI, which specifically provides for judicial review under the Administrative Procedure Act ("APA") in federal district court outside the Tucker Act's framework, *see* 42 U.S.C. § 2000d-2—a point the government's brief ignores.

2.      CTA's claims are not contractual in nature but instead challenge a prospective agency policy. Consistent with Justice Barrett's governing concurrence in *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"), a challenge to agency policy is properly heard in federal district court.

3.      CTA seeks prospective relief against an ongoing suspension of funds, over which the Court of Federal Claims has no jurisdiction.

1

For each of these reasons, this Court has jurisdiction.

Beyond the jurisdictional issue, the government barely resists entry of CTA's requested relief. On irreparable harm, the government ignores that, absent relief, hundreds of people will soon be out of work, CTA's reputation will be tarnished, and CTA's trained workforce will disperse—none of which are monetary harms that can be remedied after-the-fact. Finally, as for the public interest, the funding freeze threatens to delay CTA's ongoing projects, potentially even jeopardizing them entirely, causing significant harm to the broader Chicago region and its residents. Immediate relief is plainly warranted.

## ARGUMENT

**I.      The Tucker Act Does Not Divest This Court of Jurisdiction.**

**A.      This Court Has Jurisdiction Over CTA's Claims for Three Independent Reasons.**

The government contends that CTA is bringing pure "breach of contract" claims subject to the Tucker Act and the exclusive jurisdiction of the Court of Federal Claims. That argument ignores the true nature of CTA's claims, binding Supreme Court precedent, and numerous other decisions. In particular, this Court has jurisdiction over CTA's claims for three independent reasons.

First, Title VI expressly vests in federal courts jurisdiction to review agency action "terminating or refusing to grant or to continue financial assistance[.]" 42 U.S.C. § 2000d-2. This provision displaces the Court of Federal Claims' exclusive jurisdiction. *See Bowen v. Massachusetts*, 487 U.S. 879, 910 & n.48 (1988) ("[T]hat court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court."); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020) (presence of remedies under other statutes displaces the Tucker Act's exclusivity). As multiple courts have held, where a challenge to a funding decision is brought under

Title VI, the Tucker Act is not "relevant." *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 106 (D. Mass. 2025) ("[T]he Tucker Act's waiver of sovereign immunity" is not "relevant to Title VI, which itself expressly authorizes 'judicial review' of agency action 'terminating or refusing to grant or to continue financial assistance,' including through the APA, in an Article III court." (citation omitted)), *appeal docketed*, No. 25-2231 (1st Cir. Dec. 31, 2025); *see also Am. Ass'n of Univ. Profs. v. Trump*, 2025 WL 3187762, at *32 (N.D. Cal. Nov. 14, 2025) ("[T]he Tucker Act" does not "apply to the claim that the suspensions violated the requirements of Title VI."), *appeal docketed*, No. 26-263 (9th Cir. Jan. 13, 2026); *Duxbury Trucking, Inc. v. Mass. Highway Dep't*, 2009 WL 1258998, at *5 (D. Mass. Apr. 29, 2009) (recognizing that APA review is available for DOT's Title VI actions).[1]

Here, DOT's decision to suspend CTA's funding was made pursuant to Title VI. The IFR that serves as the basis for the funding freeze is rooted in both the Equal Protection Clause and Title VI. *See* 90 Fed. Reg. 47,969, 47,971 (Oct. 3, 2025). The IFR thus expressly cites Title VI in the "Authority" section for the new regulations, *see id.* at 47,979 (citing 42 U.S.C. § 2000d *et seq.*); and expressly references DOT's continued authority "to conduct a review or take action under Title VI or other applicable law regarding compliance with equal protection principles," *id.* at 47,974. The October 3 Freeze Letters themselves state that DOT's "review is intended to ensure that disbursements for the Project[s] are consistent with the Equal Protection principles of the U.S.

---

[1] The statutory provision authorizing APA review of Title VI funding actions, 42 U.S.C. § 2000d-2, would make little sense if Congress intended all such actions to be reviewed instead in the Court of Federal Claims. Indeed, the Court of Federal Claims would likely lack jurisdiction over Title VI claims, which makes it even less plausible that Congress intended to preclude district court review. *See Wagstaff v. United States*, 105 Fed. Cl. 99, 109 (2012) ("Likewise, the court does not have jurisdiction to adjudicate statutory civil rights claims." (citing 28 U.S.C. § 1343(a)(4))).

Constitution, [and] Federal nondiscrimination requirements under civil rights law, *including Title VI.*" Compl., Ex B (emphasis added); *see id.*, Ex. A.

Indeed, the government acknowledges (at 4) that CTA has brought Title VI claims challenging Defendants' decision "refusing … to continue financial assistance" but provides no reason that Title VI does not also provide federal jurisdiction. Because DOT has refused to continue CTA's funding based on Title VI, CTA may bring its APA claims in federal district court under 42 U.S.C. § 2000d-2.

Second, and wholly apart from Title VI, CTA's claims challenge a prospective agency policy—the IFR—which Justice Barrett's controlling opinion in *NIH* confirms this Court retains jurisdiction to hear. *See* 145 S. Ct. at 2661. *NIH* involved challenges both to agency guidance documents and to individual grant terminations. *Id.* While agreeing that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims," Justice Barrett held that "the Government is not entitled to a stay of the judgments insofar as they vacate the guidance documents." *Id.* Plaintiffs "frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds" in federal court, she explained; the mere fact that the guidance impacts a grant does not somewhere "transform a challenge to that guidance into a claim 'founded … upon' contract that only the [Court of Federal Claims] can hear." *Id.*

So too here. CTA is challenging a prospective agency policy—the IFR—insofar as it allows retroactive application of its terms to existing grants. That is a traditional APA claim against a traditional agency policy, not a grant- or contract-specific claim. Thus, following the Supreme Court's decision in *NIH*, numerous courts—both in this District and elsewhere—have held that similar challenges to agency policies may proceed in district court. *See, e.g.*, Order at 5, *Illinois v. Vought*, No. 26-cv-1566 (N.D. Ill. Mar. 12, 2026), ECF No. 63 ("Plaintiffs' challenge is not to

4

grant-by-grant, award-by-award terminations, but instead to agency-wide policies targeting states. That falls outside Tucker Act exclusivity."); *City of Chicago v. U.S. Dep't of Just.*, 2026 WL 114294, at \*4 (N.D. Ill. Jan. 15, 2026) ("Plaintiffs seek an order that prohibits [d]efendants from enforcing the Challenged Conditions set forth in the guidance documents. Jurisdiction in this case is thus consistent with *[NIH].*"); *City of Chicago v. Noem*, 2025 WL 3251222, at \*4-5 (N.D. Ill. Nov. 21, 2025) (where "the relief sought is only to vacate guidance document," such as an order "prohibiting DHS … from enforcing provisions of its Standard Terms and Conditions" it is "relief left undisturbed by *[NIH],*" so "[t]he Tucker Act does not apply"); *see also Massachusetts v. Nat'l Insts. of Health,* 164 F.4th 1, 9, 11 (1st Cir. 2026) (jurisdiction over claim that new funding guidance impermissibly applied retroactively properly lay in district court); *Hous. Auth. of City and Cnty. of San Francisco v. Turner*, 2025 WL 3187761, at \*9 (N.D. Cal. Nov. 14, 2025) ("[C]ourts have found with near or total uniformity that the district courts have jurisdiction over claims" such as those "involving constitutional and APA claims seeking an injunction against the imposition of allegedly unlawful grant conditions."), *appeal docketed*, No. 26-233 (9th Cir. Jan. 13, 2026). Consistent with these cases, jurisdiction here is likewise appropriate.

Indeed, the government's failure to defend the IFR on the merits should be essentially dispositive of its Tucker Act objections. The government has not contested that the IFR arbitrarily permits retroactive application of its terms to existing grants; was unlawfully issued without notice-and-comment or a delayed effective date; and violates the Spending Clause by retroactively imposing new conditions on existing grant funds. The Court of Federal Claims has no authority to hear, let alone grant relief on, such claims raising traditional administrative-law and constitutional challenges to an agency policy. CTA is therefore entitled to pursue those claims here.

Third, the Tucker Act's exclusive jurisdiction does not apply because CTA's grants have not been *terminated* but instead have only been *suspended*. The Supreme Court in *NIH* concluded that "the District Court likely lacked jurisdiction to hear challenges to the *grant terminations*." 145 S. Ct. at 2661 (Barrett, J., concurring) (emphasis added). But CTA's claims are different because its grants have not been terminated—only suspended.

Courts have consistently held that challenges to funding suspensions, as opposed to terminations, are not subject to exclusive Court of Federal Claims jurisdiction. For example, in *City of Chicago v. United States Department of Homeland Security*, Judge Kennelly held that the district court had "jurisdiction … over the plaintiffs' claims to the extent that they challenge the government's decision to freeze funding." 2025 WL 3043528, at *11 (N.D. Ill. Oct. 31, 2025). The court explained that such a challenge "would not require the Court to reverse or vacate past grant terminations, or otherwise require the government to pay money past due," concluding that "enjoining the government from relying on its stated reasons to withhold payment would be exactly the type of relief that the Supreme Court affirmed in *Bowen*." *Id.* Thus, suit was appropriate in district court. The First Circuit has reached the same conclusion in a case challenging a "federal funding freeze." *New York v. Trump*, --- F.4th ----, 2026 WL 734941, at *3, *16 (1st Cir. Mar. 16, 2026). CTA's challenge thus falls squarely within this Court's jurisdiction.

### B. The Government Misconstrues CTA's Claims.

Rather than confront any of these fundamental reasons why judicial review is appropriate, the government tries to characterize CTA's claims (at 10-11) as being "essentially contractual" because they allegedly arise from the two projects' fully funded grant agreements ("FFGAs") and purportedly seek to compel the government to continue performing under those agreements. But that fundamentally mischaracterizes CTA's claims. CTA is not arguing that the government breached any term of either FFGA; nor is CTA seeking specific performance of the government's

6

obligations under those FFGA.

Tellingly, the government cites nothing to support its assertion that CTA's claims are in any way dependent on the terms of the FFGAs. For example, CTA is not challenging whether DOT has complied with the FFGAs' "procedural requirements" or "substantive standards" for the funding suspension. Opp'n 11. Rather, CTA challenges the IFR's retroactive application to existing grants. That legal theory is "founded … upon" principles of administrative and constitutional law—the APA's prohibitions on arbitrary and capricious action, its notice-and-comment and delayed-effectiveness requirements, and the procedural mandates of Title VI and its implementing regulations, and the Spending Clause's prohibition on the retroactive imposition of new spending conditions, among others—not the contractual terms of the FFGAs. 28 U.S.C. § 1491(a)(1). Put another way, in assessing the merits of all of these claims, the terms of the FFGAs are beside the point: The claims target the Government's unlawful regulatory action—the retroactive application of the IFR—not any contractual obligation. Such an action properly belongs in district court.

The government's own statements confirm the point. The Freeze Letters themselves expressly stated that DOT was initiating its review of CTA's grants "[i]n conjunction with the issuance of the IFR," Compl., Exs. A-B, and DOT's contemporaneous press release likewise stated that the freezes were designed "[t]o continue implementation of th[e IFR]," *id.*, Ex. E. The government's brief nowhere disputes the link between the IFR and Defendants' freeze of CTA's funds. Accordingly, the funding freezes were, by Defendants' own admission, a byproduct of implementing a new agency rule—not an exercise of DOT's contractual rights under the FFGAs. CTA's challenge to the *regulatory* action is precisely the type of APA claim that Justice Barrett recognized as cognizable in district court in *NIH*: a challenge to agency policy that does not depend on the terms or conditions of any contract. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring)

(challenge to agency guidance properly before district court, and fact that "agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded ... upon' contract that only the CFC can hear"). As even the government's authorities demonstrate, "the mere existence of … contract-related issues" does not "convert this action to one based on the contract." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982); *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1110 (D.C. Cir. 2022) (explaining that the "claim presupposes the existence of a contract … [b]ut the right [he] seeks to vindicate is not a contract right"). Thus, the fact that CTA's APA claims have some connection to a grant agreement does not mean the APA claims are "essentially contractual."

Indeed, the government's own brief appears to (belatedly) acknowledge that CTA's APA claims properly belong in this Court. In its irreparable-harm discussion, the government essentially concedes (at 17) that CTA's challenges to the IFR's procedural deficiencies (Counts IV and V) are "independent claims directed at the IFR" over which this Court has jurisdiction. But the government ignores that *all* of CTA's claims are equally "directed at the IFR," as Defendants have purported to freeze CTA's funds pursuant to that IFR. Opp'n 17; *see* Compl., Exs. A, B, E. The government offers no basis for severing Counts IV and V from the balance of CTA's claims, and there is no basis for doing so. The freezes are an application of the IFR, and CTA's challenge to that unlawful agency action is a run-of-the-mill APA challenge that belongs in federal district court.

### C. The Government's Cited Cases Do Not Support Its Position.

The cases the government cites to support its Tucker Act argument all cut in favor of this Court's jurisdiction, are inapposite, or lack any judicial force. Perhaps most fundamentally, none involves Title VI claims, nor do any involve *suspensions* as opposed to terminations.

Many of the government's cited cases merely hold that courts lack jurisdiction to vacate grant *termination* decisions, and so are irrelevant for the reasons discussed above. *See, e.g., Thakur*

8

*v. Trump*, 163 F.4th 1198, 1203 (9th Cir. 2025) (holding that district court lacked jurisdiction over challenges to claims that grants were terminated *en masse* by form letter). Several cases establishing that proposition also go on to hold that prospective challenges to agency policies—like what CTA pursues here—are still cognizable. *See, e.g.*, *Am. Ass'n of Physics Tchrs. Inc. v. Nat'l Sci. Found.*, 804 F. Supp. 3d 45, 66 (D.D.C. 2025) (claims regarding the individual termination of NSF grants contrary to their terms belonged in the CFC, but district court retained jurisdiction over plaintiff's constitutional claims and claims challenging new agency policy regarding the *treatment* of grants); *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 588, 593 (S.D.N.Y. 2025) (retaining jurisdiction over claims tied to "[p]laintiffs' interests in procedural regularity and predictability" and claims asking the court to "enjoin [d]efendants 'from enforcing or implementing'" new agency rule "'by means of termination or interruption of funding'").

The government relies on several other cases that are inapposite. In *Sustainability Institute v. Trump*, the plaintiff's claim was that the government lacked lawful basis to terminate their grants "*en masse*…without individualized analysis." 165 F.4th 817, 826-27 (4th Cir. 2026). The court noted that the plaintiffs there identified "no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued payment on those grants." *Id.* at 827 (quoted at Opp'n 13); *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163-64 (D.D.C. Mar. 11, 2025) (complaint concerned one specific grant termination and requested relief focused solely on enjoining individual termination letter) (cited at Opp'n 16). Likewise, while the plaintiffs in *Fairfax County School Board v. McMahon*—a case currently on appeal—alleged they brought Title IX procedural claims, the court noted that "Plaintiffs do not identify any count or relief sought that relates to Title IX's procedural requirements." 798 F. Supp. 3d 563, 569 (E.D. Va. 2025), *appeal docketed*, No. 25-2087 (4th Cir. Sept. 11, 2025). CTA's claims, meanwhile,

9

are wholly distinct from the four corners of the FFGAs, and several are specifically pled under Title VI, as Defendants acknowledge (at 4).

Finally, the government spills much ink on *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025). But that opinion—as the government acknowledges in its citation but then ignores—has been vacated by the D.C. Circuit. Vacated panel opinions have no precedential effect. *Cf. Cohen v. Ill. Inst. of Tech.*, 524 F.2d 818, 829 n.33 (7th Cir. 1975) (withdrawn panel opinions have "no precedential value"); *Keller v. Client Servs., Inc.,* 2021 WL 5578794, at *4 (N.D. Ill. Nov. 30, 2021) (principle that "a vacated opinion has no precedential value" is "especially true when the vacated decision is from a different circuit" (internal citations omitted)). In any event, the panel in that case characterized the challenge as being to a grant termination decision, not a distinct challenge to the lawfulness of an agency policy.

In short, the government's cited authorities do not change the analysis, and the government largely ignores the obvious jurisdictional bases for CTA's claims here. CTA is bringing Title VI claims as expressly authorized, is challenging an agency policy, and is challenging a suspension rather than a termination—each of which independently provides this Court with jurisdiction.

## II.     This Court Should Grant a Temporary Restraining Order.

With jurisdiction secure, CTA easily satisfies the requirements for emergency relief.

### A.     The Government Does Not Dispute That the Freezes Are Unlawful.

The government offers not a single word in defense on the merits. It does not argue that the retroactive application of the IFR to CTA's existing grants was reasonable. It fails to explain why CTA's funds remain frozen many months "after [DOT's] administrative review was complete and after the CTA satisfied all requirements under the review." Opp'n 1. It does not contest CTA's claim that the freezes were pretextual and based on animus. And it does not dispute that DOT lacks

10

statutory authority to indefinitely suspend congressionally appropriated and obligated funds, or that Defendants failed to follow the mandatory procedures prior to doing so. By failing to contest any of these arguments, the government has conceded them for purposes of this motion. Accordingly, CTA has established an overwhelming likelihood of success on the merits.

### B. The Freezes Are Causing CTA Irreparable Harm.

Absent emergency relief, CTA and the people of Chicago will suffer severe, irreparable, and imminent harm. CTA set forth those harms in detail in its opening brief and supporting declaration. Br. 33-37. As a result of the suspension, the RPM and RLE Projects are out of funds. Decl. ¶ 63. Unless the freeze is lifted, CTA will be forced to notify workers of an impending stoppage and begin demobilization on March 27, with all construction halting by April 10, 2026. *Id.* ¶¶ 65-70. Hundreds will lose their jobs. *Id.* ¶¶ 69, 83-84. The people of Chicago, meanwhile, will be subjected to extended speed restrictions and denied the benefits of the revitalized and extended lines—perhaps permanently. Decl. ¶¶ 72, 76. The government does not contest any of those facts.

Instead, the government argues (at 17) that any harm cannot be traced to the IFR because "the funding suspension persists even though DOT has completed its review and the CTA has agreed to comply with the IFR and other conditions required by DOT for continued funding." That is flatly wrong, because the IFR is the basis for the funding freeze, as DOT itself repeatedly stated in both its correspondence with CTA and in its own press release. Compl., Exs. A, B, E. Moreover, it would be perverse to reward the government by denying emergency relief simply because the challenged agency action has persisted beyond any conceivable justification for it. If anything, the government's argument only confirms that its actions are arbitrary and capricious, which is more reason—not less—to issue temporary relief.

11

Nor can the harms to CTA be remedied by a subsequent money judgment. Without court intervention, the government's actions here will throw hundreds out of work, Compl., ¶ 120; subject hundreds of thousands of people to needless delays, *id.* ¶ 121; and risk goodwill that CTA has worked for decades to build, *id.* ¶ 120. All of this is quintessential irreparable harm. *E.g.*, *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1139-40 (7th Cir. 1994); *see also Staffing Servs. Ass'n of Ill. v. Flanagan*, 720 F. Supp. 3d 627, 640-41 (N.D. Ill. 2024) (Durkin, J.) (finding regulated party irreparably harmed when forced to choose between "expense and burden" of compliance or enforcement penalties where sovereign immunity bars later damages). Moreover, because the APA waives sovereign immunity only for "relief other than money damages," 5 U.S.C. § 702, CTA has no adequate legal remedy for the financial harm caused by the freeze—making that harm irreparable as a matter of law. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999); *see also, e.g., CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 262 (D.D.C. 2022) (recognizing that economic loss caused by the government can be an irreparable injury due to sovereign immunity).

**C.      The Balance of Harms and Public Interest Support an Injunction.**

The equities strongly favor a temporary restraining order. The government evidently does not dispute the principle that "there is no public interest in perpetuating unlawful agency action." Br.18-19; *see, e.g., C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020). Here, there is no conceivable public interest in the continued implementation of funding freezes that the government has not even bothered to defend on the merits. For the same reason, the government gets nowhere by invoking the principle that "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Opp'n 19 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The

12

government does not say which "statutes" it believes Defendants to be "effectuating." *Id.* And as CTA has explained, Defendants' actions are entirely *without* statutory authorization (which Defendants don't contest). There is no public interest in perpetuating an unlawful funding freeze that the Government itself cannot justify.

Nor is the government's contention that released funds "cannot be recouped," Opp'n 17-18, persuasive here. Unlike the private grantees in *NIH*, CTA is a permanent municipal corporation created by Illinois statute, with taxing authority and ongoing revenue streams—it is not going anywhere. The government faces no realistic risk that funds disbursed to CTA will prove irrecoverable.

On the other side of the ledger, CTA and the public will suffer a slew of serious irreparable harms—all of which the government's brief conveniently ignores. *See* Opp'n 18-19. Absent immediate relief, CTA will be forced, just days from now, to cease work on the two largest infrastructure projects in its history. The demobilization process will be costly and wasteful, and will imperil two landmark modernization projects that would benefit hundreds of thousands of Chicagoans for decades to come. These are quintessential harms. Accordingly, the balance of the equities strongly favors emergency relief.

## CONCLUSION

The Court should grant CTA's motion for a temporary restraining order.

Dated: March 23, 2026                         Respectfully submitted,

                                              By: */s/ Andrianna D. Kastanek*

Jeffrey C. Bora                               Andrianna D. Kastanek
CHICAGO TRANSIT AUTHORITY                     Terri L. Mascherin
567 W. Lake Street, 6th Floor                 Jason M. Bradford
Chicago, Illinois 60661                       Simon A. de Carvalho
Tel: (312) 681-3110                           JENNER & BLOCK LLP
JBora@transitchicago.com                      353 N Clark Street
                                              Chicago, IL 60654

13

Tel: (312) 222-9350
AKastanek@jenner.com
TMascherin@jenner.com
JBradford@jenner.com
SdeCarvalho@jenner.com

*Counsel for Plaintiff*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2026, I filed the foregoing brief with the Clerk of Court

for the U.S. District Court for the Northern District of Illinois using the Court's CM/ECF system.

/s/ Andrianna D. Kastanek
Andrianna D. Kastanek