**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |
|---|---|
| CHICAGO TRANSIT AUTHORITY,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION;<br><br>FEDERAL TRANSIT ADMINISTRATION; and<br><br>UNITED STATES OF AMERICA,<br><br>      Defendants. | Case No. 1:26-cv-3140 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.     THE LEGAL FRAMEWORK GOVERNING CTA'S FEDERAL TRANSIT
       GRANTS...................................................................................................................... 3

       A.     CTA's Federally Funded RLE and RPM Projects........................................ 3

       B.     CTA's Required Compliance With DBE Requirements And Title VI ................... 5

       C.     The Government's Limited Authority To Freeze Federal Grant Funds .................. 6

II.    DOT'S INTERIM FINAL RULE AND THE RESULTING FREEZES OF
       CTA'S GRANTS........................................................................................................... 8

       A.     The Interim Final Rule................................................................................... 8

       B.     Defendants' Retroactive Implementation Of The IFR To Freeze CTA's
              Funding.......................................................................................................... 9

       C.     DOT's Administrative Review And Continued Funding Freezes........................ 10

III.   THE IMMEDIATE AND IRREPARABLE HARM TO CTA AND ITS
       CUSTOMERS............................................................................................................ 11

STANDARD OF REVIEW ............................................................................................. 12

ARGUMENT ................................................................................................................... 12

I.     THIS COURT HAS JURISDICTION OVER CTA'S CLAIMS ................................... 12

       A.     This Court Has Jurisdiction Under Title VI................................................. 12

       B.     This Court Has Jurisdiction Because CTA Seeks Ordinary APA Review
              Of A Prospective Agency Policy. ................................................................ 14

       C.     Additionally, This Court Has Jurisdiction Because CTA Challenges
              Grant Suspensions Rather Than Grant Terminations.......................................... 16

II.    PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED. ........................................ 17

       A.     CTA Is Likely To Succeed In Demonstrating That The Freezes Are
              Unlawful ...................................................................................................... 18

1. The Retroactive Application Of The IFR To Freeze CTA's Grants Was Arbitrary And Capricious (Counts I-III)..............................18

2. Defendants Violated The APA's Procedural Requirements (Counts IV-V). ......................................................................23

3. The IFR's Application To CTA Violates Title VI And Its Implementing Regulations (Counts VI-VII)...........................................26

4. Defendants' Actions Violate 2 C.F.R. Part 200 (Count VIII)....................27

5. Defendants' Actions Exceed DOT's Statutory Authority (Count IX).............................................................................28

6. Defendants' Actions Violate The Constitution (Counts X and XI)...........................................................................29

B. CTA Will Suffer Irreparable Harm Absent A Preliminary Injunction...................30

III. THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT AN INJUNCTION............................................................................34

CONCLUSION....................................................................................35

ii

## TABLE OF AUTHORITIES

CASES

*Adams v. Bell*, 711 F.2d 161 (D.C. Cir. 1983)................................................................27

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...........................................................6, 26

*American Association of University Professors v. Trump*, --- F. Supp. 3d ----, 2025
  WL 3187762 (N.D. Cal. Nov. 14, 2025), *appeal docketed*, No. 26-263 (9th Cir.
  Jan. 13, 2026)...........................................................................................................13

*American Federation of Government Employees, AFL-CIO v. Block*, 655 F.2d 1153
  (D.C. Cir. 1981) .......................................................................................................24

*American Federation of Labor & Congress of Industrial Organizations v. NLRB*,
  57 F.4th 1023 (D.C. Cir. 2023).................................................................................24

*American Food & Vending Corp. v. United Parcel Service Oasis Supply Corp.*,
  2003 WL 256865 (N.D. Ill. Jan. 31, 2003)...............................................................32

*Bennett v. New Jersey*, 470 U.S. 632 (1985) ................................................................30

*Biden v. Nebraska*, 600 U.S. 477 (2023) .....................................................................29

*BNSF Railway Co. v. Federal Railroad Administration*, 105 F.4th 691 (5th Cir.
  2024) .......................................................................................................................20

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)...............................20

*Bowen v. Massachusetts*, 487 U.S. 879 (1988).............................................................13

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)...................................................35

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ........................................................25

*CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052 (S.D. Ind. 2010) ........................32

*City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025),
  *appeal docketed*, No. 25-3889 (9th Cir. June 23, 2025)...................................23, 29

*City of Chicago v. Noem*, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025)......................15

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017), *aff'd*, 888 F.3d
  272 (7th Cir. 2018)...................................................................................................34

*City of Chicago v. United States Department of Homeland Security*, --- F. Supp. 3d
  ----, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) .....................................................17

*City of Chicago v. United States Department of Justice*, --- F. Supp. 3d ----, 2026
WL 114294 (N.D. Ill. Jan. 15, 2026) ................................................................. 15, 30

*City of St. Paul v. Wright*, --- F. Supp. 3d ----, 2026 WL 88193 (D.D.C. Jan. 12,
2026) ........................................................................................................................ 10

*Consumer Financial Protection Bureau v. Community Financial Services
Association of America, Ltd.*, 601 U.S. 416 (2024) ................................................ 29

*CSL Plasma Inc. v. United States Custom & Border Protection*, 628 F. Supp. 3d
243 (D.D.C. 2022) ................................................................................................... 33

*Department of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999) ........................................ 33

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ...................................... 21

*Department of Homeland Security v. Regents of the University of California*, 591
U.S. 1 (2020) ...................................................................................................... 18, 20

*Duxbury Trucking, Inc. v. Massachusetts Highway Department*, 2009 WL 1258998
(D. Mass. Apr. 29, 2009) ........................................................................................ 13

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ........................ 25

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................... 18

*Environmental Defense Fund, Inc. v. EPA*, 716 F.2d 915 (D.C. Cir. 1983) ................. 24

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ....................................... 18, 19

*FEC v. Cruz*, 596 U.S. 289 (2022) ........................................................................... 28, 29

*GameFly, Inc. v. Postal Regulatory Commission*, 704 F.3d 145 (D.C. Cir. 2013) ....... 22

*Gateway Eastern Railway Co. v. Terminal Railroad Ass'n of St. Louis*, 35 F.3d
1134 (7th Cir. 1994) ................................................................................................ 32

*Guardians Ass'n v. Civil Service Commission*, 463 U.S. 582 (1983) .......................... 27

*Housing Authority of City & County of San Francisco v. Turner*, 2025 WL 3187761
(N.D. Cal. Nov. 14, 2025), *appeal docketed*, No. 26-233 (9th Cir. Jan. 13,
2026) ........................................................................................................................ 15

*Illinois v. Vought*, --- F. Supp. 3d ----, 2026 WL 404014 (N.D. Ill. Feb. 12, 2026) ..... 22

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004) ............................................................. 24

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) .................................................. 20

*Lopez v. FAA*, 318 F.3d 242 (D.C. Cir. 2003) ...............................................................22

*Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174 (D.D.C. 2021) .............................................................................................................................32

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ..........................................24, 25

*Maine Community Health Options v. United States*, 590 U.S. 296 (2020) ....................13

*Mandel v. United States Department of Health, Education & Welfare*, 411 F. Supp. 542 (D. Md. 1976), *aff'd sub nom. Mayor & City Council of Baltimore v. Mathews*, 571 F.2d 1273 (4th Cir. 1978) ..............................................................27

*Massachusetts v. National Institutes of Health*, 164 F.4th 1 (1st Cir. 2026) ................15

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ..............................................14

*Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419 (7th Cir. 1991).....................6

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)........................................................21

*National Council of Nonprofits v. Office of Management & Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025), *appeal docketed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025) .................................................................................................................23, 29

*National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025)................................................................................................................2, 14, 17

*New Jersey v. United States Department of Transportation*, --- F. Supp. 3d ----, 2026 WL 323341 (S.D.N.Y. Feb. 6, 2026), *appeal docketed*, No. 26-282 (2d Cir. Feb. 9, 2026) ................................................................................................23, 28

*New York v. Trump*, --- F.4th ----, 2026 WL 734941 (1st Cir. Mar. 16, 2026) ............17

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I.), *stay pending appeal denied*, 133 F.4th 51 (1st Cir. 2025), *aff'd*, 2026 WL 734941 (1st Cir. Mar. 16, 2026)...........22

*NFIB v. OSHA*, 595 U.S. 109 (2022)........................................................................28, 29

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................12, 34

*Ohio v. EPA*, 603 U.S. 279 (2024)...............................................................................18

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ...............35

*Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981)....................29, 30

*Planned Parenthood of Greater New York v. HHS*, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) .........................................................................................................................21

*President & Fellows of Harvard College v. United States Department of Health & Human Services*, 798 F. Supp. 3d 77 (D. Mass. 2025), *appeal docketed*, No. 25-2231 (1st Cir. Dec. 31, 2025) ...............................................................................13

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) .........................................................21

*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir. 1984) ........30

*Schlafly v. Volpe*, 495 F.2d 273 (7th Cir. 1974) ............................................................27

*United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013) ................................................25

*Valencia v. City of Springfield*, 883 F.3d 959 (7th Cir. 2018) .......................................34

*Wagstaff v. United States*, 105 Fed. Cl. 99 (2012) .........................................................13

*Washington v. United States Department of Transportation*, 792 F. Supp. 3d 1147 (W.D. Wash. 2025) ...............................................................................................23, 29

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .........................12

*Woonasquatucket River Watershed Council v. United States Department of Agriculture*, 778 F. Supp. 3d 440 (D.R.I. 2025), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025) ..................................................................................... 22-23, 29

*Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995) ...............................................................24

**STATUTES**

5 U.S.C. § 553(b) .............................................................................................................23

5 U.S.C. § 553(c) .............................................................................................................23

5 U.S.C. § 553(b)(B).........................................................................................................24

5 U.S.C. § 553(d)(3) .........................................................................................................25

5 U.S.C. § 702...................................................................................................................33

5 U.S.C. § 706(2) .......................................................................................................27, 28

5 U.S.C. § 706(2)(A).........................................................................................................18

15 U.S.C. § 637(d)(3) .........................................................................................................6

42 U.S.C. § 2000d...............................................................................................................6

42 U.S.C. § 2000d-1 ..........................................................................................7, 26, 27

42 U.S.C. § 2000d-2 ..............................................................................................13, 14

49 U.S.C. § 5309..................................................................................................4, 18, 28

49 U.S.C. § 5309(d)(1) ...................................................................................................5

49 U.S.C. § 5309(d)(2) ...................................................................................................5

49 U.S.C. § 5309(e)(1)....................................................................................................5

49 U.S.C. § 5309(e)(2)....................................................................................................5

49 U.S.C. § 5309(g)(1) ...................................................................................................6

49 U.S.C. § 5309(k)(2) ..............................................................................................5, 28

49 U.S.C. § 5309(n) ........................................................................................................5

49 U.S.C. § 5309(n)(1)..................................................................................................28

Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96
     Stat. 2097, 2100 (1983).........................................................................................5

**OTHER AUTHORITIES**

2 C.F.R. pt. 200.........................................................................................................6, 27, 28

2 C.F.R. § 200.305(b) ...................................................................................................28

2 C.F.R. § 200.305(b)(1)..................................................................................................8

2 C.F.R. § 200.305(b)(3)..................................................................................................8

2 C.F.R. § 200.305(b)(6)..................................................................................................8

2 C.F.R. § 200.339 ....................................................................................................27, 28

2 C.F.R. § 200.339(a)...............................................................................................7, 27, 28

2 C.F.R. § 200.342 ....................................................................................................7, 28

2 C.F.R. § 1201.1 ......................................................................................................7, 27

49 C.F.R. pt. 21 .........................................................................................................6, 26

49 C.F.R. pt. 26.............................................................................................................6

49 C.F.R. § 21.9(a)....................................................................................................7, 26

49 C.F.R. § 21.11 .............................................................................................................7, 26

49 C.F.R. § 21.11(c)................................................................................................................7

49 C.F.R. § 21.13(c)..........................................................................................................7, 26

49 C.F.R. § 21.15(a)...............................................................................................................26

49 C.F.R. § 21.15(c)................................................................................................................7

49 C.F.R. § 21.17 .....................................................................................................................7

49 C.F.R. § 21.19 .....................................................................................................................7

49 C.F.R. § 26.3 .......................................................................................................................5

49 C.F.R. § 26.5 .......................................................................................................................5

49 C.F.R. § 26.67 (effective Oct. 3, 2025)............................................................................9

49 C.F.R. § 26.67(a)(1) (effective through Oct. 2, 2025) ...................................................6

49 C.F.R. § 26.111 (effective Oct. 3, 2025)..........................................................................9

Disadvantaged Business Enterprise Program and Disadvantaged Business
    Enterprise in Airport Concessions Program Implementation Modifications, 90
    Fed. Reg. 47,969 (Oct. 3, 2025)...........................................8, 9, 13, 14, 19, 24, 25, 26

*Illinois v. Vought*, No. 26-cv-1566 (N.D. Ill. Mar. 12, 2026), ECF No. 63............................15, 29

Michael Phillis & Matthew Daly, *White House Cancels Nearly $8B in Clean
    Energy Projects in Blue States*, PBS (Oct. 2, 2025), https://www.pbs.org/news
    hour/politics/white-house-cancels-nearly-8b-in-clean-energy-projects-in-blue-
    states..................................................................................................................................10

**INTRODUCTION**

The federal government has obligated $3.1 billion to the Chicago Transit Authority ("CTA") to expand and modernize some of the most-utilized lines of Chicago's train system, the L. For six months, from October 3, 2025, to March 27, 2026, the Department of Transportation ("DOT") and the Federal Transit Administration ("FTA") held those vital funds hostage, freezing funding for four projects in Chicago and New York—but not for the hundreds of other FTA grant recipients nationwide—pursuant to an unlawfully retroactive Interim Final Rule ("IFR"). And even after CTA committed to comply with every requirement Defendants later imposed as conditions for the release of the frozen grants, Defendants still refused to release CTA's obligated funds.

In an order made effective on March 27, 2026, this Court put a stop to it. Finding that CTA was likely to succeed in demonstrating that the freezes were arbitrary and capricious, procedurally deficient, and in violation of Title VI, this Court temporarily restrained Defendants from retroactively applying the IFR to freeze CTA's grant funds. *See* ECF No. 29 at 10-13 ("TRO Op."). Nothing about that analysis has changed. Permitting Defendants to re-freeze CTA's funding would be just as unlawful—and just as disastrous for CTA and the city it serves—as it was in March. This Court should convert its TRO to a preliminary injunction and prohibit Defendants from relying on the IFR to freeze CTA's grant funds during the pendency of this litigation.

The case for preliminary relief is overwhelming. DOT regulations require grant recipients like CTA to strive to award some subcontracts to disadvantaged businesses. Prior DOT regulations applied a presumption that minority- or women-owned businesses were disadvantaged. The IFR eliminated those presumptions going forward, a policy CTA does not challenge. Yet Defendants *retroactively* applied the IFR to freeze CTA's grants pending a review of alleged discrimination in CTA's contracting practices—punishing CTA for complying with DOT's own past regulations, as it was *required to do* to secure federal funding. These freezes were unlawful many times over.

1

They were arbitrary and capricious: Defendants offered no reasoned explanation, ignored substantial reliance interests, and invoked the IFR only pretextually. They also bypassed the APA's notice-and-comment and delayed-effectiveness requirements; flouted the detailed procedural protections that Title VI and 2 C.F.R. Part 200 impose before an agency may withhold funds; exceeded DOT's authority under 49 U.S.C. § 5309, the statute governing CTA's grants; and violated the Spending Clause by retroactively imposing new conditions on CTA's grants.

At the TRO stage, Defendants notably offered no defense of their actions on the merits—likely because no defense is available. Defendants' sole argument was that this Court lacked jurisdiction over CTA's claims by virtue of the Tucker Act, but this Court rightly rejected that argument. *See* TRO Op. 5-9. Title VI expressly authorizes federal-court review of an agency's action refusing to continue financial assistance under Title VI, and Defendants expressly invoke Title VI as authority for their actions. Moreover, CTA does not merely seek payment under existing grants; it challenges application of prospective agency policy, the IFR. Justice Barrett's controlling opinion in *National Institutes of Health v. American Public Health Ass'n* (*NIH*), 606 U.S. ----, 145 S. Ct. 2658 (2025), confirms this Court's jurisdiction. And since CTA challenges ongoing freezes and not a retrospective grant termination, the Court of Federal Claims has no jurisdiction.

The TRO provided CTA a critical lifeline, lifting the six-month-long freezes and thereby permitting CTA to avoid—at the last minute—a catastrophic work stoppage. Since then, work on CTA's crucial Projects has continued apace. But that peace is fragile. If the TRO lapses and Defendants reimpose the freezes, CTA's position is precarious. With the second of its two Projects having broken ground earlier this month, CTA's daily expenditures have increased. Demobilization would be more expensive, too, because of heavy equipment now in place. Without assurance that federal funding will continue during this suit, CTA faces a renewed prospect of work stoppages

2

that would put employees out of work, prolong speed restrictions on some of Chicago's most-used transit lines, and incur construction delays that risk default of CTA's grants.

This Court should grant CTA's motion for a preliminary injunction. The Court has already found jurisdiction and a likelihood of success on the merits. Nothing has changed since. The irreparable harm that justified the TRO has not abated but intensified. And the balance of equities continues to favor CTA: there is no public interest in allowing Defendants to resume an unlawful, unjustified freeze that punishes CTA for following the law while hundreds of workers, millions of riders, and the future of two transformative infrastructure Projects hang in the balance.

**BACKGROUND**[1]

## I. THE LEGAL FRAMEWORK GOVERNING CTA'S FEDERAL TRANSIT GRANTS

### A. CTA's Federally Funded RLE And RPM Projects

CTA operates "the L"—one of the nation's largest public transit systems, providing more than a million daily rides on weekdays. Decl. ¶ 3. The Red Line is the system's backbone, operating 24 hours a day, carrying over 100,000 passengers daily on weekdays, and connecting the City's North and South Sides via the downtown Loop. *Id*. ¶¶ 5-6. The L's other lines provide vital connections to the City's other neighborhoods. *Id*. ¶ 5. This case concerns the two largest infrastructure projects in CTA history: the Red and Purple Modernization Phase One Project ("RPM Project") and the Red Line Extension Project ("RLE Project"). *See id*. ¶¶ 18, 25.

The RPM Project, which broke ground in October 2019 and is set to be completed in October 2027, aims to rebuild part of the century-old Red and Purple Lines' track structure and

---

[1] Exhibit citations refer to the exhibits filed with CTA's Complaint, ECF No. 1, verified in the Declaration of Andrianna D. Kastanek, ECF No. 7. Citations to the first Declaration of Thomas McKone, ECF No. 14, are cited as "Decl." Citations to the Supplemental Declaration of Thomas McKone, filed alongside this Motion, are cited as "Suppl. Decl." The transcript of the March 24, 2026 TRO hearing, ECF No. 37, is cited as "TRO Tr."

3

stations on Chicago's North Side to increase passenger capacity, reduce travel times, improve access to job markets and destinations, and provide improved access to riders with disabilities. *Id.* ¶¶ 17-19, 22-23. It has been a tremendous success thus far: It is proceeding on schedule, *id.* ¶ 21, and has created over 3,000 new construction jobs to date, *id.* ¶ 20. But crucial work remains to be done, including decommissioning and removing the Addison signal house; correcting nonconforming work items such as deficient drainage systems; finalizing safety and security certifications; and various miscellaneous restoration and site improvements. *Id.* ¶ 21.

The RLE Project, which began field work earlier this month and is to be completed by 2031, will extend service to roughly 100,000 new residents (mostly from low-income households) by adding four new stations along 5.5 miles of new track on the South Side. *Id.* ¶¶ 26-27, 29-30; *see also* Suppl. Decl. ¶ 5. It will provide up to 30 minutes of time savings to riders traveling from the future end point to the Loop, substantially increasing the number of accessible jobs within an hour's commute for those in the RLE Project area. Suppl. Decl. ¶ 5; Decl. ¶ 27. In addition to these long-term benefits, the RLE Project is expected to generate approximately $4.4 billion in economic activity in Cook County during its construction, directly creating roughly 12,500 construction jobs and indirectly creating an additional 59,800 jobs in local communities. Decl. ¶ 28.

These vital Projects are being funded from a variety of sources, including rider fares, state and local appropriations, and—relevantly—federal grant programs. *Id.* ¶¶ 16, 18, 25. This case is about that latter source of funds: two "[f]ixed guideway capital investment grants" awarded by DOT to CTA pursuant to 49 U.S.C. § 5309. To qualify for those grants, CTA underwent rigorous, multistage application processes, during which CTA demonstrated that, *inter alia*, it had sufficient local financial commitments to support the projects, and that the projects were "justified" based on a weighing of, *inter alia*, their "mobility improvements"; "environmental benefits"; "congestion

relief"; economic-development effects; and cost effectiveness. *See* 49 U.S.C. § 5309(d)(1), (e)(1), (d)(2)(A)(iii), (e)(2)(A)(iv).

The resulting grants are memorialized in two "full funding grant agreement[s]," or FFGAs, 49 U.S.C. § 5309(k)(2)(A). An FFGA "obligates an amount of available budget authority specified in law" to the approved project. *Id.* § 5309(k)(2)(D)(i). Once an FFGA is approved and funds are "obligate[d]" to a project, *id.*, relevant statutory authority provides that any such "amount[s] made available or appropriated … shall remain available to that project for 4 fiscal years, including the fiscal year in which the amount is made available or appropriated," *id.* § 5309(n).

The FFGAs in this case obligated to CTA approximately $1.1 billion in federal funds for the RPM Project, Decl. ¶ 18, and approximately $2.1 billion for the RLE Project, *see id.* ¶¶ 44-45.[2] The RPM Project's grant agreement requires completion by October 22, 2027, *id.* ¶ 22, while the RLE's FFGA requires completion by August 5, 2031. *Id.* ¶ 30.

**B.      CTA's Required Compliance With DBE Requirements And Title VI**

As a condition of obtaining the RPM and RLE FFGAs, CTA was required to comply (as relevant here) with two sets of federal obligations.

***DBE Requirements.*** Recipients of DOT grants like the FFGAs here have long been required as a matter of federal law to strive to expend a certain share of federal grant funds "with small business concerns owned and controlled by socially and economically disadvantaged individuals," Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100 (1983)—what are known under applicable regulations as "Disadvantaged Business Enterprise[s]," or DBEs. *See* 49 C.F.R. § 26.5; *id.* § 26.3 (applying DBE requirements to FFGA

---

[2] *See* Full Funding Grant Agreement, Chicago Transit Authority – Red and Purple Modernization Phase One Project, IL-2017-002-00 (the "RPM FFGA") (Compl., Ex. C); Full Funding Grant Agreement, Red Line Extension Project, IL-2025-001-00 (the "RLE FFGA") (Compl., Ex. D).

recipients under 49 U.S.C. § 5309). In general, each state runs its own Unified Certification Program ("UCP") for certifying DBEs. Until recently, DOT at Congress's direction required UCPs to apply a rebuttable presumption that small businesses majority-owned by women or racial minorities qualify as DBEs. *See* 49 C.F.R. § 26.67(a)(1) (effective through Oct. 2, 2025); *see also* 15 U.S.C. § 637(d)(3); *Milwaukee Cnty. Pavers Ass'n v. Fiedler*, 922 F.2d 419, 423 (7th Cir. 1991).

For both the RPM and RLE Projects, FTA agreed to execute FFGAs with CTA only after determining that CTA complied with then-applicable DBE regulations under 49 C.F.R. Part 26. *See* 49 U.S.C. § 5309(g)(1)(A)-(B). And all contracts CTA awarded for its federally funded projects—including those at issue here—complied with the DBE requirements in 49 C.F.R. Part 26 operative at the time of the contract award and the FFGAs' execution. *See* Decl. ¶ 32.

***Title VI Nondiscrimination Requirements***. FFGA recipients must comply not only with DBE requirements but also with applicable civil rights laws. As relevant here, Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. That prohibition applies to recipients of FTA grants both directly and via DOT's regulations implementing Title VI. *See* 49 C.F.R. Part 21.

### C. The Government's Limited Authority To Freeze Federal Grant Funds

Federal law limits an agency's ability to freeze funds to recipients of FFGAs like the ones at issue here. The most relevant limitations derive from two sources: Title VI and 2 C.F.R. Part 200.

***Title VI.*** Congress created a set of "elaborate restrictions" governing an agency's enforcement of Title VI, *Alexander v. Sandoval*, 532 U.S. 275, 289-90 (2001)—including the ability to freeze recipients' federal grant funds. Specifically, *prior to* "refus[ing] to … continue [federal financial] assistance," the agency must, *inter alia*, find that the recipient has failed to

comply with Title VI; advise the recipient of that finding; determine that "compliance cannot be secured by voluntary means"; conduct a hearing; make express findings on the record; *and* file "a full written report of the circumstances and the grounds for such action" in the House and Senate. 42 U.S.C. § 2000d-1. The agency's ultimate action cannot "become effective until thirty days have elapsed after the filing of such report." *Id.*

DOT regulations implement this statutory framework and impose further requirements. In addition to requiring the Secretary to seek voluntary compliance "to the fullest extent practicable" before suspending a grant, *see* 49 C.F.R. § 21.9(a), the regulations mandate an investigation and formal findings before taking action against a recipient, *id.* § 21.11. The Secretary's investigation must "include, where appropriate, a review of the pertinent practices and policies of the recipient" and "the circumstances under which the possible noncompliance … occurred." *Id.* § 21.11(c). If the investigation reveals a violation that cannot be resolved through informal means, the Secretary may commence a formal process to suspend or terminate funding, which triggers additional procedural requirements. *Id.* §§ 21.13(c), 21.15(c), 21.17. Finally, the regulatory scheme entitles recipients of DOT funding to judicial review of the Secretary's decision. *See* 49 C.F.R. § 21.19.

*2 C.F.R. Part 200.* Federal regulations further limit an agency's ability to freeze grants. OMB's guidelines for federal awards, which DOT has adopted, *see* 2 C.F.R. § 1201.1, provide that when a grantee "fails to comply with" federal law or the grant's terms and conditions, the agency may "[t]emporarily withhold payments until the recipient … takes corrective action"—but *only* if it first "determines that noncompliance cannot be remedied by imposing specific conditions[.]" *Id.* § 200.339(a). Upon taking such action, the agency "must provide the recipient with an opportunity to object and provide information challenging the action." *Id.* § 200.342.

The OMB regulations also contain guidelines regarding how federal grant payments are to

be made. A grant recipient generally "must be paid in advance" if it maintains "procedures that minimize the time elapsing between the transfer of funds and disbursement by the recipient … and financial management systems that meet [applicable] standards for fund control and accountability." *Id.* § 200.305(b)(1). Even where grant funds are permitted to be disbursed via reimbursement, the agency "must make payment within 30 calendar days after receipt of the payment request unless the [] agency … reasonably believes the request to be improper." *Id.* § 200.305(b)(3). And payments "*must not* be withheld at any time" unless "[t]he recipient … has failed to comply with the terms and conditions of the Federal award" or "is delinquent in a debt to the United States." *Id.* § 200.305(b)(6) (emphasis added).

## II. DOT'S INTERIM FINAL RULE AND THE RESULTING FREEZES OF CTA'S GRANTS

### A. The Interim Final Rule

On September 30, 2025, DOT announced an IFR eliminating the decades-old race- and gender- based presumptions from the DBE program, "pursuant to legal determinations by DOT and DOJ that [those] presumptions … are unconstitutional." Disadvantaged Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications, 90 Fed. Reg. 47,969, 47,974 (Oct. 3, 2025). The government foreshadowed this shift in position in a May 2025 stipulation in a federal case and in a June 2025 letter from the Solicitor General to the Speaker of the House.[3]

Months later, DOT issued the IFR. DOT did so without notice and comment, and it made the IFR immediately effective, contrary to the typical requirement of a 30-day delay in effective date. DOT asserted that adhering to ordinary process would be "impracticable and contrary to the

---

[3] 90 Fed. Reg. at 47,971 & nn.7-8 (quoting Joint Motion for Entry of Consent Order, *Mid-America Milling Co. v. U.S. Dep't of Transp.*, No. 23-cv-72 (E.D. Ky. May 28, 2025), and citing Letter from Solicitor General D. John Sauer to Hon. Mike Johnson (June 25, 2025), https://www.justice.gov/oip/media/1404871/dl).

public interest." 90 Fed. Reg. at 47,974. According to DOT, allowing the prior DBE regulations to remain in effect pending normal procedures would be "confusing and contradictory," *id*.—despite the government having announced its new position on DBE presumptions months earlier.

The IFR effects three main changes. First, it eliminates the old system of presumptions, requiring "[a]ll applicants [to] demonstrate social and economic disadvantage … affirmatively ... and without regard to race or sex." 49 C.F.R. § 26.67 (effective Oct. 3, 2025); *see* 90 Fed. Reg. at 47,971-72, 47,982. Second, it newly requires business-owner applicants to provide a "Personal Narrative" demonstrating that they satisfy this new definition. 90 Fed. Reg. at 47,976. Third, it requires all UCPs to reevaluate any currently certified DBEs and to decertify any that fail to either meet the new standards or provide the required additional information. 90 Fed. Reg. at 47,972; *see also* 49 C.F.R. § 26.111 (effective Oct. 3, 2025).

> **B.     Defendants' Retroactive Implementation Of The IFR To Freeze CTA's Funding**

Despite the large number of active state infrastructure projects awarded DOT funding under the old DBE standards, following the IFR's issuance, Defendants chose to freeze only four—two in Chicago and two in New York City. The October 3, 2025 letters from DOT to CTA pausing CTA's grants expressly relied on the IFR as purported authority for the freezes, stating that "[i]n conjunction with the issuance of the IFR," DOT was suspending disbursements for the RLE and RPM Projects during an ongoing review "to ensure nondiscrimination," including compliance with "Title VI." Compl., Exs. A, B ("Freeze Letters").

In its press release announcing the freezes, DOT stated that it paused CTA's funding "[t]o continue implementation of [the IFR]" and linked the freezes to its review of projects in New York

City.[4] "Illinois, like New York," the release stated, "is well known to promote race- and sex-based contracting and other racial preferences as a public policy."[5] The press release also indicated that the Administration sought to hold CTA's funds hostage as leverage over Congressional Democrats during a then-ongoing lapse in appropriations, saying that "Chuck Schumer and Hakeem Jeffries' decision to shut down the government has negatively affected [DOT]'s staffing resources for carrying out" the reviews.[6] Consistent with the federal government's stipulation in another case that, around this same time, it undertook adverse funding actions based on political affiliation,[7] DOT's press release urged "Democrats in Congress to stop holding the federal government's budget hostage so USDOT can get back to the important work of the American people"—including, impliedly, releasing the owed funds.[8] Lastly, the press release acknowledged that the "[d]iscriminatory, [u]nconstitutional [p]rocesses" in question were part of the federally mandated DBE program,[9] meaning CTA could not have received the FFGAs here had it not implemented the DBE programs that DOT now claims violate federal law.

### C. DOT's Administrative Review And Continued Funding Freezes

Shortly after freezing CTA's funds, DOT initiated its purported administrative review of the RPM and RLE Projects. On October 7, 2025, DOT sent CTA information requests, purportedly

---

[4] Press Release, U.S. Dep't of Transp., *U.S. Department of Transportation Statement on Review of Chicago's Discriminatory, Unconstitutional Processes* (Oct. 3, 2025) (Compl., Ex. E).

[5] *Id.* (italics and hyperlinks omitted).

[6] *Id.*

[7] Michael Phillis & Matthew Daly, *White House Cancels Nearly $8B in Clean Energy Projects in Blue States*, PBS (Oct. 2, 2025), https://www.pbs.org/newshour/politics/white-house-cancels-nearly-8b-in-clean-energy-projects-in-blue-states; *City of St. Paul v. Wright*, --- F. Supp. 3d ----, 2026 WL 88193, at *2 (D.D.C. Jan. 12, 2026) (permanently enjoining Department of Energy grant terminations where government "concede[d] that the political identity of a … grantee's state, including the fact that the state supported Vice President Kamala Harris in the 2024 election, played a preponderant role in the … grant termination decisions").

[8] *Id.*

[9] *See* Compl., Ex. E (quoting news article stating that "21% of [CTA's] spending on the [RPM Project] *has so far gone to DBE firms* – some 119 companies in total" (emphasis added)).

"to ensure that disbursements for the Project[s] are consistent with" federal law. Compl., Exs. F, G. CTA responded in full on October 21, 2025, providing extensive information. *Id.*, Exs. H, I.

On December 1, 2025, DOT notified CTA it had completed its initial "administrative review" of both Projects and that it "intend[ed] to resume funding disbursements ... provided CTA certifies in writing within 30 days … that it accepts and will fulfill" specific "conditions identified in th[e] letter[s]." *Id.*, Exs. J, K. CTA did just that, providing the requested certifications on December 10, 2025. *Id.*, Exs. L, M. Yet DOT did not unfreeze CTA's funds. Indeed, it did not reach out to CTA at all—whether to seek additional information, identify purported deficiencies in CTA's certifications, or assert that the certifications were inadequate. Although Defendants' reviews were apparently complete, CTA's funds remained frozen.

## III.   THE IMMEDIATE AND IRREPARABLE HARM TO CTA AND ITS CUSTOMERS

Based on the indefinite and unjustified freeze of CTA's funds, CTA filed suit on March 20, 2026, seeking emergency relief given an imminent work stoppage caused by the absence of federal reimbursement. ECF No. 1. Following this Court's grant of the TRO, CTA submitted a reimbursement request for $114 million for work on both Projects, which was paid on March 30, 2026. Suppl. Decl. ¶ 14.

While funding has been temporarily restored by virtue of the TRO, CTA's position remains precarious. CTA no longer has the resources to tolerate another months-long freeze. Should the TRO lapse and Defendants' funding freezes be reinstated, CTA would inevitably be forced to halt work on the Projects. Suppl. Decl. ¶¶ 18-20. Moreover, CTA moved heavy equipment into place and broke ground on the RLE Project, as scheduled, on April 7, 2026; so each construction day costs CTA more than it did before, and demobilization also will be more costly. Suppl. Decl. ¶¶ 15, 19-21. If funding can abruptly halt again during this litigation, CTA will be in the untenable position of not knowing whether it will have enough money to continue construction. *See id.* ¶ 24.

11

That reality undermines the predictability that is essential to large-scale, multi-year projects like these. And when work inevitably halted, it would impair the commutes of thousands of riders by prolonging speed restrictions, *id.* ¶ 27, raising project costs, *id.* ¶¶ 23, 28-30, and putting hundreds of people out of work, causing CTA to lose experienced workers and impacting the ongoing financial security of its vendors. CTA's reputation for timely payment and efficient service work would be tarnished. These harms could be further magnified if non-federal sources of money for the RPM and RLE Projects cancel matching grants. *Id.* ¶¶ 33-35.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

As this Court has already determined, the Court has jurisdiction over CTA's claims, those claims are likely to succeed on the merits, and the equities strongly favor injunctive relief. *See generally* TRO Op. This Court should grant CTA's motion for a preliminary injunction.

## I. THIS COURT HAS JURISDICTION OVER CTA'S CLAIMS

CTA anticipates that the government will argue, as it did at the TRO stage, that this Court lacks jurisdiction to consider the freezes' legality, and that the Tucker Act requires that CTA's claims be brought in the Court of Federal Claims. As this Court has already concluded, that is wrong. CTA's claims belong in district court for three reasons.

### A. This Court Has Jurisdiction Under Title VI

Title VI expressly vests federal courts with jurisdiction to review agency action

"terminating or refusing to grant or to continue financial assistance," 42 U.S.C. § 2000d-2, which displaces any jurisdiction that the Court of Federal Claims would otherwise have, *see Bowen v. Massachusetts*, 487 U.S. 879, 910 & n.48 (1988) ("[T]hat court's jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court."); *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020) (remedies under other statutes displace Tucker Act exclusivity). Thus, courts routinely hold that the Tucker Act is not "relevant" to funding challenges brought under Title VI. *See President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 106 (D. Mass. 2025) (Tucker Act not "relevant to Title VI, which itself expressly authorizes 'judicial review' of agency action 'terminating or refusing to grant or to continue financial assistance,' including through the APA, in an Article III court" (citation omitted)), *appeal docketed*, No. 25-2231 (1st Cir. Dec. 31, 2025); *see Am. Ass'n of Univ. Profs. v. Trump*, --- F. Supp. 3d ----, 2025 WL 3187762, at *32 (N.D. Cal. Nov. 14, 2025) (Tucker Act inapplicable to "claim that … suspensions violated the requirements of Title VI"), *appeal docketed*, No. 26-263 (9th Cir. Jan. 13, 2026); *Duxbury Trucking, Inc. v. Mass. Highway Dep't*, 2009 WL 1258998, at *5 (D. Mass. Apr. 29, 2009) (APA review available for DOT's Title VI actions).[10]

Here, DOT's decision to suspend CTA's funding was made pursuant to Title VI, as this Court correctly concluded. *See* TRO Op. 6. The IFR that serves as the basis for the funding freezes is rooted both in the Equal Protection Clause and Title VI. *See* 90 Fed. Reg. 47,969, 47,971 (Oct. 3, 2025). The IFR expressly cites Title VI in its "Authority" section, *see id.* at 47,979 (citing 42

---

[10] The statutory provision authorizing APA review of Title VI funding actions, 42 U.S.C. § 2000d-2, would make little sense if Congress intended all such actions to instead be reviewed in the Court of Federal Claims. Indeed, the Court of Federal Claims would likely lack jurisdiction over Title VI claims, which makes it even less likely that Congress intended to preclude district court review. *See Wagstaff v. United States*, 105 Fed. Cl. 99, 109 (2012) ("Likewise, the court does not have jurisdiction to adjudicate statutory civil rights claims." (citing 28 U.S.C. § 1343(a)(4))).

13

U.S.C. § 2000d *et seq.*); and expressly references DOT's continued authority "to conduct a review or take action under Title VI or other applicable law regarding compliance with equal protection principles," *id.* at 47,974. The October 3 Freeze Letters themselves state that DOT's "review is intended to ensure that disbursements for the Project[s] are consistent with the Equal Protection principles of the U.S. Constitution, [and] Federal nondiscrimination requirements under civil rights law, *including Title VI.*" Compl., Ex. B (emphasis added); *see id.*, Ex. A. The Court thus was right to conclude that "[h]ere, 'the source of the rights' for the CTA's claims is Title VI and not the contractual provisions of the grants," TRO Op. 6 (citation omitted), and that jurisdiction is proper in the district court. Because DOT has refused to continue CTA's funding based on Title VI, CTA may bring its APA claims in federal district court under 42 U.S.C. § 2000d-2.

**B. This Court Has Jurisdiction Because CTA Seeks Ordinary APA Review Of A Prospective Agency Policy**

Even setting Title VI aside, CTA's claims are properly brought in district court because they challenge a prospective agency policy—the IFR's application to existing grantees—over which Justice Barrett's controlling opinion in *NIH* confirms this Court retains jurisdiction. *See* 145 S. Ct. at 2661. *NIH* involved challenges to both agency guidance documents and individual grant terminations. *Id.* While agreeing that the district court "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims," Justice Barrett held that the district court retained jurisdiction to "vacate the guidance documents" as arbitrary and capricious under the APA. *Id.* As she explained, the mere fact that the guidance at issue impacted existing grants did not "transform a challenge to that guidance into a claim 'founded … upon' contract that only the [Court of Federal Claims] can hear." *Id.*; *accord Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982) ("mere existence of … contract-related issues" does not "convert this action to one based on the contract").

So too here. As this Court has recognized, CTA's challenge to the IFR's application to existing grants is a traditional APA claim against a traditional agency policy, not a grant- or contract-specific claim. *See* TRO Op. 7-8 ("CTA asks this Court to declare retroactive application of the IFR to be unlawful … and to thus remove it as a permissible basis for Defendants to take action regarding … CTA's grants."). CTA's claims are founded upon principles of administrative and constitutional law—among others, the APA's prohibition on arbitrary and capricious action and its notice-and-comment and delayed-effectiveness requirements; Title VI's procedural mandates; and the Spending Clause's bar on retroactive spending conditions—not the contractual terms of the FFGAs, which can be ignored entirely in assessing CTA's claims. *See id.* at 7 ("CTA does not bring claims about payments according to the terms of the [FFGAs]."). Under *NIH* and many cases since, CTA's claims belong in district court. *E.g.*, Order at 5, *Illinois v. Vought*, No. 26-cv-1566 (N.D. Ill. Mar. 12, 2026), ECF No. 63 ("Plaintiffs' challenge is not to grant-by-grant, award-by-award terminations, but instead to agency-wide policies targeting states. That falls outside Tucker Act exclusivity."); *City of Chicago v. U.S. Dep't of Just.*, --- F. Supp. 3d ----, 2026 WL 114294, at *4 (N.D. Ill. Jan. 15, 2026) ("Plaintiffs seek an order that prohibits [d]efendants from enforcing the … guidance documents. Jurisdiction in this case is thus consistent with *[NIH]*."); *City of Chicago v. Noem*, 2025 WL 3251222, at *4-5 (N.D. Ill. Nov. 21, 2025) (where "the relief sought is only to vacate guidance document," it is "left undisturbed by *[NIH]*," so "[t]he Tucker Act does not apply").[11]

---

[11] *See also Massachusetts v. Nat'l Insts. of Health,* 164 F.4th 1, 9, 11 (1st Cir. 2026) (district court had jurisdiction over claim that new funding guidance impermissibly applied retroactively); *Hous. Auth. of City & Cnty. of San Francisco v. Turner*, 2025 WL 3187761, at *9 (N.D. Cal. Nov. 14, 2025) ("[C]ourts have found with near or total uniformity that the district courts have jurisdiction over claims" such as those "involving constitutional and APA claims seeking an injunction against the imposition of allegedly unlawful grant conditions."), *appeal docketed*, No. 26-233 (9th Cir. Jan. 13, 2026).

At the TRO hearing, the government sought to avoid this conclusion by arguing that Defendants' actions to freeze CTA's grants were *not* taken pursuant to the IFR. *See* TRO Tr. 33-38. Even if true, all this would establish is that Defendants purported to freeze money pursuant to Title VI, over which the Court would independently have jurisdiction, as just explained. And it would confirm that the freezes violate Title VI, since there can be no dispute that Defendants did not comply with any of the many Title VI prerequisites for freezing funds. But in any event, Defendants are wrong in their characterization of the freezes as wholly disconnected from the IFR. As this Court correctly found, Defendants' own contemporaneous documents unequivocally established that the freezes implemented the IFR. *See* TRO Op. 8-9. Defendants sent the Freeze Letters to CTA on October 3, 2025—the same day the IFR took effect—and the Letters expressly state that the reviews were initiated "[i]n conjunction with the issuance of the IFR." Compl., Exs. A, B. The press release was even more explicit, announcing that DOT paused CTA's funding "[t]o continue *implementation of* th[e] [IFR]." Compl., Ex. E (emphasis added). Accordingly, this Court was right to conclude that "the IFR is the reason Defendants have suspended payment on the grants[,] [a]nd a determination that retroactive application of the IFR is unlawful would remove it as a lawful basis for the [Freezes]." TRO Op. 9.[12]

### C. Additionally, This Court Has Jurisdiction Because CTA Challenges Grant Suspensions Rather Than Grant Terminations

Finally, the Tucker Act's exclusive jurisdiction does not apply because CTA's grants have not been *terminated.* They have only been *suspended.* The Supreme Court in *NIH* concluded that

---

[12] At the TRO stage, Defendants appeared to concede that CTA's challenges to the IFR's procedural deficiencies—that is, its arguments that the IFR failed to comply with the APA's notice-and-comment and delayed-effectiveness requirements (Counts IV and V)—are "independent claims directed at the IFR" over which this Court has jurisdiction. *See* ECF No. 25 at 17. That concession dooms Defendants' argument, since *all* of CTA's claims are equally "directed at the IFR," as Defendants have purported to freeze CTA's funds pursuant to that IFR. The freezes are an application of the IFR, and CTA's challenge to that unlawful agency action is a run-of-the-mill APA challenge that belongs in federal district court.

16

"the District Court likely lacked jurisdiction to hear challenges to the *grant terminations*." 145 S. Ct. at 2661 (Barrett, J., concurring) (emphasis added). But CTA's grants have only been suspended—and courts consistently hold that challenges to funding suspensions, as opposed to terminations, are *not* subject to exclusive Court of Federal Claims jurisdiction. *See, e.g.*, *City of Chicago v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2025 WL 3043528, at *11 (N.D. Ill. Oct. 31, 2025) (finding jurisdiction over "challenge [to] the government's decision to freeze funding" because adjudicating such a challenge "would not require the Court to reverse or vacate past grant terminations, or otherwise require the government to pay money past due," but merely "enjoin[] the government from relying on its stated reasons [for] withhold[ing] payment"); *New York v. Trump*, --- F.4th ----, 2026 WL 734941, at *3, *16 (1st Cir. Mar. 16, 2026) (similar).

For the same reason, CTA's challenge falls squarely within this Court's jurisdiction.

## II.    PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED

With jurisdiction secure, CTA easily satisfies the requirements for a preliminary injunction. At the TRO stage, Defendants offered not a single word in defense of their actions on the merits, arguing solely that this Court lacked authority to remedy any illegality. *See* TRO Op. 10. That is because no such defense is available: This Court already correctly determined that CTA is likely to succeed on the merits of several of its claims, including its APA claims, *id.*, and the freezes are unlawful for several other reasons besides.[13] The remaining preliminary injunction factors also overwhelmingly support CTA: CTA will suffer irreparable harm absent an injunction, and the balance of the equities and public interest favor prohibiting Defendants from carrying out its unlawful freezes. This Court should grant CTA's motion for a preliminary injunction.

---

[13] Because Defendants have thus far not defended their actions on the merits, CTA offers an abbreviated treatment of the merits in this brief and incorporates by reference its more detailed merits arguments from its TRO briefing. *See* ECF No. 21 at 15-33; ECF No. 27 at 10-11.

17

## A.     CTA Is Likely To Succeed In Demonstrating That The Freezes Are Unlawful

In granting CTA's motion for a TRO, this Court found CTA likely to succeed in proving that the freezes (1) were arbitrary and capricious; (2) violated the APA's procedural requirements; (3) violated Title VI; and (4) violated 2 C.F.R. Part 200. TRO Op. 10-13. Those conclusions were correct. And while the Court did not address CTA's other claims challenging Defendants' actions, CTA is also likely to succeed in demonstrating that the freezes (5) exceeded Defendants' authority under 49 U.S.C. § 5309; and (6) violated the Spending Clause of the Constitution.

### 1.     The Retroactive Application Of The IFR To Freeze CTA's Grants Was Arbitrary And Capricious (Counts I-III)

Under the APA, agency action must be set aside when it is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency must offer a satisfactory explanation for its action that does not ignore important aspects of the problem. *Ohio v. EPA*, 603 U.S. 279, 292-93 (2024). And when an agency changes its position, it must account for the serious reliance interests engendered by the prior policy, *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016), even where the change in position is purportedly based on a determination that the prior policy was unlawful, *see Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25, 30 (2020).

At the outset, it bears emphasizing that CTA is not challenging the IFR itself or the IFR's application to *new* grants. *See* TRO Op. 11. Instead, CTA challenges only DOT's decision to apply the IFR's new legal framework to *existing* grantees like CTA and to immediately, unilaterally, and indefinitely freeze their funding while doing so. As this Court correctly found in its TRO opinion, "Defendants' retroactive implementation of the IFR" to freeze the CTA's existing grants was arbitrary and capricious because it (1) "failed to justify the application of its framework to existing

18

grantees and the freezing of their funding while doing so"; (2) "failed to consider the impact of its decision on ongoing projects, reliance by contractors … and … members of the public"; (3) failed to offer a "reasonable justification" for "imposing penalties on the CTA for simply following former DOT regulations and federal law"; and (4) was issued on "pretextual" grounds "unrelated to actual compliance with Defendants' stated concerns." *Id*. at 10-11. And even setting aside the legality of the *initial* freezes, (5) DOT's decision to *continue* the freezes after its reviews were complete and CTA complied with DOT's conditions of reinstatement was likewise arbitrary and capricious. *See id.* at 11. We explain each in turn.

***Lack of reasoned explanation.*** DOT made no attempt to explain why it was "necessary or reasonable" to apply the IFR retroactively to existing grantees. *Id.* at 10. In the IFR, DOT summarily claimed *authority* to take action against existing grantees based on the IFR's new legal framework, *see* 90 Fed. Reg. at 47,973 (asserting a required "reevaluation process" for DBEs does not "restrict" DOT's "ability to conduct a review or take action under Title VI"), but it nowhere *justifies* that assertion. The Freeze Letters DOT sent to CTA likewise contained no explanation, instead simply referring back to the IFR as the basis for indefinitely freezing CTA's funding. *See* Compl., Exs. A-B. Defendants' failure to supply *any* explanation for their actions—much less a reasoned one—violates the APA. *See Prometheus*, 592 U.S. at 423. Nor have Defendants offered any plausible explanation as to why the IFR was so urgent it needed to be retroactively applied to existing grants.

***Failure to consider reliance interests.*** Defendants also failed to consider the serious reliance interests of CTA, its contractors, and the public. CTA depends on timely reimbursements to pay its contractors, and those contractors require funding to continue paying the hundreds of employees whose jobs were (and will be) created by the RPM and RLE Projects. Allowing

19

Defendants' indefinite freezes to take effect again places these jobs at risk. *See* Decl. ¶¶ 83-86, 88; Suppl. Decl. ¶ 36. Defendants' complete failure to consider these reliance interests was arbitrary and capricious. *See Regents*, 591 U.S. at 25-26, 30, 32-33 (invalidating agency action that failed to "consider the alternatives ... within the ambit of the existing policy" when "deciding how best to address a finding of [the prior policy's] illegality moving forward" (cleaned up)); *see also, e.g.*, *BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691, 701 (5th Cir. 2024) (finding it "eminently reasonable" for regulated party "to rely on a specific condition that guaranteed a future" action and that agency arbitrarily failed to consider that reliance interest when rejecting that action).

***Unjustified penalty.*** Because CTA was required to comply with the then-prevailing DBE regulations in order to secure the FFGAs at issue here, Defendants' retroactive application of the IFR to freeze CTA's grants "impos[ed] [a] penalt[y] on the CTA for simply following former DOT regulations and federal law." TRO Op. 11. It was arbitrary and capricious to do so. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."). At a minimum, it was arbitrary and capricious to do so without providing "some reasonable justification"—which "Defendants have not offered here." TRO Op. 11; *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring) ("A rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule—may for that reason be 'arbitrary' or 'capricious,' and thus invalid." (citation omitted)).

***Pretext.*** Defendants' actions were also arbitrary and capricious because the stated explanation for their actions was "incongruent with what the record reveals about the agency's

20

[actual] priorities and decisionmaking process," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019), and because those actual priorities involved "reli[ance] on irrelevant ideological factors," *Planned Parenthood of Greater N.Y. v. HHS*, 2025 WL 2840318, at *26 (D.D.C. Oct. 7, 2025); *see Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is "arbitrary and capricious" if not "based on a consideration of the *relevant* factors" (emphasis added and citation omitted)).

Defendants' stated explanation for the freezes here—that they form part of a "review[] [of] the projects [DOT] funds to ensure nondiscrimination" under Title VI, Compl., Exs. A, B—does not match the facts on the ground. Defendants have not explained why this review necessitates freezing funds to CTA's RPM and RLE Projects (and two projects in New Jersey/New York) but *not* to the hundreds of other FTA-funded projects nationwide likewise subject to the old DBE framework. And executive officials' contemporaneous public statements "reveal[]" Defendants' true "priorities and decisionmaking process," *Dep't of Com.*, 588 U.S. at 785—namely, that the freezes were part of a government-wide effort to cut funding to Democratically-aligned programs, including to obtain political leverage in connection with the then-ongoing government shutdown. *See* ECF No. 21 at 3, 13, 21-22 (CTA's TRO brief collecting relevant government statements). Actions "prompted by … animus" towards Democratic-aligned cities "run afoul of the requirement that agencies act in a reasoned, nonarbitrary manner." *Robbins v. Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985). Defendants' pretextual action should be set aside.

***Irrational continuation of freezes.*** At a minimum, even if the initial funding freezes were somehow lawful—which they were not—any continued withholding of CTA's funds is irreconcilable with Defendants' own stated rationale. Agency action "must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. Defendants offered just one

21

stated reason for the freezes: to conduct an administrative "review" to ensure the Projects complied with antidiscrimination law. Compl., Ex. B; *see id.*, Exs. A, E. But by DOT's own telling, those reviews have been complete for months. On December 1, 2025, DOT informed CTA that it had "completed its initial civil rights administrative review" of both Projects, identified specific conditions for resuming funding, and promised to resume funding if "CTA certifies in writing within 30 days of receipt of this letter that it accepts and will fulfill the conditions identified in this letter." *Id.*, Ex. K; *see id.* Ex. J. Just nine days later, CTA provided exactly the written certifications DOT requested, accepting every condition without qualification. *See id.*, Exs. L, M. Yet CTA's funds remained frozen for over three months, until entry of this Court's TRO. A continued freeze would thus be "illogical on its own terms." *GameFly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013) (citation omitted); *see also Lopez v. FAA*, 318 F.3d 242, 246 (D.C. Cir. 2003) ("[A]n agency is bound to the standards by which it professes its action[s] to be judged.").

***Several other cases have invalidated comparable funding freezes.*** In several other cases, courts have concluded that similar funding freezes are arbitrary and capricious:

> Rather than taking a deliberate, thoughtful approach to [address their stated concerns], the Defendants abruptly froze billions of dollars of federal funding for an indefinite period. It is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences[.]

*New York v. Trump*, 769 F. Supp. 3d 119, 141 (D.R.I.), *stay pending appeal denied*, 133 F.4th 51 (1st Cir. 2025), *aff'd*, 2026 WL 734941, at *14 (1st Cir. Mar. 16, 2026) ("OMB acted arbitrarily and capriciously by … freez[ing] obligated funds …. without considering an obvious aspect of the problem -- namely, the reliance interests of the recipients of the obligated federal funds that were to be frozen."); *see Illinois v. Vought*, --- F. Supp. 3d ----, 2026 WL 404014, at *2 (N.D. Ill. Feb. 12, 2026) ("plaintiffs have demonstrated strong reliance interests … and there's no explanation for what 'agency priorities' justify termination"); *Woonasquatucket River Watershed Council v. U.S.*

22

*Dep't of Agric.*, 778 F. Supp. 3d 440, 470 (D.R.I. 2025) ("[T]he Government failed to provide a rational reason that the need to 'safeguard valuable taxpayer resources' justifies a sweeping pause of all already-awarded IIJA and IRA funds with such short notice."), *appeal docketed*, No. 25-1428 (1st Cir. May 1, 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 125 & n.11 (D.D.C. 2025) ("Defendants essentially adopted a 'freeze first, ask questions later' approach that entirely failed to consider multiple important aspects of the problem." (cleaned up) (citation omitted)), *appeal docketed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025); *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1200 (N.D. Cal. 2025) (agency "fail[ed] to offer a reasonable explanation of the breadth of funding withheld or the basis for withholding funds that Congress has already appropriated"), *appeal docketed*, No. 25-3889 (9th Cir. June 23, 2025); *Washington v. U.S. Dep't of Transp.*, 792 F. Supp. 3d 1147, 1185 (W.D. Wash. 2025) (agency failed to "consider[] the serious reliance interests engendered by the old policy"); *New Jersey v. U.S. Dep't of Transp.*, --- F. Supp. 3d ----, 2026 WL 323341, at *4 (S.D.N.Y. Feb. 6, 2026), *appeal docketed*, No. 26-282 (2d Cir. Feb. 9, 2026).

Consistent with this overwhelming weight of authority, Defendants' decision here—to apply the IFR's new framework retroactively to CTA—should be declared arbitrary and capricious.

### 2. Defendants Violated The APA's Procedural Requirements (Counts IV-V)

Defendants' dispensation with the required processes in its rushed enactment of the IFR also violated the APA's notice-and-comment and delayed-effectiveness requirements.

***Notice and comment.*** Defendants implemented the IFR retroactively against CTA without providing notice and an opportunity for the public (including CTA) to comment. 5 U.S.C. § 553(b)-(c). The notice-and-comment process is "central" to the APA's "commitment to public notice and participation," protecting against arbitrary decision-making by ensuring that agencies benefit from

the insights of regulated parties. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023). Defendants flouted this rule based on the conclusory assertion that permitting notice and comment "would be impracticable and contrary to the public interest," 90 Fed. Reg. at 47,974, invoking the "good cause" exception of 5 U.S.C. § 553(b)(B).

That argument fails. The "good cause" exception is not an "'escape clause[]' that may be arbitrarily utilized at the agency's whim." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981). It must be limited to "emergency situations … or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (citations omitted); *see Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94 (D.C. Cir. 2012) (exception must be "narrowly construed and only reluctantly countenanced" (citation omitted)). Defendants have identified no emergency justifying immediately implementing the IFR retroactively against CTA. *See* TRO Op. 11-12.

By Defendants' own account, DOT determined that the DBE presumptions were unlawful in June 2025—yet allowed them to continue until October. 90 Fed. Reg. at 47,974 & n.9. Good cause does not apply when the alleged "emergency" is of the agency's own making. *Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920-21 (D.C. Cir. 1983). And FTA continues to permit nearly all federal funds to continue to flow to *other* projects created under the old DBE framework. Defendants' "conclusory statement[s] that normal procedures were not followed because of the need to provide immediate guidance" are thus insufficient to justify the selectively retroactive action against CTA. *Zhang v. Slattery*, 55 F.3d 732, 746 (2d Cir. 1995) (citation omitted).

Defendants claim it would be "confusing and contradictory," and "impracticable and contrary to the public interest," to allow purportedly unconstitutional race- and gender- based presumptions to continue throughout the notice-and-comment period. 90 Fed. Reg. at 47,974. That justification fails as a matter of law: if confusion and uncertainty alone were sufficient, the notice-

and-comment process would be "writ[ten]…out of the statute." *United States v. Reynolds*, 710 F.3d 498, 510 (3d Cir. 2013); *see*, *e.g.*, *California v. Azar*, 911 F.3d 558, 576 (9th Cir. 2018).[14]

Nor are Defendants correct that notice and comment was "unnecessary" because "an agency is not required to continue to enforce a statutory provision that it has found to be unconstitutional." 90 Fed. Reg. at 47,974 & n.10. Notice and comment is "unnecessary" only where "the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Mack Trucks*, 682 F.3d at 94 (citation omitted). There is no reasonable argument that rewriting the decades-old DBE presumptions and pausing billions in funding to CTA was "insignificant" or "inconsequential."

***Delayed effectiveness.*** The IFR repeats the same "good cause" finding to justify dispensing with the default 30-day delay in the IFR's effective date. 5 U.S.C. § 553(d)(3). But the two procedural requirements serve "[d]ifferent policies": "Notice-and-comment requirements … ensure public participation in rulemaking, and the thirty-day waiting period … give[s] affected parties time to adjust their behavior before the final rule takes effect." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 675 & n.15 (9th Cir. 2021) (citation omitted). In any case, Defendants' proffered reasons are just as deficient as to the 30-day requirement as they are for dispensing with notice and comment. Defendants offer no compelling justification why an immediate effective date was required—to say nothing of retroactive application—and Defendants' own months-long delay in issuing the IFR forecloses any assertion that an additional 30 days would have been troublesome.

---

[14] Moreover, Defendants' chosen path here—issuing an IFR and then soliciting comment, such that the IFR may change—tends to create rather than ameliorate uncertainty, casting further doubt on Defendants' justifications. *See Azar*, 911 F.3d at 576.

25

### 3.   The IFR's Application To CTA Violates Title VI And Its Implementing Regulations (Counts VI-VII)

Applying the IFR retroactively to CTA also violated Title VI. That statute permits agencies to suspend funding to recipients found to have permitted discrimination, *see* 42 U.S.C. § 2000d-1, but only after observing "elaborate" procedures set forth by statute and regulation, *Alexander*, 532 U.S. at 289-90; *see* 42 U.S.C. § 2000d-1; 49 C.F.R. Part 21. Both in the IFR and the Freeze Letters, *see* 90 Fed. Reg. at 47,973; Compl., Exs. A, B, Defendants invoked Title VI as authority for the freezes. But as this Court has found, *see* TRO Op. 12, at every turn, Defendants flouted the mandatory Title VI procedures governing such funding freezes:

- Defendants failed to conduct an investigation *before* freezing funding, *see* 49 C.F.R. § 21.11 (requiring an investigation, then attempted informal resolution, prior to initiation of procedures for effecting compliance);

- Defendants gave CTA no notice of any "failure to comply" with Title VI, 42 U.S.C. § 2000d-1, the remedial action Defendants proposed to take, the "specific provision under which the proposed action … [was] to be taken," or "the matters of fact or law asserted as the basis for this action," 49 C.F.R. § 21.15(a);[15]

- CTA was not offered a hearing at which it could present evidence of its compliance, *see* 42 U.S.C. § 2000d-1; 49 C.F.R. § 21.13(c);

- Defendants did not seek voluntary compliance prior to freezing CTA's funds, *see* 42 U.S.C. § 2000d-1; 49 C.F.R. § 21.9(a) (requiring the Secretary to seek voluntary compliance "to the fullest extent practicable"), and even after Defendants *obtained* CTA's voluntary compliance in December, they did not unfreeze CTA's funds;

- Defendants never offered a written report to any congressional committee detailing the circumstances and grounds for CTA's funding suspension and giving the congressional committee the opportunity to intercede during the ensuing thirty days. 42 U.S.C. § 2000d-1; 49 C.F.R. § 21.13(c).

In short, Defendants bypassed the entirety of Congress's—and their own—procedural

---

[15] The Freeze Letters do not qualify as "notice" within the meaning of Title VI. The Letters state that DOT "is reviewing" the RPM and RLE Projects "to ensure nondiscrimination in its financial assistance programs," Compl., Exs. A, B,—not, as is required, that DOT has *already found* a failure to comply with Title VI.

26

scheme for enforcing Title VI, flouting Congress's intent that funding suspensions be a "last resort, to be used only if all else fails." *Guardians Ass'n v. Civ. Serv. Comm'n*, 463 U.S. 582, 601 (1983); *see Mandel v. U.S. Dep't of Health, Educ. & Welfare*, 411 F. Supp. 542, 555-56 (D. Md. 1976), *aff'd sub nom. Mayor & City Council of Baltimore v. Mathews*, 571 F.2d 1273 (4th Cir. 1978). Congress required these procedural safeguards in recognition of the fact that "some funding terminations harm beneficiaries of programs funded as much as they harm fund recipients themselves," *Adams v. Bell*, 711 F.2d 161, 181 (D.C. Cir. 1983), as is the case here: Freezing CTA's funds harms not just CTA itself but hundreds of contractors, Chicago's commuters, and the region more broadly. Because Defendants ignored Title VI's procedural guarantees, the freezes must be set aside as "without observance of procedure required by law," "in excess of statutory … authority," and "not in accordance with law." 5 U.S.C. § 706(2); *Schlafly v. Volpe*, 495 F.2d 273, 279 (7th Cir. 1974) (finding termination of funding to be beyond what is authorized by 42 U.S.C. § 2000d-1 where procedural protections were not satisfied).

### 4. Defendants' Actions Violate 2 C.F.R. Part 200 (Count VIII)

Defendants also flouted the detailed regulations circumscribing agencies' authority to freeze grant funds. *See* 2 C.F.R. Part 200; *id.* § 1201.1. Part 200 regulations provide that an agency may "[t]emporarily withhold payments" under a federal grant, 2 C.F.R. § 200.339(a), only if it first (1) identifies "noncompliance" with federal law on the part of the grant recipient, and (2) "determines that [such] noncompliance cannot be remedied by imposing specific conditions," *id.* § 200.339. Here, Defendants did neither. *See* TRO Op. 12-13. The Freeze Letters identified no noncompliance by CTA but rather indicated that CTA's grants were being reviewed to determine *whether* any noncompliance was occurring. Compl., Exs. A, B. Nor did Defendants determine that any purported noncompliance by CTA could not "be remedied by imposing specific conditions"

27

on CTA. 2 C.F.R. § 200.339. Defendants further violated 2 C.F.R. § 200.342 by failing to provide CTA with the required "opportunity to object and provide information challenging the [freezes]" before they took effect. At a minimum, Defendants violated 2 C.F.R. § 200.339(a) by continuing to withhold CTA's funds even after CTA "t[ook] corrective action" by agreeing to the conditions set out in Defendants' December 1 letters. And Defendants' freezes also failed to reimburse CTA within the legally required timeframe. *See* 2 C.F.R. § 200.305(b). For all of these reasons, the funding freezes violated 2 C.F.R. part 200. Indeed, another federal court has invalidated DOT's freeze of New York's funding on this very basis. *See New Jersey*, 2026 WL 323341, at *4.

### 5. Defendants' Actions Exceed DOT's Statutory Authority (Count IX)

Because "[a]dministrative agencies are creatures of statute" that "possess only the authority that Congress has provided," *NFIB v. OSHA*, 595 U.S. 109, 117 (2022), an agency "'literally has no power to act' … unless and until Congress authorizes it to do so by statute," *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (citation omitted). Here, Congress has not authorized Defendants' actions, so those actions "in excess of statutory … authority" must be "set aside." 5 U.S.C. § 706(2).

DOT's grants to CTA for the RPM and RLE Projects are generally authorized and governed by the reticulated statutory scheme set out in 49 U.S.C. § 5309. That scheme provides that grants like the ones here "shall be carried out through a[n] [FFGA]" that "obligates an amount of available budget authority" to the recipient project, and that "[a]n amount made available or appropriated … shall remain available to that project for 4 fiscal years." *Id.* § 5309(k)(2)(A), (D)(i), (n)(1).

Nowhere in that detailed scheme is *any* indication that DOT—after funds have been "made available," "appropriated," and "obligate[d]" to a project, *id.* § 5309(k)(2)(D)(i), (n)(1)—may indefinitely pause disbursements for any reason the agency sees fit. Because Congress has not "provided" the authority Defendants claim, *OSHA*, 595 U.S. at 117, Defendants have "no power

to act" as they have, *Cruz*, 596 U.S. at 301. Several courts have reached the same conclusion as to similar claims of agency authority to indefinitely freeze congressionally authorized funds. *E.g.*, Order at 6, *Vought*, No. 26-cv-1566, ECF No. 63; *Woonasquatucket*, 778 F. Supp. 3d at 471-74; *Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 125-27; *City & Cnty. of San Francisco*, 783 F. Supp. 3d at 1200-01; *Washington*, 792 F. Supp. 3d at 1179-83. This case is no different.

Any other result would violate the major questions doctrine. The Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance," *OSHA*, 595 U.S. at 117 (citation omitted), and will "not assume that Congress entrusted [such a] task to an agency without a clear statement to that effect," *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). Here, Defendants claim the power to unilaterally and indefinitely freeze billions of dollars Congress has appropriated for vital infrastructure projects— undoubtedly projects of "vast economic and political significance." *OSHA*, 595 U.S. at 117; *see Woonasquatucket*, 778 F. Supp. 3d at 473. And "there is no clear statutory hook for this broad assertion of power." *Woonasquatucket*, 778 F. Supp. 3d at 473. In these circumstances, the major questions principle requires rejecting Defendants' claim to the destabilizing power they now assert.

**6. Defendants' Actions Violate The Constitution (Counts X and XI)**

Retroactively applying the IFR to freeze CTA's grants also violates Separation of Powers and the Constitution's Spending Clause. Only Congress has the power to obligate federal funds. *See, e.g.*, *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 460 (2024). And when Congress attaches conditions to the receipt of federal funds (as it did here), those conditions are "in the nature of a contract." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The recipient must voluntarily and knowingly accept[] the terms of [that] 'contract,'" and cannot do so if "unaware of the conditions or is unable to ascertain what is

29

expected of it." *Id*. A funding recipient thus must be given "clear notice" of its legal obligations, and may not be "surpris[ed] … with post acceptance or 'retroactive' conditions." *Id*. at 25; *see Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (stating presumption that "changes in substantive requirements for federal grants" will not "operate retroactively," as obligations should be "determined by reference to the law in effect when the grants were made").

It is undisputed that CTA fully complied with DBE regulations "in effect when the grants were made." *Bennett*, 470 U.S. at 638. The IFR purported to change those regulations and apply the new framework retroactively to CTA, thereby punishing CTA for complying with rules it was *required* to follow as a condition of its entry into the grant agreements. Because CTA lacked "clear notice"—indeed, any notice—of the IFR's requirements when it entered into the FFGAs, *Pennhurst*, 451 U.S. at 25, the retroactive application of the IFR clearly violates the Spending Clause, *see U.S. Dep't of Just.*, 2026 WL 114294, at *8 (finding likelihood of success on Spending Clause claim where government added new "open-ended and retroactive" conditions to grant money).

### B. CTA Will Suffer Irreparable Harms Absent A Preliminary Injunction

CTA will suffer a host of irreparable harms if Defendants' unlawful freezes are permitted to go back into effect—harms that cannot be remedied by money damages after trial. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 382-83, 386 (7th Cir. 1984).

After DOT froze CTA's grants in October, CTA secured bridge funding by drawing on its existing cash, issuing additional bonds, and drawing down lines of credit. Decl. ¶¶ 56-59; Suppl. Decl. ¶ 11. After this Court entered a TRO, CTA was again able to submit reimbursement requests, receiving approximately $114 million on March 30, 2026—a lifeline that allowed it to avoid a work stoppage and continue work on the RPM and RLE Projects. Suppl. Decl. ¶¶ 14-15. But it lacks adequate funds to weather an extended freeze. If CTA's funding for the RPM and RLE

Projects is again suspended, CTA will inevitably be back where it was on March 20, 2026: forced to seek a TRO or to halt construction. *Id*. ¶¶ 18, 20, 22. And now that CTA began active construction on the RLE, its daily costs are even greater than they were in March. Suppl. Decl. ¶¶ 15, 19. CTA now projects it will spend $180 million on the RPM and RLE Projects from April through the end of June. *Id*. ¶ 17.

Losing federal funding again would cause a cascade of harms to CTA and the communities it serves, including:

1.      ***Impact on Workers***. If federal funding was to again lapse, CTA would inevitably be forced to halt work. CTA must maintain sufficient funding in reserves to pay for demobilization, which will be more expensive now than estimated in March, given that heavy equipment has been moved into place for the RLE Project. Suppl. Decl. ¶¶ 21-23. If a freeze were reinstated, CTA would need to move quickly to wind down work, putting hundreds of Chicagoans out of work and jeopardizing thousands of future jobs. *Id.* ¶ 22; Decl. ¶¶ 83-84.

Workers discharged during such a suspension cannot easily be replaced. CTA and its partners have mobilized hundreds of construction workers and engineers, established project offices and field facilities, procured specialized equipment, hired and trained partners and workers, engaged subcontractors who made their own commitments, and allocated resources from other potential projects. Suppl. Decl. ¶ 36; Decl. ¶ 83. CTA has also invested heavily in workforce development through apprenticeship and career development programs that cannot simply pause and restart—participants need continuous employment to develop skills and complete certifications. Decl. ¶ 84. And small vendors may go out of business as a result of another work stoppage or payment delays. *Id*. Indeed, federal funding from these grants pays the salaries of 23 members of CTA's own staff, whom CTA may have to furlough or terminate if money again stops

31

flowing. Decl. ¶ 87.

Even if funds become available again in the future following new or reinstated freezes and a resulting work stoppage, the loss of critical, already-trained personnel cannot easily be reversed—new workers will need to be identified and provided project-specific training and knowledge. *See* Decl. ¶ 88; *see Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) ("loss of talent and the inability to recruit and retain employees" constitutes irreparable harm (internal quotation marks omitted)); *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1064 (S.D. Ind. 2010) (damage to employee morale is an irreparable injury).

2. ***Reputational Harm.*** Non-payment and work stoppages risk irreparable harm to CTA's reputation that cannot be remedied by monetary damages. Contractors depend on CTA for predictable workflow and reliable payment, and a potential lack of available funds compromises CTA's commercial goodwill, Suppl. Decl. ¶¶ 25-27; Decl. ¶ 71—a classic form of irreparable harm. *See Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1139-40 (7th Cir. 1994). The funding uncertainty also compromises CTA's relationship with its own customers and Chicago's taxpayers, who depend on CTA to complete improvements efficiently and maintain Chicago's transportation systems in good repair. *See Am. Food & Vending Corp. v. United Parcel Serv. Oasis Supply Corp.*, 2003 WL 256865, at *2 (N.D. Ill. Jan. 31, 2003) (UPS's termination of contract risked "irreparable harm" to plaintiff's reputation for excellent client service).

3. ***Inconvenience to Passengers.*** Further delays in completion of the RPM Project will require prolonged speed restrictions along the Red and Purple Lines, frustrating CTA's mission and passing along costs to commuters in time and inconvenience. Suppl. Decl. ¶ 27; Decl. ¶ 72. Moreover, any future prolonged delay of the Projects will prevent CTA from fulfilling its mission and the public from enjoying the anticipated benefits: the RLE Project, for example, is projected

32

to sharply decrease transit times along its service corridor and put thousands of additional jobs within reach of Chicago residents. Suppl. Decl. ¶ 5; Decl. ¶¶ 27, 72. Each month of delay means Chicago's residents will continue to face the transportation barriers that these Projects are meant to address, including the cascading consequences on employment from prolonged commutes.

        **4.**        ***Construction Delays Enhancing Risk of Default.*** The RLE and RPM Projects involve time-sensitive construction activities where delays risk further irreparable harms. As with any major outdoor infrastructure project, CTA has certain weather windows in which to complete the work most efficiently. Decl. ¶ 77. Lost construction seasons cannot easily be recaptured, so delays compound. *Id.* Stopping work during prime construction season in Chicago would be particularly costly, risking longer delays. Decl. ¶¶ 77-78. Yet the FFGAs require the Projects to be completed by specified dates: October 22, 2027, for the RPM and August 5, 2031, for the RLE. Prolonged delays imperil CTA's ability to meet these dates, threatening default and forfeiture of the full obligated amounts. Suppl. Decl. ¶¶ 4-5, 31-32; Decl. ¶ 76.

        Work stoppages will increase the final cost of the Projects in other ways, too. Equipment currently in place must be moved during a stoppage and returned when work restarts. Suppl. Decl. ¶¶ 22-23; Decl. ¶¶ 74-75. For the RLE Project, a work stoppage would subject CTA by contract to "breakage costs": unused workers' contractually owed wages, materials and goods ordered for the work that cannot be cancelled, the cost of demobilization, the cost of redeploying equipment, and the cost of restarting the work. Suppl. Decl. ¶ 28; Decl. ¶ 74. These consequential damages are not recoverable from Defendants here, so CTA's only option is to prevent them. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999); 5 U.S.C. § 702; *see also, e.g., CSL Plasma Inc. v. U.S. Cust. & Border Prot.,* 628 F. Supp. 3d 243, 262 (D.D.C. 2022) (economic loss caused by the government can be an irreparable injury due to sovereign immunity).

**5.** ***Risks to the RLE Project***. Prolonged work stoppage and delays would put the RLE Project as a whole at risk. Suppl. Decl. ¶ 33; Decl. ¶¶ 80-82. If the RLE cannot be completed, or cannot be completed timely, not only will the public lose the many economic and community benefits that the RLE will bring, but CTA could lose other funding it received to complete that work. Suppl. Decl. ¶¶ 33-35; Decl. ¶¶ 80-82. CTA alone could then be responsible for the costs of the already completed work and could face liability to contractors, which could trade off with CTA's other funding obligations. *See id.*

These harms—inevitable, substantial, and irreversible—cannot be adequately remedied by monetary damages and warrant immediate injunctive relief. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950-51 (N.D. Ill. 2017) (finding irreparable harm to Chicago where federal government threatened to withhold far less funding than here), *aff'd*, 888 F.3d 272 (7th Cir. 2018). Monetary damages cannot restore lost construction seasons, reassemble dispersed specialized workforces, recapture lost economic development momentum, or repair lost trust of communities serviced by these projects.

## III. THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT AN INJUNCTION

The balance of the equities and public interest—which "merge when the Government is the opposing party," *Nken*, 556 U.S. at 435—favor preliminary relief. Permitting Defendants' unlawful freezes to again take effect would subject CTA to reputational harm that will impair its future relationships with contractors and the public alike; subject CTA's ridership to inconvenience and lost time due to speed restrictions; risk lost employment for hundreds of trained staff who will not be fully paid during the freezes; and imperil CTA's ability to complete the RPM and RLE Projects at all, or by the default dates set in the FFGAs. For these many injuries, "post-trial relief would come too late." *Valencia v. City of Springfield*, 883 F.3d 959, 965 n.6 (7th Cir. 2018).

Meanwhile, Defendants will suffer no cognizable harm if the IFR's retroactive application to CTA is enjoined. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (citations omitted). Here, Defendants seek to punish CTA for complying with the government's *own previously binding regulations* while failing to comply with *any* of the required procedures itself. There is "no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws— such as the APA, as well as regulations … that govern their existence and operations." *Id*. (internal quotation marks and citations omitted). Defendants should be mandated to follow their own procedures and fulfill their own binding commitments.

## CONCLUSION

The Court should grant CTA's motion for a preliminary injunction.

Dated: April 17, 2026

Jeffrey C. Bora
CHICAGO TRANSIT AUTHORITY
567 W. Lake Street, 6th Floor
Chicago, IL 60661
Tel: (312) 681-3110
JBora@transitchicago.com

Respectfully submitted,

By: */s/ Andrianna D. Kastanek*
Andrianna D. Kastanek
Terri L. Mascherin
Jason M. Bradford
Simon A. de Carvalho
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
AKastanek@jenner.com
TMascherin@jenner.com
JBradford@jenner.com
SdeCarvalho@jenner.com

*Counsel for Plaintiff*