UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 26 C 3140 |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | Judge Durkin |
| TRANSPORTATION, FEDERAL | ) | |
| TRANSIT ADMINISTRATION, and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT UNITED STATES' MEMORANDUM IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**Table of Contents**

Table of Authorities ............................................................................................................ ii

Introduction........................................................................................................................1

Background .........................................................................................................................2

    I.       The Contracts ................................................................................................2

    II.     The Instant Complaint and the Resulting Litigation .....................................5

Argument ...........................................................................................................................6

    I.       Legal Standard ..............................................................................................7

    II.     DOT's Obligation to Monitor Compliance ...................................................9

    III.   Absence of Jurisdiction in the District Court Based on Tucker Act
          Principles......................................................................................................12

          A.     *California* and *NIH* Control..........................................................14

          B.     Source of Plaintiff's Rights............................................................17

          C.     The CTA's Requested Remedies ....................................................19

          D.     This Court's Opinion Granting CTA's TRO ...................................22

    IV.   Inapplicability of APA to Agency Action that Are Not Final ................................24

    V.    Limitations on the Enforcement of Title VI and DOT's Implementing
          Regulations....................................................................................................26

    VI.   Limitations on the Enforcement of 2 C.F.R. Part 200 ...........................................30

    VII.  Absence of a Congressional Directive that Funds Be Provided to the CTA .........32

Conclusion ........................................................................................................................35

**Table of Authorities**

Cases

2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) ........................................................................... 18

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ...................................................................... 24

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................................................ 28

*Am. Ass'n of Univ. Profs. v. Trump*, 815 F. Supp. 3d 907 (N.D. Cal., 2025) ...................... 27

*Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39 (1st Cir. 2025) .......................................... 16, 17

*American Ass'n of People with Disabilities v. Harris*, 605 F.3d 1124 (11th Cir. 2010) ........ 28, 29

*American Association of Physics Teachers, Inc. v. National Science Foundation*, 804 F.
   Supp. 3d 45 (D.D.C. 2025) ................................................................................................ 17

*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440 (7th Cir. 2009) .......................... 9

*Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398 (2d Cir. 2015) .................................... 14, 18

*B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713 (2d Cir. 1983) ................................................. 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 8

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................... 24

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023) ................................... 7, 8

*California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass. 2025) ............................. 15

*Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) ................... 18, 19, 20

*Dep't of Educ. v. California*, 604 U.S. 650 (2025) ....................................................... *passim*

*Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999) ................................................... 13

*Duxbury Trucking, Inc. v. Mass. Highway Dep't*, 2009 WL 1258998 (D. Mass. Apr. 29, 2009) 27

*Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d 563 (E.D. Va. 2025) ....................... 21

*Fedosseeva v. Gonzales*, 492 F.3d 840 (7th Cir. 2007) ........................................................ 3

*Girl Scouts of Manitou Council, Inc., v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079
   (7th Cir. 2008) ..................................................................................................................... 8

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ........................................ 16

*Henke v. United States Dep't of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996) .............................. 16

*Hometown Connections v. Noem*, 165 F.4th 835 (4th Cir. 2026) ........................................... 19, 23

*Hum. Servs.*, 798 F. Supp. 3d 77 (D. Mass. 2025) .......................................................... 27

*In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795 (7th Cir. 2003) ................................ 8

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985) ................................. 13, 19, 20

*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.,* 298 F.3d 600 .................................. 3

*Lane v. Pena*, 518 U.S. 187 (1996) ......................................................................... 13

*Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir. 1986) ....................................... 8

*Longberg v. City of Riverside*, 571 F.3d 846  (9th Cir. 2009) ......................................... 29

*Lunney v. United States*, 319 F.3d 550 (2d Cir. 2003) ............................................... 24, 25

*McNutt v. Gen. Motors Acceptance Corp.*, 289 U.S. 178 (1936) ...................................... 9

*MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931 (D.C. Cir. 2021) ................................ 25

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ......................................... 14, 16

*Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) ...................................... 9

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ............................ *passim*

*New Jersey v. United States Department of Transportation*, 26-CV-00939, 2026 WL 323341
   (S.D.N.Y. Feb. 6, 2026) ............................................................................ 32, 33

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................... 8

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 .............................................................. 14

*Pickett v. Sheridan Health Care Ctr.*, 664 F.3d. 632 ..................................................... 3

*Presidential Gardens Assocs. v. U.S. ex rel. Secretary of Housing and Urban Dev.*,
   175 F.3d 132 ...................................................................................... 20

*Roland Mach. Co v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984) ................................. 7

*She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) .................................. 14

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985) ................................. 23

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616 (7th Cir. 2007) ................... 8

*Trades vs. Department of Labor, et al.,* 2025 WL 1331743 (N.D. Ill., May 7, 2025) ................. 32

*Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) .. 14

*Travelers Prop. Cas. v. Good*, 689 F.3d 714 (7th Cir. 2012) ......................................................... 9

*Trump v. Boyle*, 145 S. Ct. 2653 (2025) ..................................................................................... 15

*Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998) ................. 23

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. Mar. 11, 2025) ............................................................................................................................................ 22

*Up State Fed. Credit Union v. Walker,* 198 F.3d 372 (2d Cir. 1999) .......................................... 14

*Vera Institute of Justice v. U.S. Department of Justice*, 805 F. Supp. 3d 12 (D.C. Cir. 2025) ............................................................................................................................ 30, 31, 32

*Virnich v. Vorwald*, 664 F.3d 206 (7th Cir. 2011) ........................................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................... 7, 8, 33

*Xirum v. U.S. Immigration and Customs Enforcement*, 2024 WL 5473667 (Sept. 27, 2024) ...... 31

## Statutes

5 U.S.C. § 702 ............................................................................................................................. 13

5 U.S.C. § 704 ............................................................................................................................. 24

28 U.S.C. 1491(a)(1) ................................................................................................................... 16

28 U.S.C. § 1491 ......................................................................................................................... 13

42 U.S.C. § 2000d-2 ............................................................................................................... 26, 28

49 U.S.C. § 5309 ........................................................................................................ 32, 33, 34, 35

## Rules

Fed. R. Evid. 201(b) ...................................................................................................................... 3

## Regulations

2 C.F.R. Part 200 ............................................................................................................ *passim*

2 C.F.R. § 200.300 ................................................................................................................ 12

2 C.F.R. § 200.300(a)............................................................................................................ 11

2 C.F.R. § 200.300(c)............................................................................................................ 11

2 C.F.R. § 200.339 ........................................................................................................... 10, 11

49 C.F.R. Part 26................................................................................................................... 4

49 C.F.R. § 19 ...................................................................................................................... 28

49 C.F.R. § 21 ...................................................................................................................... 28

49 C.F.R. § 21.11 ...................................................................................................... 11, 12, 29

49 C.F.R. § 21.11(c).............................................................................................................. 10

C.F.R. Part 200...................................................................................................................6, 10

C.F.R. § 200.339 ............................................................................................................. 12, 31

## Other Authorities

2025 WL 963588 .................................................................................................................. 18

Executive Order 14173 ......................................................................................................4, 9

**Introduction**

Plaintiff Chicago Transit Authority operates the public transportation system in Chicago, which includes the fixed rail system known as the "L" (elevated train).  The CTA is currently engaged in two long-term improvement projects on the L that are partially funded by federal grants from the Federal Transit Administration, a component of the United States Department of Transportation ("DOT").  The CTA now challenges the government's October 3, 2025 suspension of federal funding for these two projects.  The CTA claims it was unlawful under the Administrative Procedure Act ("APA") and the Constitution for the government to suspend funding while it conducted an administrative review to determine whether the CTA was using federal funds in violation of federal laws.  The CTA mistakenly contends that the funding suspension resulted from DOT's alleged retroactive application of a federal regulation, or alternatively, that it was part of a Title VI proceeding.  In fact, the DOT's temporary funding suspension was taken pursuant to the terms of the federal grants.  And regardless of how the CTA characterizes the facts and styles its claims, this court must decide whether DOT's funding suspension breached the terms of the transportation contract before it grants the CTA the relief it seeks — continued payment under the grant.  Thus, despite the fact that the CTA strategically avoids asserting a breach of contract claim to obtain money damages and instead asserts APA and Constitutional claims seeking equitable relief, the "essence" of the CTA's claim is contractual, and it must be dismissed on jurisdictional grounds because exclusive jurisdiction of such claim belongs in the Court of Federal Clams.

Even if the court reaches the merits, all APA claims should be dismissed because there is no final agency decision.  In addition, the alleged procedural requirements under Title VI do not apply because DOT's funding suspension was not undertaken pursuant to Title VI.  Finally, the

1

constitutional claims fail because the statute the CTA relies on does not mandate the appropriated funding be spent on CTA's projects.

## Background

### I.     The Contracts

Plaintiff Chicago Transit Authority ("CTA") is an Illinois corporation that operates a large public transportation system in Chicago and the surrounding suburbs.  Compl. ¶ 24.  A component of that system is a rapid transit network commonly known as the "L" (elevated train), encompassing eight color-coded rail lines — Red, Blue, Brown, Orange, Green, Pink, Purple, and Yellow.  Compl. ¶¶ 30, 63-65.  In 2017, the CTA and DOT entered into a funding agreement known as full funding grant agreement ("FFGA") to provide just over $1 billion for the purpose of rebuilding Red and Purple Line track structures and stations ("RPM Project").  Compl. ¶¶ 70-71; Ex. C.  Further, in January of last calendar year, the CTA and DOT entered into a second FFGA to provide almost $2 billion for the purpose of adding five miles of new track and four stations to the Red Line on Chicago's southern border ("RLE Project").  Compl. ¶¶ 76-78 ("RLE Project"); Ex. D.

For each FFGA, DOT has developed terms and conditions, consistent with the Office of Management and Budget's Uniform Guidance, 2 C.F.R. Part 200. DOT's terms and conditions require recipients of federal funds to comply with federal law as a condition of receiving federal funds. In addition, the terms of each FFGA govern (1) what constitutes a breach of contract or event of default; (2) the circumstances in which DOT may withhold funding from the CTA or suspend the CTA's drawdown of funds; and (3) the procedural requirements attendant to the government's withholding or suspension of funding in the event of breach or default.  Compl. Exs. C, D.  Further, each FFGA incorporates by reference the Federal Transit Administration ("FTA")

Master Agreement. In particular, the FFGA for the RPM Program includes and incorporates by reference the FTA Master Agreement dated October 1, 2016, "as may be revised from time to time." Compl. Ex. C at 13. Similarly, the FFGA for the RLE Project includes and incorporates by reference the FTA Master Agreement dated May 2, 2024, "as may be revised from time to time." Compl. Ex. D at 12. Each FTA Master Agreement,[1] as further discussed below, tasks DOT with responsibility for oversight of the CTA's compliance with the FFGAs.

DOT notified the CTA by letters of October 3, 2025, that, *in conjunction* with the issuance of a new Interim Final Rule ("IFR") concerning the Disadvantaged Business Enterprises program requirements, it was undertaking an administrative review of these two FFGA grants in order to ensure that disbursements were consistent with the Equal Protection Clause of the U.S. Constitution, nondiscrimination requirements of applicable federal civil rights laws, and Executive Order 14173 titled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* ("EO 14173"). Compl. Ex. A (review of the RPM Project); Compl. Ex. B (review of the RLE Project). The letters further advised that no additional disbursements would be made pending this review. *Id.*

---

[1] Each FTA Master Agreement is available on defendant's website. United States Department of Transportation: Federal Transit Administration, *FTA Grant Agreements*, (last updated on Nov. 26, 2025), https://www.transit.dot.gov/funding/grantee-resources/sample-fta-agreements/fta-grant-agreements. Fed. R. Evid. 201(b) permits courts to take judicial notice of materials whose accuracy can be readily determined by resort to sources not reasonably subject to being questioned. Courts of this circuit have repeatedly found that materials published on a governmental agency's website fall in this category. *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d. 632, 648 (7th Cir. 2011 ("We have recognized the authority of a court to take judicial notice of government websites"); *Fedosseeva v. Gonzales*, 492 F.3d 840, 848 (7th Cir. 2007) (taking judicial notice of a human rights report issued by the State Department and published on the agency's website in evaluating plaintiff's claims regarding the conditions in her native country); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (taking judicial notice of information found on the official website of the Federal Deposit Insurance Corporation). Defendants accordingly respectfully requests that this court take judicial notice of the 2016 FTA Master Agreement and the 2024 FTA Master Agreement.

3

The parties subsequently engaged in correspondence regarding DOT's administrative review. Compl. Exs. F-I. On December 1, 2025, DOT notified the CTA that it had completed its *initial* administrative review with respect to both grants. Compl. Exs. J, K. The December 1, 2025 correspondence further advised that the CTA "appear[s] to have considered race and sex as part of both the prime and subcontract bidding and contract awards" and that the resulting requirements the CTA had imposed on its contractors were "plainly inconsistent with the Equal Protection principles of the U.S. Constitution." Compl. Ex. J at 1; Ex. K at 1.[2] To rectify this issue, each letter requested that the CTA certify its commitment to take actions necessary to safeguard compliance with principles underlying the Equal Protection Clause and federal civil rights law within 30 days of receipt. Compl. Ex. J at 2; Ex. K at 2. In addition, the letter respecting the RLE Project required the CTA to develop a comprehensive timeline for reevaluating applicable contracts. Compl. Ex. K at 2. Finally, the December 1, 2025 correspondence stated that, upon review of the certifications the CTA was required to make, as well as review of the timeline requested with respect to the RLE Project in particular, DOT would notify the CTA of any additional deficiencies that might need to be addressed before funding would resume. Compl. Ex. J at 2 (requesting certification with respect to the RPM Program); Ex. K at 2 (requesting both certification and a reevaluation timeline with respect to the RLE Project).

---

[2]     DOT had concluded earlier in 2025 that considering race or gender in determining subcontract requirements for Disadvantaged Business Enterprises (DBE) programs under 49 C.F.R. Part 26 was unconstitutional. Compl. ¶ 4. Accordingly, on September 30, 2025, DOT announced an interim final rule ("IFR"), eliminating from DBE program regulations the race- and gender-based presumptions of social and economic disadvantage for purposes of DBE participation. Compl. ¶ 84.

The CTA provided the two certifications along with the requested timeline for the RLE Project on December 10, 2025.  Compl. Exs. L, M.  No further correspondence occurred between the parties before the CTA filed this lawsuit.

## II.     The Instant Complaint and the Resulting Litigation

The CTA's complaint is premised on the notion that the funding suspension is the result of DOT's retroactive application of the new IFR and therefore a violation of the APA, Title VI and its implementing regulations, 2 C.F.R. Part 200, and the United States Constitution.  With respect to the APA, the CTA claims that the funding suspension resulting from this alleged retractive application is arbitrary and capricious because DOT (1) provided no reasoned or reasonable explanation for suspending disbursements initially or for continuing that suspension after the government completed its review; (2) improperly relied on pretext to justify its decision; and (3) failed to consider the CTA's reliance interests in suspending disbursements.  Compl. Counts I-III. The CTA further alleges that DOT could not retroactively apply the new IFR to its grants and that its decision to do so violates various procedural requirements, including (1) the APA's notice-and-comment and delayed-effectiveness requirements (*id.*, Counts IV, V);  (2) the requirements that govern the imposition of remedies under Title VI and DOT's Title VI implementing regulations (*id.*, Counts VI, VII); and (3) the federal financial assistance regulations codified under 2 C.F.R. Part 200 (*id.*, Count VIII).  For its final APA claim, the CTA asserts that DOT had no statutory authority to suspend the CTA's grant funding.  *Id.*, Count IX. With respect to its constitutional claims, the CTA alleges that the alleged retroactive IFR application violates the Separation of Powers and the Spending Clause.  *Id.*, Counts X-XI.

This court granted the CTA's request for a temporary restraining order ("TRO"), filed alongside the complaint, on March 24, 2026.  Dkt. 29.  The parties subsequently agreed that the

5

TRO would remain in place until the completion of the CTA's anticipated preliminary injunction briefing, as well as DOT's anticipated motion to dismiss briefing. Dkt. 35.

The preliminary injunction motion subsequently filed by the CTA reiterates the arguments presented in the complaint and the attendant briefing requesting the TRO. Thus, the motion argues that the alleged retroactive application of the IFR to the CTA's existing grants was arbitrary and capricious, Dkt. 40-1 at 18-23; that the resulting funding suspension disregarded the APA's procedural requirements, *id.* at 23-25; that this retroactive application violated Title VI and DOT's regulations implementing that statute, *id.* at 26-27; that it likewise ran afoul of the regulatory framework governing federal financial assistance under 2 C.F.R. Part 200, *id.* at 27-28; that DOT's actions exceed its statutory authority, *id.* at 28-29; and, that the alleged retroactive IFR application violates the Spending and the Separation of Powers clauses because the CTA was not given notice of the new conditions attaching to the grants at issue prior to the funding suspension. Dkt. 40-1 at 29-30.

To rectify the alleged retroactive application of the IFR, the CTA asks this court to issue an order declaring that such application is unlawful and unconstitutional and enjoining DOT from applying the new IFR to the CTA's existing grants. Dkt. 40 at 1-2. The CTA maintains that it does not challenge the IFR itself. Dkt. 40-1 at 1.

### Argument

As sections that follow reflect, a dismissal under Rule(12)(b)(1) and 12(b)(6) rather than an entry of a preliminary injunction is warranted here. Section I overviews the applicable legal standard for the preliminary injunction that the CTA seeks, as well as the applicable legal standard governing DOT's Rule 12(b)(1) and 12(b)(6) challenges. Section II sets forth DOT's right to conduct grant award reviews for compliance with law (separate and apart from the regulatory

6

frameworks that the CTA accuses DOT of violating with the funding suspension at issue in this litigation). Section III overviews the essentially contractual nature of the CTA's claims and the consequent propriety of adjudicating those claims in the Court of Federal Claims. Section IV discusses the temporary nature of the funding suspension and the resulting lack of finality that is a necessary prerequisite to the APA claims that the CTA relies on to avoid the jurisdiction of the Court of Federal Claims. Section V discusses limitations on the enforcement of Title VI and DOT's implementing regulations that preclude the CTA's Title VI claims, as articulated in counts VI and VII. Section VI discuses enforcement constraints applicable to 2 C.F.R. Part 200, another regulatory framework the CTA invokes in order to avoid the jurisdiction of the Court of Federal Claims. Finally, section VII sets forth why absence of a congressional mandate in the statute the CTA relies on dooms the CTA's constitutional claims under the Spending and the Separation of Powers clauses.

## I. Legal Standard

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted); *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)) (emphasizing that a preliminary injunction is "an extraordinary remedy never awarded as of right"). In the first phase of analysis, the plaintiff must satisfy three threshold requirements: (1) that plaintiff will suffer irreparable harm prior to resolution of their claims; (2) likelihood of success on the merits, and (3) no adequate remedy at law. *Girl Scouts of Manitou Council, Inc., v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). For the first factor, the movant must make a "'strong' showing that reveals how it proposes to prove its case." *Bevis*, 85 F.4th at 1188 (quoting

7

W*inter*, 555 U.S. at 20). For the second factor, "a mere possibility of irreparable harm will not suffice." *Id.* If the movant fails on any one of these requirements, the court "must deny the injunction." *Girl Scouts of Manitou Council, Inc., v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d at 1086. If the plaintiff does meet this significant burden, "the district court must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986) (internal quotation marks omitted). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Further, dismissal "for failure to state a claim under Rule 12(b)(6) is 'proper when the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (concluding that dismissal under Fed. R. Civ. P. 12(b)(6) is proper "if the complaint fails to set forth enough facts to state a claim to relief that is plausible on its face") (citation omitted). And while the court "must accept all well pled factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor" for the purpose of a Rule 12(b)(6) challenge, *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 803 (7th Cir. 2003), the court is free to "consider evidence beyond the pleadings" when an additional challenge under Rule 12(b)(1) is mounted. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (explaining that because 12(b)(1) challenge tests court's "very power to hear the case" the district court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear

8

the case").[3] "In all cases, the party asserting federal jurisdiction has the burden of proof to show that jurisdiction is proper." *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 722 (7th Cir. 2012) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 289 U.S. 178, 189 (1936)). Ultimately, "subject-matter jurisdiction must be secure at all times, regardless of whether the parties raise the issue, and no matter how much has been invested in a case." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 853 (7th Cir. 2012).

## II.       DOT's Obligation to Monitor Compliance

While the CTA maintains that the funding suspension resulted from DOT's retroactive application of the new IFR, the language of the correspondence notifying the CTA of that suspension contradicts this claim. In particular, October 3, 2025 notification letters reflect that the suspension was instituted pursuant to an administrative review aimed at ensuring that the disbursements under the grant agreements were consistent with the Constitution, federal civil rights laws, including Title VI and the implementing regulations, and the EO 14173. Compl. Ex. A at 1; Compl. Ex. B at 1. While this correspondence does reference the new IFR, it does so only to note that the review is being conducted *in conjunction* with its issuance. *Id*. That the review proceeded in tandem with the issuance of the new IFR does not establish that the purpose of the review was to enforce that IFR. To presume that is to ignore the plain language of October 3, 2025 notification letters.

The CTA's claim that this review had to follow the regulatory framework of either Title VI or 2 C.F.R. Part 200 is without merit because neither of these two frameworks is applicable in

---

[3]       As footnote 1 reflects, defendant asks that the court take judicial notice of the two FTA Master Agreements that are incorporated in the grant awards that were attached as Exhibits C and D to the CTA's complaint. Each of these is pertinent to establishing that the jurisdiction rests with the Court of Federal Claims and thus to defendant's challenge under Rule 12(b)(1).

9

this instance. The Title VI regulatory framework for conducting investigations that the CTA relies on empowers the agency to conduct an investigation "whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply[.]" 49 C.F.R. § 21.11(c). As to the requirements found under 2 C.F.R. § 200.339, the CTA's briefing correctly notes that those requirements outline the process that should be followed when an agency considers instituting a funding suspension pursuant to a finding of noncompliance. Here, DOT does not allege that it initiated the review pursuant to information obtained through a periodic compliance review, report or a complaint, nor does it allege that the suspension was triggered by a finding of noncompliance. Both Title VI and 2 C.F.R. Part 200 are accordingly inapposite.

Rather, 2 C.F.R. § 200.300(a) imposes on DOT an overarching obligation to "manage and administer the Federal award" in such a manner "as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution" as well as "applicable Federal statutes and regulations[.]" 2 C.F.R. § 200.300(a). "In administering awards in accordance with the U.S. Constitution," DOT "must take account of the heightened constitutional scrutiny that may apply under the Constitution's Equal Protection guarantee for government action that provides differential treatment based on protected characteristics." 2 C.F.R. § 200.300(c). DOT is thus tasked with ensuring that federal funds are not spent in a way that violates the Constitution or the applicable federal laws and regulations separate and apart from the regulatory provisions found under 49 C.F.R. § 21.11 and 2 C.F.R. § 200.339.[4]

---

[4] These provisions negate the CTA's argument that the agency is acting in excess of its statutory authority. Dkt. 40-1 at 28-29.

The FTA Master Agreements, [5] incorporated by reference in each of the two FFGAs governing grants at issue, further support DOT's authority to conduct administrative reviews for compliance with applicable laws and regulations. For instance, these agreements provide that the agency "may take an enforcement action" if the recipient "violates an applicable federal law, regulation, or requirement, or does not follow applicable federal guidance." 2016 FTA Master Agreement at 2 (Sec. 1(c)); 2024 FTA Master Agreement at 3 (Sec. 1(c)). Further, the agreements broadly reference "oversight and reviews" that the agency "may conduct" in addition to its express authorization "to conduct oversight of the Recipient's . . . compliance with federal requirements for . . . procurement . . . management and finance. 2016 FTA Master Agreement at 11-12 (Sec. 3(h)(2)(c)); 2024 FTA Master Agreement at 15-16 (Sec. 3(h)(2)(iii)). To help effectuate these provisions, the agreements empower the agency to "inspect and audit records and information" as well as "inspect all work and materials related to [the CTA's] Award." 2016 FTA Master Agreement at 33-34 (Sec. 9(c)(1)-(2)); 2024 FTA Master Agreement at 48 (Sec. 9(c)(1)-(2)). While the agency does not consider the temporary funding suspension that was instituted for the duration of the administrative review an 'enforcement action' within the meaning of the FTA Master Agreements, that provision, together with other above-referenced contractual oversight and auditing rights, helps illustrate DOT's right to conduct compliance reviews outside the parameters

---

[5] As noted in footnote 1, each FTA Master Agreement is available on defendant's website. United States Department of Transportation: Federal Transit Administration, *FTA Grant Agreements*, (last updated on Nov. 26, 2025), https://www.transit.dot.gov/funding/grantee-resources/sample-fta-agreements/fta-grant-agreements. The FTA Master Agreement dated October 1, 2016 and incorporated in the Full Funding Grant Agreement respecting the RPM Program ("2016 FTA Master Agreement") is available at https://www.transit.dot.gov/sites/fta.dot.gov/files/FTA%20Master%20Agreement%20FY2017%20-%2010-1-2016.pdf. The FTA Master Agreement dated May 2, 2024 and incorporated in the Full Funding Grant Agreement respecting the RLE Project ("2024 FTA Master Agreement") is available at https://www.transit.dot.gov/sites/fta.dot.gov/files/2024-05/FTA-Master-Agreement-v31-05-02-2024.pdf.

11

of either 49 C.F.R. § 21.11 or 2 C.F.R. § 200.339. To the extent CTA disagrees that the terms and conditions allow DOT to suspend funds in this manner, that disagreement is a dispute over the terms of the grant agreement, which must be heard in the Court of Federal Claims.

In sum, DOT's choice to manage the two grants at issue in this litigation through a temporary suspension of disbursements pending a review for compliance with federal law is consistent with its supervisory role, as envisioned under 2 C.F.R. § 200.300 and effectuated through the FTA Master Agreements. To the extent DOT failed to honor the terms of either the FFGAs or the FTA Master Agreements that those FFGAs incorporate, the Court of Federal Claims, as further set forth in section III below, is the appropriate venue for vindicating such breaches.

## III. Absence of Jurisdiction in the District Court Based on Tucker Act Principles

This court lacks jurisdiction over the CTA's claims because those claims, as further discussed below, are fundamentally contractual. As such, all causes of action arising out of DOT's suspension of federal grant funding to the CTA are subject to the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act. This includes all the CTA's constitutional and APA claims; its claims under Title VI, DOT's Title VI implementing regulations, and 2 C.F.R. Part 200; and even its basic breach-of-contract claims, which the CTA strategically avoids asserting in this case.

The federal government enjoys sovereign immunity and may be subject to suit only when it has explicitly waived that immunity. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). Waivers of sovereign immunity must be strictly construed to protect the prerogatives of the government and to ensure the courts stay within the jurisdiction provided by Congress. *Lane v. Pena*, 518 U.S. 187, 192 (1996). In the APA, Congress provided a limited waiver of sovereign immunity for claims against the United States by persons "adversely affected . . . by agency action"

12

if they "seek[ ] relief other than money damages." 5 U.S.C. § 702. However, the APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id*.

For contract claims against the government, the Tucker Act establishes review in the Court of Federal Claims. 28 U.S.C. § 1491. When it applies, Tucker Act jurisdiction is exclusive and precludes jurisdiction in district court under the *APA's* waiver of sovereign immunity. The Court of Federal Claims is the "single, uniquely qualified forum for the resolution of contractual disputes." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).

Because Congress has limited the forum and the remedies for contract claims against the government, a litigant whose claim is essentially contractual cannot "avoid the jurisdictional and hence remedial) restrictions of the Tucker Act" by simply asking for injunctive relief in district court. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (explaining that Section 702 of the APA "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes"); *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual."); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("[T]he APA does not waive sovereign immunity for contract claims seeking specific relief."). In other words, the Tucker Act impliedly forbids an APA action seeking injunctive and declaratory relief if that action is a disguised breach-of-contract claim. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*"); *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam) ("*California*").

13

"Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [his] claims, and . . . the type of relief sought.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker,* 198 F.3d 372, 375 (2d Cir. 1999) and *Megapulse,* 672 F.2d at 968)*.* Thus, this jurisdictional inquiry, known as the "*Megapulse* framework," does not turn on a plaintiff's preferred characterization of its claim.

### A.      *California* and *NIH* Control.

The Supreme Court's recent orders in *California* and *NIH* foreclose plaintiff's attempt to bring APA challenges, seeking the restoration of government funding pursuant to grant contracts, in district court.  *See NIH,* 145 S. Ct. at 2664 (Gorsuch, J., concurring part and dissenting in part) (emphasizing that the "reasoning" of Supreme Court decisions regarding interim relief "binds lower courts as a matter of vertical *stare decisis*"); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (explaining that the Supreme Court's "interim orders . . . inform how a court should exercise its equitable discretion in like cases").

In *California*, the plaintiffs challenged under the APA the Department of Education's termination of various education related grants under certain federal grant programs.  604 U.S. at 650.  They alleged that the grant terminations were arbitrary and capricious in violation of the APA and sought a temporary restraining order from a district court "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and continue paying obligations as they accrue."  *Id*.  The district court had found that plaintiffs were likely to succeed on the merits of their claim that the grant terminations were arbitrary and capricious under the APA since the agency failed to conduct

14

individualized analyses of the grants or offer a reasoned explanation for its *en masse* grant terminations. *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 72, 76-78 (D. Mass. 2025). As a remedy, the district court ordered the government to pay out past due grant obligations and continue to pay its grant obligations, holding that the Tucker Act did not preclude jurisdiction because the plaintiffs invoked federal statutes and regulations and did not style their action as one for money damages. *Id*. at 76, 80.

The Supreme Court stayed the district court's order. *See California*, 604 U.S. 650. As the Court explained, the district court had "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying grant obligations as they accrue." *Id*. But the district court likely lacked jurisdiction because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* at 651 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, such suits must be brought in the Court of Federal Claims, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. 1491(a)(1)).

Rooted in *California* is the principle that a plaintiff's putative APA claim, disguised as a breach-of-contract claim, belongs in the Court of Federal Claims. The Department of Education's grant agreements had "the essential elements of a contract"—offer, acceptance, and consideration. *See Henke v. United States Dep't of Commerce*, 83 F.3d 1445, 1450-1451 (D.C. Cir. 1996). And those grant agreements were "the source of the rights upon which" the plaintiffs based their claims. *Megapulse*, 672 F.2d at 968. Without a grant agreement (a contract), the plaintiffs would have had no right to payment in the first place.

15

The Supreme Court reiterated its holding in *NIH*. There, the government changed its funding to align with changed policy priorities mandated by several executive orders. *NIH*, 145 S. Ct. at 2660 (Barrett, J., concurring in part). In doing so, the government issued internal guidance documents describing those priorities and terminating numerous grants. *Id*. at 2661 (Barrett, J., concurring in part). The district court concluded that the government's grant termination decision was arbitrary and capricious under the APA. *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 791 F. Supp. 3d 119, 179 (D. Mass. 2025). In upholding the district court's finding that it had subject matter jurisdiction over the grant terminations, the First Circuit reasoned the case could proceed because the district court provided "declaratory relief that is unavailable in the Court of Federal Claims" and the case does not "depend on the terms or conditions of any contract." *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 43–44, 47, 50 (1st Cir. 2025). The First Circuit distinguished *California* on the grounds that *California* was limited to an order "to pay out past-due grant obligations." *Id.* at 50–51 (quoting *California*, 604 U.S. at 650).

The Supreme Court disagreed and stayed the district court's judgment vacating the government's termination of the individual grants. *NIH*, 145 S. Ct. at 2660. The Supreme Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* at 2660 (cleaned up).

In light of the Supreme Court's orders in *California* and *NIH*, various courts have found that APA claims, brought by grantees or beneficiaries of government grants, are barred by the Tucker Act. *See Thakur v. Trump*, 163 4th 1198, 1204 (9th Cir. 2025) (court likely lacked jurisdiction over APA claim that the government's termination of research grants was arbitrary

16

and capricious because it was designed to enforce an obligation to pay money pursuant to the grants); *American Association of Physics Teachers, Inc. v. National Science Foundation*, 804 F. Supp. 3d 45 (D.D.C. 2025) (court likely lacked jurisdiction over claims brought by grantees who sought declaratory and injunctive relief on the grounds that the termination of their grants and the change in priorities violated the APA).

Applying the *Megapulse* framework to the claims at issue here makes clear that plaintiff's claims are in essence contractual claims for payment of the suspended funding over which this court lacks jurisdiction.

### B.       Source of Plaintiff's Rights

First, though the CTA styled its claims as stemming from the APA, Title VI and DOT's Title VI implementing regulations, 2 C.F.R. Part 200, and the Constitution, the essence of the complaint is that the government should not have suspended funding and must continue performing pursuant to the FFGAs.  Because the CTA would have no cause of action against DOT absent those FFGAs, the CTA's APA claims are necessarily "based on' the [] grants," *NIH*, 145 S. Ct. at 2658 (quoting *California*, 604 U.S. at 651), and this court lacks jurisdiction.  To conclude otherwise and determine that the CTA has some independent, extra-contractual basis to bring an APA claim would swallow the rule.  It would mean that any recipient could bypass the Court of Federal Claims, obtain equitable relief in district court, and force continued performance of federal contracts through the APA.  That would gut the Tucker Act's exclusivity and undo Congress's deliberate channeling of contract disputes with the United States.

In *California*, the plaintiffs brought APA claims alleging that across-the-board cuts to DEI-related grants were arbitrary and capricious and that the grant terminations were "contrary to the

17

Department's regulations and arbitrary and capricious when viewed in light of the statutes authorizing those grants." *See* Opposition to Application at 22, *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (No. 24A910), 2025 WL 963588. They claimed that "[t]he controversy thus centers around federal statutes and regulations" rather than contract rights. *Id.* Yet the Supreme Court still found that the government was likely to succeed in showing that the claims belonged in the Court of Federal Claims under the Tucker Act. *California*, 640 U.S. at 651.

Similarly, in *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) ("*Climate United*"), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025), a grantee alleged that EPA's termination of its grant agreements violated OMB guidance, which the grantees interpreted to prohibit termination. The court reasoned that any violation of law "expressly refers to and incorporates the grant agreements," and that "the fact that the government's termination of a contract 'also arguably violates certain other regulations does not transform the action into one based solely on those regulations.'" *Id.* at 821 (quoting *Ingersoll-Rand*, 780 F.2d at 78).

Further, in *Sustainability Institute*, 165 F.4th 817 (4th. Cir, 2026), nonprofit organizations and local governments that were awarded or were subrecipients of federal grants brought APA challenges concerning the government's termination or suspension of environmental and agricultural grants pursuant to executive orders. Plaintiffs argued that their APA claims arose from the Constitution and federal statutes rather than contract because they sought "forward-looking injunctive and declaratory relief." 165 F.4th at 828. The Fourth Circuit rejected that argument, explaining that the alleged statutory and constitutional violations did not alter the essentially contractual nature of plaintiffs' claims. *Id.* The *Sustainability Institute* plaintiffs identified "no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued

18

payments on those grants." *Id*. at 827. Thus, the court found, the plaintiffs' "injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id*. (quoting *NIH*, 145 S. Ct at 2664). Accordingly, the Fourth Circuit held that the plaintiffs' claims were foreclosed by *California* and *NIH*. *See also Solutions in Hometown Connections v. Noem*, 165 F.4th 835, 843 (4th Cir. 2026) ("Without that contractual basis, the plaintiffs could claim no relief.").

The same principles apply here. The CTA's allegations that the government violated law or failed to follow its own regulations in suspending funding it had committed to under the FFGAs cannot transform this action, which was undertaken pursuant to the FFGAs' terms, into one based solely on those laws and regulations. Nor can its claim that the government acted without reason in suspending funding. In essence, the CTA claims DOT breached the FFGAs by suspending funding without affording the CTA appropriate notice and an opportunity to respond. Those are claims that must be analyzed solely based on contract principles in the Court of Federal Claims.

### C. The CTA's Requested Remedies

The relief that the CTA seeks is likewise contractual in nature. It seeks an injunction restraining the government from refusing to disburse funding under the FFGA grants. Compl. at 49 (Prayer for Relief D) (asking this court to preliminarily and permanently enjoin defendants from "refusing to disburse funding under the CTA's Red Line Extension and Red and Purple Modernization grants"). In other words, the CTA asks the court to rescind the October 3, 2025 funding suspension, reinstate past due FFGA payments, and compel continued federal performance under the FFGA grants (by paying money). That relief is functionally indistinguishable from specific performance (and indeed of little value outside of that specific performance, as perhaps best illustrated by a holding discussed in part VI below).

19

These classic contractual remedies are generally *unavailable* against the government. *Ingersoll-Rand Co.*, 780 F.2d at 79–80 (order "reinstating the original award of [a] contract . . . amount[ed] to a request for specific performance"); *Climate United*, 154 F.4th at 823 (seeking an injunction barring termination and ordering disbursement of grant funds was identical to requesting "specific performance" of a grant agreement). As courts have repeatedly held, a plaintiff may not use the APA to compel the United States to perform contractual obligations, regardless of whether the relief is characterized as equitable or non-monetary. *Presidential Gardens Assocs. v. U.S. ex rel. Secretary of Housing and Urban Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States." (citing *B.K. Instrument, Inc. v. U.S.*, 715 F.2d 713, 728 (2d Cir. 1983)).

Like the *California* and *NIH* plaintiffs, the CTA seeks relief in the form of declaratory and injunctive relief that requires the government to pay money on contracts. Like the *California* and *NIH* plaintiffs, the CTA challenges the termination or suspension decision under the APA, on the grounds that it is arbitrary and capricious and contrary to law. And like the district courts in *California* and *NIH*, this court too "lack[s] jurisdiction . . . under the APA" to compel the Government "to pay money" under the grant agreements, *California*, 604 U.S. at 651, or "to order relief designed to enforce any obligation to pay money pursuant to those grants," *NIH*, 145 S. Ct. at 2658 (internal quotation marks omitted).

It is of no moment that the CTA seeks only declaratory and injunctive relief to set aside the October 3, 2025 decision to suspend payments under the FFGA grants. Compl., at 49 (Prayer for Relief D). The result would still in essence require the government to pay money. The *NIH* plaintiff similarly "invoked the APA only to vacate the government's decision to terminate" grants

20

rather than seeking past due sums, and the Supreme Court's stay order affirms that such cases must be heard in the Court of Federal Claims. *NIH*, 145 S. Ct. at 2664 (2025) (Gorsuch, J. concurring in part and dissenting in part); *see also id.* ("[A]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants."); *see also Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d 563, 569 (E.D. Va. 2025) (fact that plaintiffs did not explicitly request money damages, but rather declaratory and injunctive relief, did not help them plead around Tucker Act jurisdiction), appeal docketed, Nos. 25-2087 and 25- 2107 (4th Cir. Aug. 29, 2025). And with good reason: if plaintiffs could evade the Tucker Act just by requesting declaratory relief, virtually *any* contract suit could be transmuted into an APA claim. *See U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 165 (D.D.C. Mar. 11, 2025) ("Sure, the [plaintiff] seeks to set aside agency action. But the agency action that it asks the Court to reverse is the Government's decision to cease a financial relationship with the [plaintiff]. This is not standard injunctive fare.").

When plaintiff's claim is "[s]tripped of its equitable flair," the "requested relief seeks one thing: [T]he Court to order the Government to stop withholding the money due" under its grant agreements. *Catholic Bishops*, 770 F. Supp. 3d at 163. "In even plainer English: [they] want[] the Government to keep paying up." *Id.* Such a claim for "the classic contractual remedy of specific performance," "must be resolved by the Claims Court." *Id.* (citations omitted).

### D. This Court's Opinion Granting the CTA's TRO

In its order granting the CTA's TRO motion ("TRO Order"), this court concluded that it had jurisdiction over CTA's lawsuit because it includes a claim under Title VI and because it

alleges that DOT suspended funding based on a policy of retroactively applying the IFR.[6] At this preliminary injunction and motion to dismiss phase, the court should now conclude it lacks jurisdiction because the CTA's claims mischaracterize the underlying facts and because notwithstanding the labels affixed to those claims, they are in essence contractual.

As an initial matter, jurisdiction cannot be based on the CTA's characterization of its claims because they are unsupported in the record. As explained in section (I) above, the decision to temporarily suspend funding was not part of any Title VI enforcement proceeding and was not caused by a retroactive application of the IFR. Rather, the funding suspension was taken pursuant to terms of the FFGAs. Therefore, the CTA cannot bootstrap jurisdiction in this court using legal claims that are contradicted by its own filing.

More importantly, each and every claim the CTA asserts in its complaint amounts to a mere refashioning of the causes of action that arise out of DOT's failure to pay under the FFGAs. The CTA's complaint is that the federal government is unlawfully suspending performance required by the FFGAs. That is contract enforcement, full stop. Critically, the CTA cites no legal duty independent of the FFGAs as authority requiring funding from the government. Indeed, in the absence of the FFGAs, plaintiff would not have any cause of action at all.

Therefore, regardless of the labels that the CTA attaches to its claims, they are in essence contractual. *See, e.g., NIH*, 145 S. Ct. at 2658 (APA claims relating to grant terminations belong in Federal Court of Claims); *Sustainability Institute v. Trump*, 165 F.4th 817 (4th. Cir, 2026) ("the alleged statutory and constitutional violations do not alter the essentially contractual nature of

---

[6] This court found that it has jurisdiction This court found that it has jurisdiction consistent with the *NIH* decision by describing CTA's claim as a challenge to DOT's policy of retroactively applying the IFR. Characterized as such, the court held it has jurisdiction to grant vacatur of DOT's retroactive application of its IFR, noting that "CTA does not bring claims based the terms of the grants themselves." TRO Order at 7.

Plaintiffs' APA claims before us on appeal"); *Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (where one claim was a due process claim, explaining that "[b]ecause the United States's obligation is in the first instance dependent on the contract, these claims are contractually based" and "the district court lacks jurisdiction under the Tucker Act"); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that district court lacked jurisdiction pursuant to the Tucker Act because the right to payment "is created in the first instance by the contract, not by the Debt Collection Act," the statutory vehicle through which plaintiff asserted its claim).

Put another way, regardless of the fact that the CTA adeptly tries to avoid asserting breach-of-contract claims in its complaint, this court will ultimately need to decide whether DOT's temporary funding suspension breached the terms of the FFGAs. Accordingly, even if the court preliminarily enjoins DOT from withholding funding based on a retroactive application of the IFR, the court must still evaluate whether such withholding is appropriate under the terms of the FFGAs in order to grant the CTA the ultimate relief it seeks in this case — continued payment under the grant. As the court notes in its opinion, "the only claims in the case seek vacatur of the IFR, which would have the result of requiring resumption of payment, *absent some further explanation from Defendants as to why payment should continue to be suspended.*" (emphasis added)). Accordingly, enjoining the retroactive application of the IFR against the CTA's grants — a rationale that DOT is not relying on to withhold CTA funding — will not provide the CTA the relief it requests unless the court also determines whether withholding is justified under the terms of the FFGAs. That is a straightforward contractual claim, which must be adjudicated in the Court of Federal Claims.

23

## IV. Inapplicability of APA to Agency Actions That Are Not Final

Even if the CTA were permitted to reframe its essentially contractual claims as claims arising under the APA, this suit would nonetheless merit dismissal because those APA claims are premature. While the APA "embodies a 'basic presumption of judicial review,'" *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)), actions not made explicitly reviewable by statute are only reviewable when "final," *see* 5 U.S.C. § 704. In turn, an agency action is final only if two conditions are met: (1) "the action must mark the 'consummation' of the agency's decision making process" rather than being "of a merely tentative or interlocutory nature[,]" and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). In the absence of a final agency decision, the court lacks subject matter jurisdiction under the APA. *See Lunney*, 319 F.3d at 554; *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 938-39 (D.C. Cir. 2021) (holding that both *Bennett* prongs must be met, and that where agency procedures were still ongoing, there was no final agency action). That the finality of an agency's action is a key factor is further reflected by Justice Barrett's concurrence in *NIH*, 145 S. Ct. at 2662 (observing that "whether claims about the guidance in this case will succeed" in the district court remains in doubt since it is "not obvious" whether the NIH guidance prompting grant terminations at issue in that litigation constitutes "final agency action."). *Id.* (Barrett, J., concurring in part).

Relevant correspondence reflects that no final agency action has occurred here. As discussed in section (A) above, the December 1, 2025 letters made expressly clear that DOT had completed its *initial* administrative review respecting both grants. Compl., Exs. J, K. That the review was not complete was further indicated by the agency's assertion that it had not yet received

24

all materials it considered relevant in response to its information requests. Ex. J at 1 ("Although CTA provided some materials in response to our letter of October 7, 2025, it did not provide information responsive to all the Department's requests."); Ex. K at 1 (same). It was likewise underlined by the preliminary nature of the agency's findings to date, making those findings tentative and interlocutory under the *Bennett* test. *Id*. (advising, in both letters, that "the CTA and its prime contractors *appear* to have considered race and sex as part of both the prime and subcontract bidding and contract awards") (emphasis added). Finally, the lack of finality was further indicated by the agency's description of its intended next steps. Ex. J at 2 (advising that "[o]nce the Department has reviewed CTA's certification, DOT will notify CTA whether any other deficiencies need to be addressed before DOT resumes disbursements for the RPM Program"); Ex. K at 2 (advising that "[o]nce the Department has reviewed CTA's certification and response and has determined that the DBE reevaluation timeline is sufficient, DOT will notify CTA whether any other deficiencies need to be addressed before DOT resumes disbursements for the [RLE] Project.").

The plain language of DOT's letters thus makes clear that the agency's suspension was intended to be temporary pending the final determination. Because the APA therefore precludes judicial review of the CTA's claims at this time, the CTA's APA claims merit dismissal and the court need not reach the question of whether DOT's actions qualify as contrary to law, arbitrary or capricious.

V.     **Limitations on the Enforcement of Title VI and DOT's Implementing Regulations**

The CTA's attempt to invoke the statutory language of Title VI in order to establish this court's jurisdiction and thus sidestep the Tucker Act, *see* Compl. Count VI, should fail because the language of 42 U.S.C. § 2000d-2 limits that jurisdiction to instances where the termination or

25

refusal to grant or continue financial assistance occurs "upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1 of this title." Section 2000d-1 in turn sets forth the scope of "rules, regulations, or orders of general applicability" that may be promulgated under it and further provides that compliance with any thus adopted requirement can be accomplished in a number of ways, including (though not limited) to "termination of or refusal to grant or to continue assistance." Here, DOT has not terminated, refused to grant, or refused to continue financial assistance, and its temporary suspension is not pursuant to a finding of failure to comply with a requirement imposed under section 2000d-1.

Each of the three holdings the CTA relies on for the proposition that district courts can exercise Title VI jurisdiction in the wake of a grant termination or suspension is distinguishable from the facts of this case. In *President & Fellows of Harvard Coll. v. U.S. Dep't of health & Hum. Servs.*, 798 F. Supp. 3d 77, 107 (D. Mass. 2025), the court expressly excepted grant freezes from the scope of its Title VI analysis, emphasizing that "the title VI violations would be the termination decisions rather than the freezes." *Id.* (emphasizing that "as to the Title VI claim, the Termination Letters form the sole basis of the claim"). The court additionally noted that proceeding with the Title VI claim would not necessarily obligate the government to make any monetary payments since the sole purpose of "the resolution of the Title VI claims here will merely determine whether statutory procedural requirements were satisfied." *Id.* at 108. Here, by contrast, proceeding with the Title VI claim — at least absent dissolution of the TRO currently in place — at least absent dissolution of the TRO currently in place – necessarily obligates the government to continue making payments, precisely because, unlike in *President & Fellows of Harvard Coll.*, the funding action at issue is a temporary suspension rather than a final termination of the federal award.

26

The two remaining holdings the CTA relies on are likewise distinguishable. *Duxbury Trucking, Inc. v. Mass. Highway Dep't*, 2009 WL 1258998, at *5 (D. Mass. Apr. 29, 2009) holds that courts can review an agency's handling of a private litigant's Title VI claim, a set of facts with little in common with the facts at issue in the instant suit. And as to *Am. Ass'n of Univ. Profs. v. Trump*, 815 F. Supp. 3d 907 (N.D. Cal., 2025), the factual record in that case showed that funding suspensions were effectuated pursuant to the DOJ's Notice of Findings, which itself cited Title VI violations and was then used as basis for agency's demand that plaintiffs pay considerable penalties if they wished to unsuspend funding. *Id*. at 964-966. Here, by contrast, DOT began the suspension at the very outset of its investigation, and DOT has merely made a tentative preliminary finding that CTA "appears to have [impermissibly] considered race and sex" and the agency has reserved the right to determine whether any additional deficiencies might need to be addressed before it unsuspends funding. Compl. Ex. J, K. (For that matter, even the preliminary finding of apparent impermissible consideration of race or sex was found to be an Equal Protection Clause, rather than a Title VI, violation. Compl. Ex. J at 1; Compl. Ex. K at 1.)

Finally, neither of these three courts has had the occasion to consider whether funding recipients have a freestanding right to enforce the regulatory framework the CTA relies on, codified under 49 C.F.R. § 21 and presented as basis for count VII of its complaint. As noted above, section 2000d-2 encompasses "termination or refusal to grant or continue financial assistance" that occurs "upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1." 42 U.S.C. § 2000d-2. While the procedural framework under 49 C.F.R. § 21 may be relevant to the determination as to whether section 2000d-1 was fairly enforced against a non-complying recipient, it is not clear that failure to follow that framework gives rise to a separate standalone cause of action. The language of this regulatory framework's judicial review

27

provision indeed merely reiterates the statutory parameters for such review. 49 C.F.R. § 19 (stating that "[a]ction taken pursuant to section 602 of the Act is subject to judicial review as provided in section 603 of the Act."). In doing so, this language suggests that the provision does not create any causes of action in addition to those that are already available under the statutory language of Title VI (which the CTA relies on as the basis for its count VI).

Caselaw in the wake of Supreme Court's ruling in *Alexander v. Sandoval*, 532 U.S. 275 (2001) establishes that "[t]here is no freestanding private right of action to enforce a statute's implementing regulation unless Congress has clearly indicated, expressly or impliedly, to the contrary." *American Ass'n of People with Disabilities v. Harris*, 605 F.3d 1124, 1133 (11th Cir. 2010). To determine whether an implementing regulation can be judicially enforced, "a court must examine the text, history, and structure of both the statute and the regulation to see if Congress provided both a right to enforce the regulation and a remedy of successful plaintiffs." *Id.* The review of the challenged regulation should be "particularized" and also include "a determination of whether the regulation effectuates the statutory right and corresponding remedy." *Longberg v. City of Riverside*, 571 F.3d 846, 852 (9th Cir. 2009) (applying this test to conclude that plaintiff could not enforce an implementing regulation requiring public entities to develop transition plans by way of providing meaningful access for constituents with disabilities). Enforceability is ultimately limited to "[o]nly those regulations effectuating the statute's clear prohibitions or requirements[;]" it does not sweep in "regulations that do not encapsulate the statutory right and the corresponding remedy." *Id.* at 850-51. The regulations that "interpret and define the scope" of a statute fall in the latter category." *American Ass'n of People with Disabilities*, 605 F.3d at 1135 (finding that such regulations "do not, themselves, create a private right of action and a remedy.").

28

It is far from clear, at the minimum, that the regulations the CTA seeks to enforce in its Count VII effectuate the statutory right and the corresponding remedy, as opposed to simply interpreting and defining the scope of the procedural protections contemplated under § 2000d–1 for the purpose of establishing rules that should govern DOT's own administrative proceedings under Title VI. The relevant statutory right in this instance is the right to obtain judicial review of an agency's enforcement action. *Sandoval*, 532 U.S. at 289 (observing that "every agency enforcement action is subject to judicial review under § 2000d–2"). The CTA, however, is not merely asserting that the funding suspension undertaken by DOT qualifies as an (unlawful) enforcement action within the meaning of § 2000d–1 (which § 2000d–2 would then render subject to judicial review). Rather, the CTA is also asserting a wholesale breach of the regulatory framework effectuated by DOT in order to implement § 2000d–1. Compl. ¶ 174-76 (counting off "mandatory procedural protections" established under 49 C.F.R. § 21.11-21.19 as a basis for assertion that DOT has failed to effectuate the funding suspension "in accordance with its own Title VI regulations" (internal quotations omitted)). The sheer language of these regulations reflects that their intent was to operationalize, as a practical matter, the procedural protections that the recipients of federal money disbursed by DOT ought to receive before DOT undertakes an enforcement action. To take just a few examples, 49 C.F.R. § 21.15(b) mandates that "hearings shall be held at the offices of the Department in Washington, D.C., at a time fixed by the Secretary unless he determines that . . . another place be selected"; § 21.15(d) provides that evidentiary rules applicable to hearings shall encompass "rules or principles designed to assure production of the most credible evidence available and to subject testimony to test by cross-examination"; and, § 21.15(e) permits consolidation of multiple hearings where circumstances indicate that such consolidation is warranted. Because these regulations, on their face, simply interpret and define

29

the scope of the procedural safeguards promulgated by DOT to govern its administrative proceedings under Title VI, it is at best dubious whether they supply a cause of action against DOT separate and apart from any claim that an enforcement action undertaken by DOT has run afoul of § 2000d–1.

## VI.    Limitations on the Enforcement of 2 C.F.R. Part 200

The CTA's attempt to hold DOT accountable for failing to comply with 2 C.F.R. Part 200 through litigation in the district court runs counter to a principle that, like other similar principles discussed in section (III) above, mandates the jurisdiction of the Court of Federal Claims: The district court lacks jurisdiction where the "non-monetary relief has little, if any, independent value from the future potential of monetary recovery." *Vera Institute of Justice v. U.S. Department of Justice*, 805 F. Supp. 3d 12, 33 (D.C. Cir. 2025). The court in *Vera Institute* rejected plaintiff's attempt to enforce requirements concerning grant terminations under 2 C.F.R. Part 200 on grounds that the relief plaintiff sought to obtain by enforcing this provision was primarily monetary and therefore within the ambit of matters that belong in the Court of Federal Claims. As the court explained, plaintiff's request for a declaration that grant terminations as effected by defendant violated these regulatory requirements demonstrated "that the value of the non-monetary relief was the avoidance of future grant terminations." *Id.* at 33. And because this requested non-monetary relief would "merely ensure that the monetary relief will continue," *see id.*, "source of the right and the relief requested" was "at its essence contractual," and therefore insufficient to establish "this court's jurisdiction over this claim." *Id.* The CTA's claims are functionally indistinguishable, as there can be no doubt that the continued funding of the two grants at issue in this litigation is the primary, if not the only, function of declaring DOT in violation of 2 C.F.R. Part 200.

30

Moreover, at least one court has indicated that there is no private cause of action under 2 C.F.R. Part 200. In *Xirum v. U.S. Immigration and Customs Enforcement*, 2024 WL 5473667, at *5 (Sept. 27, 2024), court considered, among other arguments, plaintiff's claim that defendants, a federal agency's funding recipients, were in violation of "known federal restrictions found within the Uniform Administrative Requirements ("UAR"), codified at 2 C.F.R. Part 200." While the court's eventual conclusion that plaintiffs lacked a cause of action under this regulatory framework rested in part on the finding that the relevant underlying statute lacked "rights-creating language needed to imply a private right of action," *id.* at 6, the court additionally found that such right of action does not exist because the very language of the enforcement provision found in 2. C.F.R. § 200.339 limits that provision to remedies "that the Federal awarding agency may impose on a non-Federal entity for its noncompliance with the regulations or terms and conditions of a Federal Award." *Id*. Accordingly, because this language indicated that "even the Office of Budget and Management did not intend detainees to enforce the regulations," *id.*, private litigants lacked a cause of action to proceed with their claims against the funding recipients.

Because there is likewise no indication that the Office of Budget and Management intended to permit a funding recipient to sue the federal agency that provided its funding for deficient adherence to the requirements of 2 C.F.R. Part 200, the CTA lacks a cause of action to enforce this regulatory framework in this court. While the CTA relies on the holding in *New Jersey v. United States Department of Transportation*, 26-CV-00939, 2026 WL 323341 (S.D.N.Y. Feb. 6, 2026) for the proposition that the court invalidated the funding freeze at issue in that litigation for noncompliance with these regulations, the language of that decision reflects that the court found plaintiffs likely to succeed on their APA claims and that the issue of whether a right of action to enforce 2 C.F.R. Part 200 exists to begin with was never before it. For that reason, the *New Jersey*

31

holding does not establish the CTA's entitlement to vindicate the requirements of 2 C.F.R. Part 200 in this court.

## VII.    Absence of a Congressional Directive Under the Statute the CTA Relies On

Finally, the CTA's constitutional claims are not viable because 49 U.S.C. § 5309, the statute the CTA relies on as "the reticulated statutory scheme" that governs its grants, Dkt. 40-1 at 28, does not incorporate a congressional mandate that funds be spent on those particular grants. The CTA is of course correct that only Congress can obligate federal funds. *Id*. at 29. But the CTA has not pointed to a congressional mandate directing DOT to expend money on the specific grants at issue in this litigation.

A recent decision in this circuit, *Chicago Women in Trades vs. Department of Labor et al.,* 2025 WL 1331743 (N.D. Ill., May 7, 2025) is instructive on this point.  There, the court had the occasion to consider whether Department of Labor's termination of five grants previously awarded to plaintiff violated the Spending Clause as well as Separation of Powers.  The court found that only one of the five grants merited constitutional protection because the underlying congressional appropriation expressly mandated that certain amount of funding must be used for grants awarded under a specific statute and that statute, in turn, mandated that money must be spent on certain clearly defined activities. *Id.* at *5 (emphasizing that "the WANTO Act and relevant appropriations acts do not allow for discretionary action by the Executive and contain a single permissible use of Executive authority: spend the money Congress allocated for the WANTO grants").

By contrast, each of the four remaining grants was grounded in statutory authorizations whose language reflected no express congressional directive as to how money must be spent and thereby left those decisions to agency's discretion.  In particular, the first of those grants was grounded in the 2024 Appropriations Act which provided that the money at issue "*may* be used for

grants to serve and promote the interests of women in the workforce." *Id*. at 6 (emphasis not added). The second of these grants was grounded in the Consolidated Appropriations Act of 2021, which provided that "equity intermediaries" were among possible funding recipients, but without mandating that those intermediaries must in fact be funded. *Id*. at 7 ("The use of the preposition 'including' indicates that the Secretary of Labor may choose to fund an 'equity intermediary' but that it is not required to do so."). Lastly, the remaining two grants likewise lacked the authority of an express congressional authorization, notwithstanding the fact that the legislative history behind the underlying funding source, the 2021 Appropriations Act, reflected Congress's interest in certain priorities. *Id*. at 8-9 (finding that "this legislative history, although referencing concerns over gender inequity, does not carry the force and effect of a congressional mandate.").

Provisions of 49 U.S.C. § 5309 mirror the broad, discretion-permitting language of the congressional acts underlying those four grants. For instance, the Secretary "*may* make grants under this section to State and local governmental authorities" to finance certain projects. 49 U.S.C. § 5309 (b)(1)-(2) (emphasis added). In the same vein, the Secretary "*may* make a grant under this section for new fixed guideway capital projects, small start projects, or core capacity improvement projects" pending certain determinations. *Id*. (c)(1) (emphasis added). Similar discretion-permitting provisions recur throughout the statute. *See, e.g., id.* (h)(3) (the "Secretary may provide Federal assistance for a small start project" pending certain determinations); *id*. (h)(7) (to the extent assistance cannot be provided via a single grant, "the Secretary may execute an expedited grant agreement"); *id*. (i)(1)(I)(i) (after entering into certain grant agreements, "the Secretary may issue a letter of intent to the applicant that announces an intention to obligate" certain future funding sources). That this language reflects Congress's deliberate decision to vest the agency with discretion is confirmed by the use of "shall" in other contexts within this statute.

33

*See, e.g., id.* (c)(3) (the "Secretary shall use an expedited technical capacity review process" for certain qualifying applicants); *id.* (d)(2)(B)(i)-(ii) ("the Secretary shall evaluate, analyze, and consider" certain designated factors in determining whether certain projects are justified); *id.* (f)(2)(A)-(F) ("the Secretary shall consider" certain designated factors when "assessing the stability, reliability, and availability of proposed sources of local financing" for purposes of certain subsections); *id.* (g)(2)(C) ("the Secretary shall not require that any single project justification criterion meet or exceed a 'medium' rating in order to advance the project from one phase to another").

In sum, CTA does not point to a congressional directive that expressly obligates DOT to expend funding on the two grants at issue in this litigation. The ultimate source of CTA's entitlement to these funds are the contracts DOT chose to enter into with the CTA in order to commit the funds to the RPM Program and the RLE Project (and to the extent the CTA has any authority to enforce provisions of 49 U.S.C. § 5309, it has that authority insofar as those provisions are incorporated in the FFGAs as contractual terms). This reality compels the conclusion that the CTA's claims are essentially contractual, regardless of the CTA's attempt to skirt that reality by invoking the Constitution to justify direct enforcement of various regulatory provisions in this court. As such, those claims belong in the Court of Federal Claims, and this court should direct that they be litigated in that forum.

34

## Conclusion

For these reasons, this court should deny plaintiff's motion for a preliminary injunction and dismiss its complaint.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Patrick Johnson
PATRICK JOHNSON
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5327
patrick.johnson2@usdoj.gov